# EXHIBIT 1

# COMMONWEALTH OF VIRGINIA



PORTSMOUTH CIRCUIT COURT
Civil Division
1345 COURT STREET
PORTSMOUTH  VA
(757) 393-8671

Proof of Service

Virginia:
  In the PORTSMOUTH CIRCUIT COURT

Case number: 740CL19000234-00
Service number: 022
Service filed: January 15, 2019
Judge:

Served by: SPECIAL PROCESS SERVER
Style of case: CITY OF PORTSMOUTH vs PURDUE PHARMA  ET AL
Service on: MCKESSON CORPORATION                          Attorney:
            ONE POST STREET
            SAN FRANCISCO CA 94104


Instructions:

Returns shall be made hereon, showing service of Summons issued Friday, January 25, 2019 with a copy of the
Complaint filed Tuesday, January 15, 2019 attached.


Hearing date   :
Service issued:  Friday, January 25, 2019

For Sheriff Use Only

# COMMONWEALTH OF VIRGINIA



PORTSMOUTH CIRCUIT COURT
Civil Division
1345 COURT STREET
PORTSMOUTH  VA
(757) 393-8671

Summons

To: MCKESSON CORPORATION
ONE POST STREET
SAN FRANCISCO CA 94104

Case No. 740CL19000234-00

The party upon whom this summons and the attached complaint are served is hereby notified that unless within 21 days after such service, response is made by filing in the clerk's office of this court a pleading in writing, in proper legal form, the allegations and charges may be taken as admitted and the court may enter an order, judgment, or decree against such party either by default or after hearing evidence.

Appearance in person is not required by this summons.

Done in the name of the Commonwealth of Virginia on, Friday, January 25, 2019

Clerk of Court:  CYNTHIA P. MORRISON

by _____
(CLERK/DEPUTY CLERK)

Instructions:


Hearing Official:


Attorney's name:

VIRGINIA: IN THE CIRCUIT COURT FOR THE CITY OF PORTSMOUTH

CITY OF PORTSMOUTH,

               Plaintiff,

    vs.

PURDUE PHARMA L.P. d/b/a PURDUE PHARMA
(DELAWARE) LIMITED PARTNERSHIP; PURDUE
PHARMA INC.; THE PURDUE FREDERICK
COMPANY, INC.; TEVA PHARMACEUTICALS
USA, INC.; CEPHALON, INC.; COLLEGIUM
PHARMACEUTICAL, INC.; JOHNSON &
JOHNSON; JANSSEN PHARMACEUTICALS, INC.;
ORTHO-MCNEIL-JANSSEN PHARMACEUTICALS,
INC. n/k/a JANSSEN PHARMACEUTICALS, INC.;
ENDO HEALTH SOLUTIONS INC.; ENDO
PHARMACEUTICALS, INC.; ALLERGAN PLC f/k/a
ACTAVIS PLC; ALLERGAN FINANCE, LLC f/k/a
ACTAVIS, INC. f/k/a WATSON
PHARMACEUTICALS, INC.; WATSON
LABORATORIES, INC.; ACTAVIS LLC; ACTAVIS
PHARMA, INC. f/k/a WATSON PHARMA, INC.;
SPECGX LLC; MALLINCKRODT LLC; and INSYS
THERAPEUTICS, INC.,

           Manufacturer Defendants,

    - and -

MCKESSON CORPORATION; CARDINAL
HEALTH, INC.; and AMERISOURCE BERGEN
DRUG CORPORATION,

           Distributor Defendants,

    - and -

JOHN KAPOOR; RICHARD SACKLER; THERESA
SACKLER; KATHE SACKLER; JONATHAN
SACKLER; MORTIMER D.A. SACKLER; BEVERLY
SACKLER; DAVID SACKLER; and ILENE
SACKLER LEFCOURT

           Individual Defendants.

Case No _____

January 11, 2019

RECEIVED
2019 JAN 11  PM 2: 58
CYNTHIA P. MORRISON
CIRCUIT COURT CLERK

## TABLE OF CONTENTS

I.      PRELIMINARY STATEMENT ................................................................................. 1

II.     JURISDICTION AND VENUE .............................................................................. 17

III.    PARTIES ................................................................................................................. 18

        A.     Plaintiff .......................................................................................................... 18

        B.     Manufacturer Defendants............................................................................... 19

        C.     Distributor Defendants................................................................................... 30

        D.     Individual Defendants.................................................................................... 31

IV.     FACTUAL ALLEGATIONS ................................................................................. 33

        A.     The Scientific Basis for Pain-Relieving and Addictive Properties of Opioids..... 33

               1.    Similarity Between Prescription Opioids and Heroin............................... 33

               2.    Biology of Why a Person with a Prescription Opioid Addiction
                     Frequently Turns to Street Drugs............................................................. 38

               3.    Biology of Why a Person with an Opioid Addiction Frequently
                     Turns to Crime ......................................................................................... 40

               4.    Lack of Evidence that Long-Term Opioid Use Was a Valid Pain
                     Treatment .................................................................................................. 41

        B.     Campaign of Misinformation and Unlawful Conduct by Manufacturer
               Defendants ..................................................................................................... 43

               1.    Summary of Manufacturer Defendants' Disinformation Campaign ........ 43

               2.    False Messaging........................................................................................ 44

                     a.     Drug Companies Must Deal Honestly with Patients,
                            Consumers, and Governmental Payors ......................................... 44

                     b.     Falsehood: No Upper Limit on Amount of Opioids to
                            Consumer ...................................................................................... 47

                     c.     Falsehood: Opioids Are the Optimal Solution for Pain................ 52

                     d.     Falsehood: The Promise of a Pain-Free Life and Vigorous
                            Existence ....................................................................................... 53

*i*

e.    Falsehood: Tapering Is an Effective Way to Manage Any Withdrawal................................................................................. 54

f.    Falsehood: Pseudoaddiction......................................................... 55

3.    Means of Disinformation ......................................................................... 57

a.    Unsupported Research .................................................................. 59

b.    Key Opinion Leaders .................................................................... 64

c.    Continuing Medical Education ..................................................... 67

d.    Treatment Guidelines................................................................... 69

    (i)    Federation of State Medical Boards.................................. 69

    (ii)    AAPM/APS Guidelines ..................................................... 70

    (iii)    American Geriatrics Society ............................................. 72

e.    Front Groups and Unbranded Advertising.................................... 73

    (i)    APF's Role as a Front Group for Defendants' Deceptive Marketing........................................................ 74

    (ii)    The Role of Other Front Groups in Defendants' Deceptive Marketing........................................................ 76

f.    Defendants Inappropriately Used Their Sales Force and "Speakers Bureaus" to Unfairly and Deceptively Promote Use of Their Drugs.......................................................................... 78

g.    Direct-to-Consumer Marketing..................................................... 83

    (i)    The Elderly......................................................................... 84

    (ii)    Veterans ............................................................................. 85

4.    Purdue-Specific Misrepresentation: The 12-Hour Dosing Lie ................. 88

5.    Insys-Specific Misrepresentation............................................................. 90

6.    Actavis-Specific Misrepresentation.......................................................... 93

7.    The Sackler Family Defendants Control and Direct Purdue's Misconduct................................................................................................ 94

8.   Guilty Pleas and Prior Attorney General Settlements with Certain Defendants in Connection with Improper Opioid Marketing .................. 95

   a.   Purdue's 2007 Guilty Plea for OxyContin Marketing Misrepresentations ........................................................ 95

   b.   Cephalon Enters a Criminal Plea for Off-Label Marketing of Actiq. ...................................................................... 97

   c.   Purdue's 2015 Settlement with the New York Attorney General ........................................................................... 98

   d.   Endo's 2016 Settlement with the New York Attorney General ........................................................................... 100

   e.   Mallinckrodt's 2017 Settlement with the DEA and U.S. Attorneys ...................................................................... 101

9.   Summary of Manufacturer Defendants' Unlawful Marketing Claims and Practices .............................................................. 103

C.   Unlawful Conduct of Distributor Defendants ..................................................... 127

D.   Defendants Are Estopped from Asserting Statute of Limitations or Laches Defenses ............................................................................................................ 135

1.   The Manufacturer Defendants Fraudulently Concealed Their Misconduct .............................................................................. 135

2.   Distributor Defendants Concealed Their Violations of State Statutory and Common Law .......................................................... 138

3.   The Statute of Limitations and Laches Doctrine Do Not Apply Here .......................................................................................... 139

E.   Damages to the City of Portsmouth ..................................................................... 141

1.   Nuisance Abatement Expenditures ...................................................... 142

2.   Overdose-related Deaths ..................................................................... 144

   a.   The State of Virginia ................................................................. 144

   b.   City of Portsmouth .................................................................... 146

3.   Increased Hospitalizations and Related Health Care Costs ................... 147

4.   Neo-Natal Care Costs ......................................................................... 148

5.     Direct Purchases of Opioids and Related Costs ...................................... 149

6.     Expenses Related to Opioid Education and Training ............................. 151

7.     Emergency Treatment Costs .................................................................... 151

8.     Law Enforcement Costs .......................................................................... 152

9.     Diversion Costs ....................................................................................... 154

10.    Community Outreach Expenses ............................................................... 154

V.      CAUSES OF ACTION ................................................................................................ 156

PRAYER FOR RELIEF .................................................................................................... 170

JURY DEMAND ................................................................................................................ 171

## COMPLAINT

1.    Plaintiff, City of Portsmouth, Virginia, with offices located at 801 Crawford Street, Portsmouth, VA 23704, alleges as follows:

## I.    PRELIMINARY STATEMENT

2.    Many communities across the United States, including the City of Portsmouth, Virginia ("Plaintiff," "City," and "City of Portsmouth"), are currently experiencing a stark increase in the numbers of residents who have become addicted to prescription opioids and heroin, and a stark increase in opioid overdoses.  Prescription opioids are now known to be the "gateway" drug to heroin; approximately 80% of current heroin users got their start with prescription opioids.[1]  Unlike any other epidemic, the opioid epidemic is not natural, nor typical, but largely man-made.  It has been created, fueled, and continues to expand by the persistent unlawful conduct of the defendant pharmaceutical manufacturers ("Manufacturer Defendants"), pharmaceutical wholesale distributors ("Distributor Defendants"), and of individual board members and pharmaceutical company executives ("Individual Defendants") who put profits over the public health.  The epidemic continues to expand.

3.    A pharmaceutical manufacturer should never place its desire for profits above the health and well-being of its customers.  Drug manufacturers have a legal duty to ensure that their products are accompanied by full and accurate instructions and warnings to guide prescribing doctors and other healthcare providers in making treatment decisions.    Pharmaceutical manufacturers have legal duties to tell the truth when marketing their drugs and to ensure that

---

[1]    *Prescription Opioids and Heroin: Prescription Opioid Use is a Risk Factor for Heroin Use*, NAT'L INST. ON DRUG ABUSE, https://www.drugabuse.gov/publications/research-reports/relationship-between-prescription-drug-heroin-abuse/prescription-opioid-use-risk-factor-heroin-use (last updated Jan. 2018).

their marketing claims are supported by science and medical evidence. A pharmaceutical distributor of controlled substances has a legal duty to conduct its business lawfully, carefully, and in a manner that does not irresponsibly and unreasonably saturate a community with opioids. Executives of pharmaceutical companies, such as Individual Defendants (defined below), have a legal obligation to ensure that their company conducts itself in a manner compliant with the law that is designed to protect rather than harm patients. Defendants broke these simple rules.

4.      Manufacturer Defendants (collectively consisting of Defendants Purdue Pharma L.P. d/b/a Purdue Pharma (Delaware) Limited Partnership; Purdue Pharma Inc.; The Purdue Frederick Company, Inc.; Teva Pharmaceuticals USA, Inc.; Cephalon, Inc.; Collegium Pharmaceutical, Inc.; Johnson & Johnson; Janssen Pharmaceuticals, Inc.; Ortho-McNeil-Janssen Pharmaceuticals, Inc. n/k/a Janssen Pharmaceuticals, Inc.; Endo Health Solutions Inc.; Endo Pharmaceuticals, Inc.; Allergan plc f/k/a Actavis plc; Allergan Finance, LLC f/k/a Actavis, Inc. f/k/a Watson Pharmaceuticals, Inc.; Watson Laboratories, Inc.; Actavis LLC; Actavis Pharma, Inc. f/k/a Watson Pharma, Inc.; SpecGx LLC; Mallinckrodt LLC; and Insys Therapeutics, Inc.) knew that opioids were effective treatments for short-term use, such as post-surgical and trauma-related pain, and for end-of-life care. They also knew, or reasonably should have known, that prescription opioids were addictive and subject to abuse, particularly when used over prolonged periods, and should be used, if at all, as a last resort. Defendants[2] also knew, or reasonably should have known, that with prolonged use, the effectiveness of opioids decreases, requiring dosage increases to reduce pain, thereby increasing the risk of significant side effects and addiction. Defendants also knew that there were no clinical trial results in existence that showed

---

[2]      "Defendants" collectively include Manufacturer Defendants, Distributor Defendants (further defined below), and the Individual Defendants.

that opioids were safe for long-term treatment of chronic pain, although they falsely represented that the safety of such drugs for long-term use had been authoritatively established.

5.    Prior to the mid-1990s, medical orthodoxy rejected the use of opioids as an accepted modality for the long-term treatment for chronic pain.   The U.S. Food and Drug Administration ("FDA") has expressly recognized that there have been no long-term studies demonstrating the safety and efficacy of opioids for long-term use.[3]

6.    In order to expand their market for opioids and realize blockbuster profits, Manufacturer Defendants needed to create a fundamental change in medical orthodoxy and public perception that would make opioids a permissible and even the preferred treatment modality, not just for acute and palliative care, but also for long-term treatment of everyday aches and pains, like lower back pain, arthritis, headaches, and sports injuries.

7.    Since the mid-1990s, the Manufacturer Defendants, led by Purdue (defined below), have engaged in a scheme to boost sales for their prescription opioid products by upending medical orthodoxy and popular belief regarding the safety and efficacy of long-term opiate use.  Defendants accomplished this reversal by falsely exaggerating the safety of opioid use and recklessly and negligently, and with wanton disregard for the public health, denying or trivializing the risk of addiction.

8.    In furtherance of their scheme, each Manufacturer Defendant expended millions of dollars and used the following unethical and unlawful methods to disseminate misinformation regarding the safety and efficacy of long-term opioid use for pain management treatment, including:

---

[3]    Janet Woodcock, *FDA/CDER Response to Physicians for Responsible Opioid Prescribing – Partial Petition Approval and Denial*, REGULATIONS.GOV (Sept. 10, 2013) (*available at* https://www.regulations.gov/document?D=FDA-2012-P-0818-0793).

(a)     paying off doctors, known as Key Opinion Leaders ("KOLs"), to give speeches and write misleading studies advocating the advantages of prescription opioids and present deceptive continuing medical education programs ("CMEs") promulgating the message to fellow physicians that opioids were a risk-free and safe treatment modality that was the most effective for most, if not all, types of pain;

(b)     promoting the use of opioids for chronic pain through sales representatives, also called "detailers," whose jobs involved visiting individual physicians and their staff in their offices and setting up small group speaker programs. By establishing close relationships with doctors, the sales representatives were able to disseminate their misrepresentations in targeted one-on-one settings that allowed them to address and dispel individual prescribers' reservations about prescribing opioids for chronic pain. Representatives were trained on techniques to build these relationships, with Manufacturer Defendant Actavis (defined below) even rolling out an "Own the Nurse" kit as a "door opener" to time with doctors. Using the detailers as "foot soldiers" in the misinformation campaign, the Manufacturer Defendants were able to address individual prescribers' concerns about prescribing opioids for chronic pain and push higher doses of the opioids, thereby driving up revenue.

(c)     twisting scientific literature; most notably, transforming a five-sentence letter written to the New England Journal of Medicine in 1980 by Doctor Hershel Jick and his graduate assistant, Jane Porter (the "Porter/Jick Letter"), regarding the relative safety of short-term opioid use by patients in a medical setting, into a false assertion (cited more than 900 times) that long-term opioid use in a non-medical setting has been proven to be "safe" and non-addictive;

4

(d)    infiltrating medical societies and CMEs with the false information that chronic pain could and should be safely treated with prescription opioids;

(e)    using non-branded advertisements (that promote opioids generally, rather than any particular brand), which advertisements are not regulated by the FDA, to falsely promise relief from pain with no harmful side-effects from opioids;

(f)    providing front groups with tens of millions of dollars and giving them official-sounding names, such as "American Pain Foundation," to disseminate the falsehood that addiction is a very minor and easily handled risk of prescription opioids; and

(g)    influencing consumers and the lay public through magazine articles, newspaper stories, TV programs, etc., featuring KOLs and front groups regarding the falsely described advantages of opioids for chronic pain, with the specific intention and effect of recruiting patients to demand opioids from their treating physicians.

9.    Defendants' actions are not permitted or excused by the fact that the FDA did not require that their products' labels specifically exclude the use of opioids for chronic pain. Accurate content on a label of a pharmaceutical product is squarely the responsibility of the manufacturer. The FDA's approval of their drugs for narrowly defined applications did not entitle Defendants to misrepresent the risks, benefits, or superiority of opioids. In fact, unlike any other prescription drugs that may have been marketed unlawfully in the past, opioids are highly addictive controlled substances. Thus, Manufacturer Defendants deceptively engaged – and in many instances profoundly harmed – a patient base that by definition was not able, biologically, to turn away from the drugs. These drugs would never have been prescribed in the first place, but for the Manufacturer Defendants' unlawful scheme.

5

10.    Defendants' causal role is also not broken by the involvement of legitimate doctors writing opioid prescriptions for their patients. Defendants' ubiquitous marketing efforts and their deceptive messages tainted virtually every information source doctors could rely on and prevented these doctors from making informed treatment decisions. Defendants even infiltrated CME courses, which were attended by physicians who reasonably expected the information they received from the presenters of the CMEs to be a fair and accurate reporting of the most current pain management practices. The CME courses are given with the expectation that physicians, including general practice doctors, can rely on the information presented. Unbeknown to the attendees of the CMEs, much of the curricula were corrupted by Defendants' influence: among other things, the CME presentations exaggerated the benefits and minimized the risks of opioids, while exaggerating the risks and minimizing the benefits of other pain treatment modalities Defendants targeted not only pain specialists, but also primary care physicians, nurse practitioners, physician assistants, and other non-pain specialists, who were even less likely to be able to assess the companies' misleading statements.

11.    To the huge detriment of the public health of Americans, Virginia residents, and residents of the City of Portsmouth, the scheme of the Manufacturer Defendants (which was well-funded, well-organized, and pervasive) was extremely successful. In just a few years, the Manufacturer Defendants managed to jettison decades of well-established and sound medical orthodoxy holding that prescription opioids are far too addictive and potentially debilitating to be used to treat chronic pain. Manufacturer Defendants individually, and working together through their front groups and KOLs, persuaded doctors, patients, and even hospitals that what they had long known – that opioids are addictive drugs, unsafe in most circumstances for long-term use –

was no longer true, and that the opposite, that the compassionate treatment of pain *required* opioids, the most superior pain management protocol, was the new truth.

12.     For example, the Manufacturer Defendants, acting through one of their front groups, the American Pain Society, successfully introduced the "Pain as the Fifth Vital Sign" factor, which, along with respiration rate, body temperature, blood pressure, and pulse rate, is now considered to be a "vital sign" upon which doctors and emergency room personnel assess patients.[4] The Pain as a Fifth Vital Sign campaign was adopted by the Veterans Administration and the Joint Commission (responsible for accreditation of hospitals), both of whom had extensive financial relationships with Purdue at the time of the roll-out of the campaign.

13.     The profits of the Manufacturer Defendants skyrocketed.   Opioid sales have steadily risen, from $3.8 billion in 2000 to $8 billion in 2010 to $9.6 billion in 2015.  Purdue has earned more than *$35 billion* in opioid profits since 1996, including more than $3 billion in 2015 (from $800 million in 2006).  Purdue's OxyContin sales rose from $45 million in 1996 to $3.1 billion in 2010.  Endo Pharmaceuticals has gained a tremendous amount of revenue from opioid sales as well, reaping over $1 billion from Opana ER alone in 2010 and again in 2013.

14.     The sales push for greater volume of prescription writing by Manufacturer Defendants came at a lethal cost.  A patient who receives three months of prescribed opioids is *30 times* more likely to die from an overdose than a person selected randomly from the general population.  A patient who stays on prescription opioids for 6-11 months is *46 times* more likely

---

[4]     *See* Natalia E. Morone & Deborah K. Weiner, *Pain as the 5th Vital Sign: Exposing the Vital Need for Pain Education*, 35 CLINICAL THERAPEUTICS 1728, 1729 (2013).  In 2016, the American Medical Association recommended removing pain as the fifth vital sign.  *See* Joyce Frieden, *Remove Pain as 5th Vital Sign, AMA Urged*, MEDPAGE TODAY (June 13, 2016), https://www.medpagetoday.com/meetingcoverage/ama/58486 ("'Just as we now know earth [is] not flat, we know that pain is not a vital sign.'").

to die.  Devastatingly, a patient who stays on prescription opioids for a year is *51 times* more likely to die.  The three Distributor Defendants (collectively consisting of Defendants McKesson Corporation, Cardinal Health Inc., and AmerisourceBergen Drug Corporation) dominate 85-90% of the market share of prescription opioid distribution in the United States.[5]   Each wholesale distributor has a common law duty to conduct the business of distributing dangerous drugs in a reasonable and safe manner.  In order to fulfill this duty, Distributor Defendants must carefully monitor the wholesale orders that they receive and, where appropriate, refuse to fill such orders. Because Distributor Defendants are uniquely positioned to oversee the marketplace for the dangerous opioids they distribute, their common law duty of due care may in some cases require that they report suspicious actions to appropriate law enforcement authorities.

15.    Distributor Defendants' common law duty to conduct their dangerous – and highly profitable – business in a safe and reasonable manner is mirrored in both Virginia and federal laws and regulations that emphasize the seriousness of Distributor Defendants' responsibilities.  The Virginia Drug Control Act requires that manufacturers and wholesale distributors of controlled substances annually obtain controlled substances registration certificates issued by the Virginia Board of Pharmacy. Va. Code Ann. §§54.1-3422, 54.1-3435.01(A) (2018).  As under federal law, opioids are Schedule II controlled substances under Virginia law.  *Id.* §54.1-3448.

16.    Like the Virginia Drug Control Act, the 1970 Controlled Substances Act ("CSA"), 21 U.S.C. §§801 *et seq.*, requires wholesale distributors of "controlled substances" (all of the prescription opioids involved in the opioid epidemic and listed in Tables 1-9, *infra,* are

---

[5]    Adam J. Fein, *2016 MDM Market Leaders/Top Pharmaceutical Distributors*, MDM, https://www.mdm.com/2016-top-pharmaceuticals-distributors (last visited Jan. 2, 2018).

either Schedule II or III controlled substances) to register with the U.S. Drug Enforcement Administration ("DEA") to be approved as vendors of controlled substances. *See* 21 U.S.C. §§821-30; Va. Code Ann. §54.1-3422(A); 18 Va. Admin. Code 110-50-30(D).

17.    Recognizing the foreseeability of the harms that can arise from the careless distribution of opioids, as well as Distributor Defendants' unique ability to maintain the integrity of the prescription opioid supply chain through the exercise of reasonable care, the CSA requires that such distributors "report to [the] DEA suspicious orders for controlled substances and to take other precautions to ensure that those medications would not be diverted into illegal channels." *Masters Pharm., Inc. v. DEA*, 861 F.3d 206, *211-12 (D.C. Cir. 2017); 21 C.F.R. §1301.74. Similarly, Va. Code Ann. §54.1-3435(F) requires every wholesale distributor to "comply with federal requirements for an electronic, interoperable system to identify, trace, and verify prescription drugs as they are distributed." *See also* Va. Code Ann. §54.1-3435.01(H) (same requirement for nonresident wholesale distributors).

18.    In fact, Virginia law establishes -- with even greater specificity than is found in the CSA -- the requirement that suspicious orders (defined as unusual in size or frequency or deviation from buying patterns) be reported to the Virginia Board of Pharmacy:

> A wholesale distributor that ceases distribution of Schedule II through V drugs to a pharmacy, licensed physician dispenser, or licensed physician dispensing facility located in the Commonwealth due to suspicious orders of controlled substances shall notify the Board within five days of the cessation. For the purposes of this section, "suspicious orders of controlled substances" means, relative to the pharmacy's, licensed physician dispenser's, or licensed physician dispensing facility's order history and the order history of similarly situated pharmacies, licensed physician dispensers, or licensed physician dispensing facilities, (i) orders of unusual size, (ii) orders deviating substantially from a normal pattern, and (iii) orders of unusual frequency.

Va. Code Ann. §54.1-3435(B); *see also* Va. Code Ann §54.1-3435.01(D) (same requirement for nonresident wholesale distributors).

9

19.    The Virginia Board of Pharmacy also requires that wholesale distributors "establish and maintain . . . inventories and records of all transactions, including the dates of receipt and distribution or other disposition or provision, and records related to the federal requirements for an electronic, interoperable system to identify, trace, and verify prescription drugs as they are distributed", and that, as a minimum requirement of wholesale distribution in Virginia, that distributors "provide and maintain appropriate inventory controls in order to detect and document any theft, counterfeiting, or diversion of prescription drugs." 18 Va. Admin. Code §§110-50-90, 110-50-130 (2018).

20.    These statutes and regulations reflect society's considered judgment that Distributor Defendants are the entities best positioned to monitor and control the opioid distribution network in a manner that does not unnecessarily endanger the public. Accordingly, in breaching its common law duty of due care, each Distributor Defendant *also* utterly failed to discharge its non-delegable regulatory and statutory obligations under Commonwealth Law (Va. Code Ann. §54.1-2400, Va. Code Ann. §54.1-3300, Va. Code Ann. §§54.1-3400-3472, 18 Va. Admin. Code §110-50-10 *et seq.*) and the CSA to maintain and monitor a closed chain of distribution, and to detect, report, inspect, and halt suspicious orders, so as to prevent the diversion of controlled substances, and to protect the public as required under state and federal law. The direct and foreseeable result of the Distributor Defendants' unlawful conduct is that many communities, including the City of Portsmouth, have been flooded with an excess supply of pharmaceutical opioids.

21.    Each Distributor Defendant has been investigated and fined by the DEA for failing to:

(a)    operate its mandatory internal oversight system in good faith;

10

     (b)     report suspicious orders to the DEA; and

     (c)     halt the shipment of "suspicious orders for controlled substances" when they were discovered.

22.     McKesson Corporation, the largest wholesale distributor in the United States, agreed on January 17, 2017 to pay a $150 million fine to the U.S. Department of Justice ("DOJ") for its violations of the CSA.[6]

23.     In late December 2016, Cardinal Health, Inc. ("Cardinal") agreed to a $34 million fine to "resolve allegations that [it] failed to report to the DEA suspicious orders of Class II [powerful narcotics] by pharmacies located in Central Florida and Maryland."[7]  This is the second settlement in less than a decade in which Cardinal has agreed to allegations by the federal government that it failed to report suspicious opioid orders.

24.     Cardinal settled a lawsuit initiated by the State of West Virginia for $20 million, which alleged violations of the CSA that are similar to its violations in the State of Virginia.[8] AmerisourceBergen Drug Corporation also agreed to pay West Virginia $16 million for settlement of the same litigation. *See id.*

---

[6]     *See* News Release, US DOJ, Office of Public Affairs, *McKesson Agrees to Pay Record $150 Million Settlement for Failure to Report Suspicious Orders of Pharmaceutical Drugs* (Jan. 17, 2017) (available at https://www.justice.gov/opa/pr/mckesson-agrees-pay-record-150-million-settlement-failure-report-suspicious-orders).

[7]     *See* News Release, US Attorney's Office of the Middle District of Florida, *United States Reaches $34 Million Settlement with Cardinal Health for Civil Penalties Under the Controlled Substances Act* (Dec. 23, 2016) (available at https://www.justice.gov/usao-mdfl/pr/united-states-reaches-34-million-settlement-cardinal-health-civil-penalties-under).

[8]     Eric Eyre, *2 Drug Distributors to Pay $36M to Settle WV Painkiller Lawsuits*, CHARLESTON GAZETTE-MAIL (Jan. 9, 2017), https://www.wvgazettemail.com/news/health/drug-distributors-to-pay-m-to-settle-wv-painkiller-lawsuits/article_b43534bd-b020-5f56-b9f3-f74270a54c07.html; *See State ex rel. Morrisey v. AmerisourceBergen Drug Corp.*, No. 12-C-141 (W.Va.Cir.Ct.).

25.     The explosion in opioid use and abuse, along with the corresponding explosion in profits for the Defendants, was not due to a medical breakthrough in pain treatment. Instead, it was due in substantial part – as the National Institutes of Health ("NIH") recognizes – to the "aggressive marketing" of Defendants. The NIH stated:

> Several factors are likely to have contributed to the severity of the current prescription drug abuse problem. They include drastic increases in the number of prescriptions written and dispensed, greater social acceptability for using medications for different purposes, and aggressive marketing by pharmaceutical companies.[9]

26.     Over the last two decades, as the sales of opioids increased, so too did deaths and hospitalizations caused by opioids.[10]

27.     Starting in or about 1996 – coinciding with a rapid increase in prescription opioid use for medical purposes – the United States has experienced an opioid epidemic that has been characterized as the worst drug epidemic in its history. An epidemic is defined as a sharp increase in the prevalence of a disease (or diseases) within a discreet period of time.[11]  The principal disease associated with the opioid epidemic is opioid addiction, sometimes referred to as "opioid use disorder" or "opioid abuse or dependence."

---

[9]     *America's Addiction to Opioids: Heroin and Prescription Drug Abuse: Hearing Before the U.S. S. Caucus on Int'l. Narcotics Control*, 113th Cong. 2 (2014) (testimony of Nora D. Volkow, M.D., Director, National Institute on Drug Abuse), available at https://www.drugcaucus.senate.gov/sites/default/files/Volkow%20Testimony.pdf.

[10]    Andrew Kolodny, *et al.*, *The Prescription Opioid and Heroin Crisis: A Public Health Approach to an Epidemic of Addiction.*, 36 ANNU. REV. PUB. HEALTH 559 (2015), available at http://www.annualreviews.org/doi/pdf/10.1146/annurev-publhealth-031914-122957.

[11]    U.S. DEP'T OF HEALTH AND HUMAN SERVS., CTRS. FOR DISEASE CONTROL AND PREVENTION, *Principles of Epidemiology in Public Health Practice, An Introduction to Applied Epidemiology and Biostatistics* 1-72 (3d ed. 2012), available at https://www.cdc.gov/ophss/csels/dsepd/ss1978/ss1978.pdf [hereinafter "Volkow Testimony"].

28.     The 2016 Guidelines issued by the U.S. Centers for Disease Control and

Prevention ("CDC"), *Guideline for Prescribing Opioids for Chronic Pain* (the "2016 CDC

Guidelines"), is a peer-reviewed guideline that is based on scientific evidence.  It has defined

"opioid addiction," "opioid use disorder," and "opioid abuse or dependence" as a "problematic

pattern of opioid use leading to clinically significant impairment or distress . . . manifested by

specific criteria such as unsuccessful efforts to cut down or control use and use resulting in social

problems and a failure to fulfill major role obligations at work, school, or home."[12]

29.     Opioid addiction, like other forms of addiction, is a chronic medical condition.  It

is treatable, but not curable.  Unfortunately, for a variety of reasons, including a shortage of and

limitations on resources, the presence of shame and stigma, and the presence of barriers to

treatment, only a small percentage of patients who need treatment actually receive the right types

of treatment and levels of care, in the right settings, for the right lengths of time.  In the absence

of proper treatment, the disease of addiction is progressive and frequently fatal.  Even with

optimal treatment for the optimal time at the optimal setting, opioid addiction tends to be a

relapsing disease.

30.     According to the CDC, the opioid addiction has led to an epidemic in opioid

overdoses, which, in turn, has led to an increase in opioid fatalities.  In the period from 1994 to

---

[12]     Deborah Dowell, *et al.*, *CDC Guideline for Prescribing Opioids for Chronic Pain –
United States, 2016*, 65 MORBIDITY AND MORTALITY WKLY. REP. 1, 2 (2016),
https://www.cdc.gov/mmwr/volumes/65/rr/pdfs/rr6501e1.pdf.  The current diagnostic manual
used by most behavioral health professionals, DSM-V, uses the term "opioid use disorder" to
refer to and define what has in the past essentially been referred to as opioid addiction. In this
Complaint, Plaintiff will generally use the term "addiction" to refer to opioid use disorder, opioid
addiction, and opioid abuse or dependence, unless context dictates otherwise.  These diagnoses
are "different from tolerance (diminished response to a drug with repeated use) and physical
dependence (adaptation to a drug that produces symptoms of withdrawal when the drug is
stopped)." *Id.*

13

2014, the CDC estimated that there were 165,000 overdose deaths in the United States associated with prescription opioid use.[13] Public health authorities estimate that, for every opioid overdose death, there are 30 non-fatal overdoses.[14] Thus, in the period from 1999 to 2014, an estimated 5 million non-fatal opioid overdoses were also likely to have occurred. Of course, there are also untold tens of thousands of people who are seriously impaired in their ability to function in society by the disease of opioid addiction, but do not necessarily experience overdoses.

31. In 2016, the CDC acknowledged the existence of two opioid epidemics involving addiction and overdoses. Also in 2016, the President of the United States declared that an opioid and heroin epidemic exists in America.[15] On November 21, 2016, Virginia Health Commissioner, Marissa Levine, declared that a public health emergency resulting from opioid addiction existed in the Commonwealth, affecting the health and safety of Virginians. That emergency continues to exist.

32. The direct correlation between increases in sales of prescription opioids and opioid addiction and overdoses prompted the CDC and other public health authorities to conclude that the principal cause of both opioid epidemics was the unprecedented increase in use of prescription opioids.[16] The CDC gathered data relating to prescription opioid usage using

---

[13]     *Id.* at 2, 18.

[14]     Andrea Hsu, *Hospitals Could Do More for Survivors of Opioid Overdoses, Study Suggests*, NPR (Aug. 22, 2017), http://www.npr.org/sections/health-shots/2017/08/22/545115225/ hospitals-could-do-more-for-survivors-of-opioid-overdoses-study-suggests.

[15]     Dowell, *et al., supra* n.12 at 3, 34; *accord* Press Release, Ctrs. for Disease Control and Prevention, CDC Launches Campaign to Help States Fight Prescription Opioid Epidemic (Sept. 25, 2017) (available at https://www.cdc.gov/media/releases/2017/p0925-rx-awareness-camp aigns.html) (recognizing "opioid epidemic"); *see* Proclamation No. 9499, 81 Fed. Reg. 65173 (Sept. 16, 2016) (proclaiming "Prescription Opioid and Heroin Epidemic Awareness Week").

[16]     Dowell, *et al., supra* n.12 at 2.

sales of prescription opioids as a measure of prescription opioid usage, and correlated this data with data relating to admissions for treatment of opioid use disorders and overdose deaths. Using this data and analyses, the CDC and other researchers concluded that the daily use of prescription opioids to treat chronic pain has been the principal causative factor driving both epidemics in opioid addiction and overdoses.[17]

33.     Public health authorities have also concluded that prescription opioid use is responsible not only for the addiction and overdose epidemics relating directly to prescription opioids, but also for the multi-year surge in non-prescription, illegal opioid use, including the use of heroin and fentanyl.   As law enforcement, public health authorities, and the medical profession have begun to limit the improper use of prescription opioids, along with other reasons (including the high price of prescription opioids), the supply of prescription opioids for legal use has diminished, many prescription opioid users suffering from opioid addiction have turned to heroin available on the black market.[18]

34.     As the profits of the Defendants have increased year-after-year, so, too, have the numbers of substance abuse treatment admissions and overdose deaths in the Commonwealth of Virginia and the City of Portsmouth.   Statewide, 1,227 people died due to an opioid overdose in

---

[17]     *Id.*

[18]     Approximately 80% of individuals who begin using heroin made the transition from initial prescription opioids. Andrew Kolodny, *et al.*, *The Prescription Opioid and Heroin Crisis: A Public Health Approach to an Epidemic of Addiction*, 36 ANNU. REV. PUB. HEALTH 559 (2015), available at https://www.annualreviews.org/doi/full/10.1146/annurev-publhealth-031914-122957?url_ver=Z39.88-2003&rfr_id=ori%3Arid%3Acrossref.org&rfr_dat=cr_pub%3Dpubmed; *accord* THE MAYOR'S TASK FORCE TO COMBAT THE OPIOID EPIDEMIC IN PHILADELPHIA: FINAL REPORT AND RECOMMENDATIONS 7 (2017), http://dbhids.org/wp-content/uploads/2017/05/OTF_Report.pdf.

2017, an increase of almost 8% over the previous year.[19]  In 2017 alone, Portsmouth medical responders and police administered emergency medical treatment to 210 opioid overdose victims, 30 of whom fatally overdosed.[20]  Portsmouth, like the Commonwealth of Virginia, has experienced a public health crisis from the skyrocketing opioid addiction and opioid-related overdoses and deaths, as well as the ensuing devastating social and economic consequences. This public health crisis is a public nuisance to the City because it constitutes unreasonable interference with, and injury to, the public health, safety, peace, and welfare of its citizens and the community as a whole.

35.    The catastrophic effects of each Manufacturer Defendant's unlawful deceptive marketing scheme and each Distributor Defendant's wanton, willful, reckless, and negligent violation of its statutory and common law gatekeeping role to ensure the supply of opioids into communities be maintained at safe levels, are only getting worse.

36.    The Manufacturer Defendants' scheme of deception and the Distributor Defendants' failure to conduct their business in a lawful and reasonable manner in compliance with state common law and state and federal statutory law have flooded the City with opioids and created a greatly increased number of opioid addicted individuals that has strained the City's resources to cope with the epidemics.  In addition to the enormous costs to the City's ability to provide traditional municipal services, the City has also been forced to create and fund (both directly and indirectly) collaborative interventions to respond to the epidemics, including without limitation, naloxone programs, "take-back" events, opioid prevention summits, and the Hampton

---

[19]    Margaret Matray, *Last Year, 230 People Died from Opioid Overdoses in Hampton Roads. But the Number Dipped from 2016*, VIRGINIAN-PILOT (May 19, 2018) https://pilotonline.com/news/local/crime/article_1b387cf8-594e-11e8-bf9f-77016ae24486.html.
[20]    *Id.*

Roads Opioid Working Group. *See generally* ¶¶423-70. These programs, and others, are well beyond the scope of what has ever been considered a municipal service.

37.    Plaintiff brings this lawsuit to enjoin the violations of all the Defendants, obtain damages for the monies it has been forced to expend as a result of the Defendants' wrongful conduct, and require Defendants to abate the public nuisance they created.

38.    Defendants' conduct has violated and continues to violate the Virginia Consumer Protection Act of 1977 ("VCPA"). Va. Code. Ann. §§59.1-196 – 207 (2018). Additionally, Defendants' conduct constitutes a common law public nuisance, common law fraud, negligent misrepresentation, negligence, and has resulted, and continues to result, in unjust enrichment. Plaintiff does not allege that any product was defective and expressly does not bring product liability claims.

39.    To redress and enjoin Defendants' previous and continuous violations of the law, the City of Portsmouth brings this action seeking injunctive relief, abatement, restitution, damages, treble damages, disgorgement of unlawful profits, civil penalties, attorneys' fees and costs permitted by law and equity.

## II.    JURISDICTION AND VENUE

40.    This Court has subject matter jurisdiction over this matter pursuant to Va. Code Ann. §17.1-513.

41.    This Court has personal jurisdiction over each Defendant pursuant to Va. Code Ann. §8.01-328.1 because each Defendant carries on a continuous and systematic part of its general business within Virginia, has transacted substantial business with Virginia entities and residents, has contracted to supply services or things in Virginia, and has caused harm in Virginia as a result of the specific business activities complained of herein.



42.    Venue is proper in this Court pursuant to Virginia Code §8.01-262 because Plaintiff is located in Portsmouth, Virginia, Defendants regularly conduct substantial business activity within Portsmouth, Virginia, and Defendants' actions in Portsmouth, Virginia gave rise to the causes of action alleged herein.

## III.    PARTIES

### A.    Plaintiff

43.    Plaintiff, City of Portsmouth, is a municipal corporation duly charted and existing under the laws of the Commonwealth of Virginia, with the Portsmouth City Council serving as its governing body.  The City of Portsmouth derives its governmental powers from its legislative charter and from the general laws of the Commonwealth of Virginia.

44.    The City provides many municipal services that are designed to foster the safety, health, and well-being of its residents, including: police, fire, and first responder services; law enforcement services; public health, safety and assistance services for families, youth, veterans, and persons in need; and public parks, libraries and recreational activities.  Due to the severity and nature of the public nuisance created and fueled by Defendants' wrongful conduct, the City has been forced to expend enormous amounts of taxpayer dollars to meet the needs of its citizens and its integrity as a City, to provide many services that are well beyond those traditionally considered to be municipal services in order to address the opioid epidemic, thereby diverting tax dollars away from other resources.

45.    Plaintiff, City of Portsmouth, is a 47-square mile independent city located in the heart of the Hampton Roads metropolitan area.  Portsmouth's population as of the 2010 census was 95,535.  Various industries, including the United States military, manufacturing, retail, and educational and healthcare services comprise a large portion of Portsmouth's economy.

46.     The City of Portsmouth self-insures for medical and health insurance for its employees and retirees, as well as for workers' compensation insurance for all of its employees.

47.     The City brings this action on its own behalf, and expressly disclaims that it is seeking any damages on behalf of the residents of the City of Portsmouth.

### B.     Manufacturer Defendants

### Defendants Purdue Pharma L.P. d/b/a Purdue Pharma (Delaware) Limited Partnership, Purdue Pharma Inc., and The Purdue Frederick Company, Inc. ("Purdue")

48.     Defendant Purdue Pharma L.P., ("PPL") registered and doing business in Virginia as Purdue Pharma (Delaware) Limited Partnership, is a limited partnership organized under the laws of Delaware with its principal place of business in Stamford, Connecticut.

49.     Defendant Purdue Pharma Inc. ("PPI") is a New York corporation with its principal place of business in Stamford, Connecticut.

50.     Defendant The Purdue Frederick Company, Inc. ("PFC") is a New York corporation with its principal place of business in Stamford, Connecticut.

51.     PPL, PPI, and PFC (collectively, "Purdue") are engaged in the manufacture, promotion, distribution, and sale of opioids nationally and in the City of Portsmouth, including the following:

**Table 1 - Purdue Opioids**

| Drug Name | Chemical Name |
|---|---|
| OxyContin | Oxycodone hydrochloride extended release |
| MS Contin | Morphine sulfate extended release |
| Dilaudid | Hydromorphone hydrochloride |
| Dilaudid-HP | Hydromorphone hydrochloride |
| Butrans | Buprenorphine |
| Hysingla ER | Hydrocodone bitrate |
| Targiniq ER | Oxycodone hydrochloride and naloxone |

19

52.    OxyContin is Purdue's largest-selling opioid.   Since 2009, Purdue's national annual sales of OxyContin have fluctuated between $2.47 billion and $3.1 billion, up three-fold from 2006 sales of $800 million.  OxyContin constitutes roughly 30% of the entire market for analgesic drugs (*i.e.*, painkillers).

53.    In 2007, Purdue settled criminal and civil charges brought against it by the DOJ for misbranding OxyContin and agreed to pay the United States over $600 million – at the time, one of the largest settlements with a drug company for marketing misconduct – as well as a sweeping set of injunctive relief requiring the Defendant to cease its unlawful and deceptive marketing practices.[21]  Simultaneously, Purdue settled an action brought by 27 states Attorneys General, including the Commonwealth, for $20 million and further injunctive relief.

54.    Upon information and belief, Purdue has violated most, if not all, of its commitments under its consent decrees with the government.

### Defendants Teva Pharmaceuticals, Cephalon, Inc., Watson Laboratories, Inc., Actavis LLC, and Actavis Pharma, Inc. f/k/a Watson Pharma, Inc. ("Cephalon")

55.    Defendant Teva Pharmaceuticals USA, Inc. ("Teva USA") is a Delaware corporation with its principal place of business in North Wales, Pennsylvania.

56.    Defendant Cephalon, Inc. is a Delaware corporation with its principal place of business in Frazer, Pennsylvania.  In 2011, Teva Ltd. acquired Cephalon, Inc.

57.    Defendant Watson Laboratories, Inc. is a Nevada corporation with its principal place of business in Parsippany, New Jersey.

58.    Defendant Actavis LLC is a Delaware limited liability company with its principal place of business in Parsippany, New Jersey.

---

[21]    Plea Agreement, *United States v. Purdue Frederick Co., Inc.*, No. 07-CR-29 (W.D. Va. May 10, 2007), ECF No. 6.

59.    Defendant Actavis Pharma, Inc. f/k/a Watson Pharma, Inc. is a Delaware corporation with its principal place of business in Parsippany, New Jersey

60.    Teva USA, Cephalon, Inc. Watson Laboratories, Inc., Actavis LLC, and Actavis Pharma, Inc. f/k/a Watson Pharma, Inc. (collectively, "Cephalon") are indirect wholly-owned subsidiaries of Teva Pharmaceutical Industries, Ltd. ("Teva Ltd."), an Israeli corporation.

61.    Cephalon Defendants work together to manufacture, promote, distribute and sell both brand name and generic versions of opioids nationally and in the City of Portsmouth, including the following:

**Table 2 – Cephalon Opioids**

| Drug Name | Chemical Name | Form |
|-----------|---------------|------|
| Actiq | Fentanyl citrate | Lollipop or lozenge |
| Fentora | Fentanyl citrate | Buccal tablet, like a smokeless tobacco plug |

62.    In September 2008, Cephalon pleaded guilty to a criminal violation of the Federal Food, Drug, and Cosmetic Act ("FD&C Act") for its misleading promotion of Actiq (and two other drugs) and agreed to pay $425 million in fines, damages, and penalties.

**Defendant Collegium Pharmaceutical, Inc. ("Collegium")**

63.    Defendant Collegium Pharmaceutical, Inc. ("Collegium") is a company incorporated under the laws of the Commonwealth of Virginia, and its principal place of business is in Stoughton, Massachusetts.

64.    Collegium manufactures, promotes, sells, and distributes opioids nationally and in Portsmouth, including the following opioids, as well as their generic versions:

**Table 3 – Collegium Opioids**

| Drug Name | Chemical Name | Form |
|-----------|---------------|------|
| Xtampza ER | Oxycodone | Tablet extended release |
| Nucynta (from 2018) | Tapentadol | Tablet |
| Nucynta ER (from 2018) | Tapentadol ER | Tablet |

21

65.     As of January 10, 2018, Collegium has signed a commercialization agreement with Depomed, Inc., which allows Collegium to market the opioid products Nucynta and Nucynta ER.[22]

**Defendants Johnson & Johnson, Janssen Pharmaceuticals, Inc., and Ortho-McNeil-Janssen Pharmaceuticals, Inc. n/k/a Janssen Pharmaceuticals, Inc. ("Janssen")**

66.     Defendant Johnson & Johnson ("J&J") is a New Jersey corporation with its principal place of business in New Brunswick, New Jersey.

67.     Defendant Janssen Pharmaceuticals, Inc. ("Janssen Pharmaceuticals") is a Pennsylvania corporation with its principal place of business in Titusville, New Jersey, and is a wholly owned subsidiary of J&J.

68.     Defendant Ortho-McNeil-Janssen Pharmaceuticals Inc. ("OMP") (now known as Janssen Pharmaceuticals, Inc.) is a Pennsylvania corporation with its principal place of business in Titusville, New Jersey.

69.     OMP was formerly known as Janssen Pharmaceutica, Inc.

70.     J&J is the only company that owns more than 10% of Janssen Pharmaceuticals stock.   Upon information and belief, J&J controls the sale and development of Janssen Pharmaceuticals drugs, and Janssen Pharmaceuticals' profits inure to J&J's benefit.  J&J has a well-known and proudly advertised reputation and company-wide business practice of strictly controlling the development and marketing of pharmaceuticals by its affiliates.

---

[22]     *Depomed Announces Closing of NUCYNTA Commercialization Agreement with Collegium Pharmaceutical*, GLOBENEWSWIRE (Jan. 10, 2018), https://globenewswire.com/news-release/2018/01/10/1286734/0/en/Depomed-Announces-Closing-of-NUCYNTA-Commercializat ion-Agreement-With-Collegium-Pharmaceutical.html.

71.     J&J, Janssen Pharmaceuticals, OMP, and Janssen Pharmaceutica (collectively, "Janssen") are or have been engaged in the manufacture, promotion, distribution, and sale of opioids nationally and in the City of Portsmouth, including the following:

**Table 4 – Janssen Opioids**

| Drug Name | Chemical Name | Form |
|---|---|---|
| Duragesic | Fentanyl | Transdermal Patch |
| Nucynta (prior to 2015) | Tapentadol | Tablet |
| Nucynta ER (prior to 2015) | Tapentadol ER | Tablet |

72.     Together, Nucynta and Nucynta ER accounted for $172 million in sales in 2014. In April 2015, Janssen Pharmaceuticals transferred to Depomed, Inc. the right to license Nucynta and Nucynta ER in the United States.[23] Prior to 2009, Duragesic accounted for at least $1 billion in annual sales.

### Defendants Endo Health Solutions Inc. and Endo Pharmaceuticals, Inc. ("Endo")

73.     Defendant Endo Health Solutions Inc. ("EHS") is a Delaware corporation with its principal place of business in Malvern, Pennsylvania.

74.     Defendant Endo Pharmaceuticals, Inc. ("EPI") is a wholly owned subsidiary of EHS and is a Delaware corporation with its principal place of business in Malvern, Pennsylvania.

75.     EHS and EPI (collectively, "Endo") manufacture, promote, distribute, and sell opioids nationally and in the City of Portsmouth, including the following:

**Table 5 – Endo Opioids**

| Drug Name | Chemical Name | Form |
|---|---|---|
| Opana ER | Oxymorphone hydrochloride extended | Tablet |

---

[23]     Press Release, J&J, Janssen Pharmaceuticals, Inc. Completes Divestiture of U.S. License Rights to NUCYNTA® (tapentadol), NUCYNTA® ER (tapentadol) extended–release tablets and NUCYNTA® (tapentadol) Oral Solution to Depomed, Inc. (Apr. 2, 2015) (available at https://www.jnj.com/media-center/press-releases/janssen-pharmaceuticals-inc-completes-divestiture-of-us-license-rights-to-nucynta-tapentadol-nucynta-er-tapentadol-extended-release-tablets-and-nucynta-tapentadol-oral-solution-to-depomed-inc).

| Opana | Oxymorphone hydrochloride and aspirin | Tablet |
| Percodan | Oxycodone hydrochloride and acetaminophen | Tablet release |
| Percocet | Oxycodone and acetaminophen | Tablet |

76.     Opioids comprised approximately $403 million of Endo's overall revenue of $3 billion in 2012. Opana ER yielded revenue of $1.15 billion from 2010 to 2013, and it accounted for 10% of Endo's total revenue in 2012. Endo also manufactures and sells generic opioids, both directly and through its subsidiary, Qualitest Pharmaceuticals, Inc. ("Qualitest"), including generic oxycodone, oxymorphone, hydromorphone, and hydrocodone products.

77.     A reformulated Opana ER that had been approved in 2012 was removed from the market in June 2017, at the request of the FDA, which found that "the benefits of the drug may no longer outweigh its risks." [24] The FDA stated, "the FDA determined that the data did not show that the reformulation could be expected to meaningfully reduce abuse and declined the company's request to include labeling describing potentially abuse-deterrent properties for Opana ER."[25]

### Defendants Allergan Finance, LLC f/k/a Actavis, Inc. f/k/a Watson Pharmaceuticals, Inc., and Allergan plc f/k/a Actavis plc ("Actavis")

78.     Allergan Finance, LLC is a privately held Nevada corporation with its principal place of business in Parsippany, New Jersey. Allergan Finance, LLC is an indirect wholly owned subsidiary of Allergan plc, which is incorporated in Ireland with its principal place of business in Dublin, Ireland. Allergan Finance, LLC and Allegan plc are collectively referred to as "Actavis."

---

[24]     News release, FDA, *FDA requests removal of Opana ER for risks related to abuse* (June 8, 2017), https://www.fda.gov/newsevents/newsroom/pressannouncements/ucm562401.htm.

[25]     *Id.*

79.    Actavis manufactures, promotes, sells, and distributes opioids nationally and in the City of Portsmouth, including the following opioids, as well as their generic versions:

**Table 6 – Actavis Opioids**

| Drug Name | Chemical Name | Form |
|-----------|---------------|------|
| Kadian | Morphine sulfate | Tablet extended release |
| Norco | Hydrocodone bitartrate and acetaminophen | Tablet |

80.    Kadian is an extended-release tablet for "the management of pain severe enough to require daily, around-the-clock, long-term opioid treatment and for which alternative treatment options are inadequate."    Actavis acquired the rights to Kadian from King Pharmaceuticals, Inc. and began marketing Kadian in 2009.

**Defendants Mallinckrodt LLC and SpecGx LLC ("Mallinckrodt")**

81.    Mallinckrodt LLC is a limited liability company organized and existing under the laws of the State of Delaware, headquartered in St. Louis, Missouri.  Since 2013, Mallinckrodt LLC has been a wholly owned subsidiary of Mallinckrodt plc; prior to 2013, it was a wholly owned subsidiary of Irish public limited company Covidien PLLC (formerly known as Tyco Healthcare).  Defendant SpecGx LLC is also a Delaware limited liability company with its headquarters in Clayton, Missouri, and is a wholly owned subsidiary of Mallinckrodt plc. Mallinckrodt LLC and SpecGx LLC are referred to collectively as "Mallinckrodt."

82.    Mallinckrodt manufactures, promotes, sells, and distributes opioids nationally and in the City of Portsmouth, including the following opioids, as well as their generic versions:

**Table 7 – Mallinckrodt Opioids**

| Drug Name | Chemical Name | Form |
|-----------|---------------|------|
| Exalgo | Hydromorphone hydrochloride | Tablet extended release |
| Xartemis XR | Oxycodone hydrochloride and acetaminophen | Tablet extended release |

| Roxicodone | Oxycodone hydrochloride | Tablet |
|---|---|---|

83.    Mallinckrodt also manufactures, markets and sells generic oxycodone, of which it is one of the largest manufacturers.

84.    In July 2017, Mallinckrodt agreed to pay $35 million to settle allegations brought by the Department of Justice that it failed to detect and notify the DEA of suspicious orders of controlled substances.

### Defendant Insys Therapeutics, Inc. ("Insys")

85.    Defendant Insys Therapeutics, Inc. ("Insys") is a Delaware corporation with its principal place of business in Chandler, Arizona.

86.    Since 2012, Insys has been manufacturing and selling the following opioid:

**Table 8 – Insys Opioids**

| Drug Name | Chemical Name | Form |
|---|---|---|
| Subsys | Fentanyl | Sublingual spray absorbed through mucous in the mouth |

87.    Subsys is a highly addictive synthetic opioid mouth spray approved for treatment of cancer pain in patients who are tolerant of other opioids. Subsys is a form of fentanyl – a narcotic up to 50 times more powerful than heroin and 100 times more powerful than morphine.

88.    According to Insys's 2016 Annual Report, Subsys was the most prescribed transmucosal immediate-release fentanyl, with 42% market share, which translates to nearly $300 million in annual U.S. product sales for Insys – an increase of 270% in sales over just a year.[26]

89.    The broad sales of Subsys raised suspicions over Insys's sales practices, especially because it appeared that only 1% of Subsys sales were generated by oncologists, and

---

[26]    *See* Insys Therapeutics, Inc., Annual Report at 1 (Form 10-K) (April 3, 2017).

26

the only approved use of Subsys is for a subset of cancer patients. Subsequent investigations revealed that Insys executives (including Individual Defendant John Kapoor, named below) devised and sanctioned blatantly unlawful methods to increase sales for off-label uses to the profound harm, including death, of many patients.

90.    On December 16, 2016, six former Insys executives, including former CEO Michael Babich, were indicted for their participation in an alleged "nationwide conspiracy" to give healthcare providers kickbacks in exchange for the improper prescribing of Subsys. On October 24, 2017, a superseding indictment named and incorporated Individual Defendant John Kapoor for his role in Insys's alleged "nationwide conspiracy."

91.    According to the superseding indictment, the former head of sales for Insys, Alec Burlakoff, and others ran a sophisticated scheme that used pharmacy data to identify doctors who prescribed a lot of opioids. They then bribed the doctors with offers of cushy speaking engagements to increase their Subsys prescriptions even further and to write a minimum number of prescriptions at a minimum dose to generate as many insured refill orders as possible "without regard to the medical needs of ... Subsys patients."[27] On November 28, 2018, Burlakoff pleaded guilty to one count of racketeering conspiracy and agreed to cooperate with prosecutors in their case against Insys.

92.    Likewise, Natalie Levine, a former Insys salesperson who is married to a former Insys CEO, Michael Babich, pled guilty in July 2017 in federal court in Hartford for violating the federal anti-kickback statute by bribing nurse Heather Alfonso through a sham speakers bureau to prescribe Subsys for patients who did not have cancer.

---

[27]    Alex Johnson, *Ex-Drug Company Executive Pleads Guilty to Bribing Doctors*, NBC NEWS (Nov. 28, 2018), https://www.nbcnews.com/news/amp/ncna941466.

27

93.     A Senate investigation into the opioid crisis generally began with an investigation into Insys, specifically.  The conclusion to the initial report, *Fueling an Epidemic*, states that Insys "has repeatedly employed aggressive and likely illegal techniques to boost prescriptions for its fentanyl product Subsys . . . [that] included actions to undermine critical safeguards in the prior authorization process[.]"[28]

94.     The Senate investigation confirmed anecdotal evidence that sales representatives were instructed to encourage their sales "targets" (the physician, physician's assistant, nurse practitioner, or staff of the medical group with whom they met) to start the patient on a higher dosage of Subsys than was approved by the FDA.  The sales representatives were told to explain to the physician that the reason to start the patient at a higher dose was to improve the pain relief outcome to the patient, but the true reason was to increase Insys's revenue.  There is anecdotal evidence that the "motto" among the sales force in many regions of the country, including Virginia, was "start them high and hope they don't die." The investigation uncovered a chilling letter from an Insys sales representative to the CEO confirming that was indeed a commonly used refrain among the sales force at Insys.

95.     For ease of reference, the following is a table of all Manufacturer Defendants and their principal opioid products:

**Table 9**

| Purdue Opioids | |
|---|---|
| **Drug Name** | **Chemical Name** |
| OxyContin | Oxycodone hydrochloride extended release |
| MS Contin | Morphine sulfate extended release |

---

[28]     U.S. CONG. S. COMM. ON HOMELAND SEC. AND GOV'T AFFAIRS, *Fueling an Epidemic: Insys Therapeutics and the Systemic Manipulation of Prior Authorization* (Sept. 6, 2017), *available at* https://www.hsdl.org/?view&did=803959.

**Table 9**

| Dilaudid | Hydromorphone hydrochloride |
|---|---|
| Dilaudid-HP | Hydromorphone hydrochloride |
| Butrans | Buprenorphine |
| Hysingla ER | Hydrocodone bitrate |
| Targiniq ER | Oxycodone hydrochloride and naloxone |

| Cephalon Opioids | | |
|---|---|---|
| **Drug Name** | **Chemical Name** | **Form** |
| Actiq | Fentanyl citrate | Lollipop or lozenge |
| Fentora | Fentanyl citrate | Buccal tablet, like a smokeless tobacco plug |

| Collegium Opioids | | |
|---|---|---|
| **Drug Name** | **Chemical Name** | **Form** |
| Xtampza ER | Oxycodone | Tablet extended release |
| Nucynta (from 2018) | Tapentadol | Tablet |
| Nucynta ER (from 2018) | Tapentadol ER | Tablet |

| Janssen Opioids | | |
|---|---|---|
| **Drug Name** | **Chemical Name** | **Form** |
| Duragesic | Fentanyl | Transdermal Patch |
| Nucynta (prior to 2015) | Tapentadol | Tablet |
| Nucynta ER (prior to 2015) | Tapentadol ER | Tablet |

| Endo Opioids | | |
|---|---|---|
| **Drug Name** | **Chemical Name** | **Form** |
| Opana ER | Oxymorphone hydrochloride extended | Tablet |
| Opana | Oxymorphone hydrochloride and aspirin | Tablet |
| Percodan | Oxycodone hydrochloride and acetaminophen | Tablet release |
| Percocet | Oxymorphone hydrochloride and acetaminophen | Tablet |

**Table 9**

| Actavis Opioids | | |
|---|---|---|
| **Drug Name** | **Chemical Name** | **Form** |
| Kadian | Morphine sulfate | Tablet extended release |
| Norco | Hydrocodone bitartrate and acetaminophen | Tablet |
| **Mallinckrodt Opioids** | | |
| **Drug Name** | **Chemical Name** | **Form** |
| Exalgo | Hydromorphone hydrochloride | Tablet extended release |
| Xartemis XR | Oxycodone hydrochloride and acetaminophen | Tablet extended release |
| Roxicodone | Oxycodone hydrochloride | Tablet |
| **Insys Opioids** | | |
| **Drug Name** | **Chemical Name** | **Form** |
| Subsys | Fentanyl | Sublingual spray absorbed through mucous in the mouth |

## C.    Distributor Defendants

### Defendant McKesson Corporation

96.    Defendant McKesson Corporation ("McKesson") is incorporated under the laws of Delaware with its principal place of business located in San Francisco, California. McKesson was at all relevant times licensed by the Virginia State Board of Pharmacy as a wholesaler and out-of-state wholesaler. McKesson is the largest pharmaceutical distributor in North America; it delivers approximately one-third of all pharmaceuticals used in North America. McKesson conducts business in the State of Virginia by distributing prescription opioids to hospitals, retail pharmacies, practitioners, mid-level practitioners, and teaching institutions ("Retail End Users"). McKesson is subject to state and federal reporting obligations with respect to the distribution of controlled substances to the Commonwealth of Virginia. *See* Va. Code. Ann. § 54.1-3400-3472; 21 U.S.C. §§801 *et seq*.

**Defendant AmerisourceBergen Drug Corporation**

97.     Defendant AmerisourceBergen Drug Corporation ("ABDC") is a company incorporated under the laws of Delaware with its principal place of business located in Chesterbrook, Pennsylvania. ABDC was at all relevant times licensed by the Virginia State Board of Pharmacy as a wholesaler and out-of-state wholesaler. ABDC is the second largest pharmaceutical distributor in North America. ABDC conducts business in the Commonwealth of Virginia by distributing prescription opioids to Retail End Users. ABDC is subject to federal and state reporting obligations with respect to the distribution of controlled substances in the Commonwealth of Virginia. *See id.*

**Defendant Cardinal Health, Inc.**

98.     Defendant Cardinal Health, Inc. ("Cardinal") is a company incorporated under the laws of Ohio with its principal place of business located in Dublin, Ohio. Cardinal at all relevant times, operated as a licensed distributor in Virginia, licensed by the Virginia State Board of Pharmacy and holding both wholesaler and out of state wholesaler distributor licenses. Cardinal is the third largest distributor of pharmaceuticals in North America. Cardinal conducts business in the State of Virginia by distributing prescription opioids to Retail End Users. Cardinal is subject to federal and state reporting obligations with respect to the distribution of controlled substances to the Commonwealth of Virginia. *See id.*

99.     Cardinal, McKesson, and AmerisourceBergen are collectively referred to as the "Distributor Defendants."

**D.     Individual Defendants**

100.    Defendant John Kapoor ("Kapoor") is the founder, former Chairman of the Board and Chief Executive Officer ("CEO") of Insys Therapeutics, Inc.   He remains the majority stockholder of the company. Kapoor was indicted in Boston federal court on October 24, 2017

on charges of conspiracies to commit racketeering pursuant to 18 U.S.C. §1962(d), mail fraud pursuant to 18 U.S.C. §1349, wire fraud pursuant to 18 U.S.C. §1349, and to violate the Anti-Kickback Law pursuant to 18 U.S.C. §371.  The indictment arose from the practice of Insys paying kickbacks to doctors to write large numbers of prescriptions, which, upon information and belief, was devised by Individual Defendant Kapoor, along with other Insys executives. Kapoor is a citizen of the State of Arizona.

101.    Defendant Richard Sackler has been a member of the board of Purdue Pharma Inc. since the 1990s.  Upon information and belief, Defendant Richard Sackler resides in the State of Connecticut.

102.    Defendant Jonathan Sackler has been a member of the board of Purdue Pharma Inc. since the 1990s. Upon information and belief, Defendant Jonathan Sackler resides in the State of Connecticut

103.    Defendant Mortimer D.A. Sackler has been a member of the board of Purdue Pharma Inc. since the 1990s. Upon information and belief, Defendant Mortimer D.A. Sackler resides in the State of New York.

104.    Defendant Kathe Sackler has been a member of the board of Purdue Pharma Inc. since the 1990s. Upon information and belief, Defendant Kathe Sackler resides in the State of Connecticut.

105.    Defendant Ilene Sackler Lefcourt has been a member of the board of Purdue Pharma Inc. since the 1990s. Upon information and belief, Defendant Ilene Sackler Lefcourt resides in the State of New York.

106.    Defendant Beverly Sackler has been a member of the board of Purdue Pharma Inc. since the 1990s. Upon information and belief, Defendant Beverly Sackler resides in the State of Connecticut.

107.    Defendant Theresa Sackler has been a member of the board of Purdue Pharma Inc. since the 1990s. Upon Information and belief, Defendant Theresa Sackler resides in the United Kingdom.

108.    Defendant David Sackler has been a member of the board of Purdue Pharma Inc. since the 2012. Upon information and belief, Defendant David Sackler resides in the State of New York.

109.    Defendants Richard Sackler, Jonathan Sackler, Mortimer D.A. Sackler, Kathe Sackler, Ilene Sackler Lefcourt, Beverly Sackler, Theresa Sackler, and David Sackler are collectively referred to herein as the "Sackler Family Defendants."

## IV.    FACTUAL ALLEGATIONS

### A.    The Scientific Basis for Pain-Relieving and Addictive Properties of Opioids

#### 1.    Similarity Between Prescription Opioids and Heroin

110.    The medicinal effects of opium, an extract from the flowering poppy plant, to relieve pain and often cause euphoria, have been known for thousands of years.

111.    In the early 1800s, a German pharmacist, Freidrich Sertürner, isolated a molecule from opium and named it "morphine" for its hypnotic, as well as analgesic, properties

112.    The late 1800s and early 1900s saw a plethora of semi-synthetic opioids that were easily derived by manipulating the basic morphine structure. Semi-synthetic opioids produce a more rapid effect than morphine because they cross the blood-brain barrier more easily.

113.    One of the first semi-synthetic opioids, heroin, began being manufactured in the late 19th century. In 1914, the Harrison Narcotics Tax Act imposed a tax on those making,

importing, or selling any derivative of opium. By the 1920s, physicians were aware of the highly addictive nature of opioids and tried to avoid treating patients with them. Heroin became illegal in 1924.

114.    Other semi-synthetic opioids such as oxycodone, hydrocodone, oxymorphone and hydromorphone continued to be designed in labs and approved for restricted medical uses. All the opioids sold by Manufacturer Defendants Purdue, Endo, Actavis, Collegium, and Mallinckrodt fall within these categories. *See supra* at ¶91, Table 9.

115.    In 1960 a fully synthetic opioid, named fentanyl, was synthesized by Dr. Paul Janssen in Belgium.

116.    Fentanyl has been produced in various forms, including lollipops (Actiq) and a spray absorbed through the mouth (Subsys). The products of Cephalon, Janssen, and Insys (listed *supra* at ¶91, Table 9) are fentanyl or fentanyl-based synthetic opioids.

117.    All these opioids, including semi-synthetic and fully synthetic opioids, work on a patient in very similar ways. They react with opioid receptors in the brain of the patient and are considered "full agonists." "Agonists interact with a receptor to produce a maximal response from that receptor."[29]

118.    When a full agonist opioid interacts with the opioid receptor, there is a cascade of reactions, ultimately leading to an increase in the release of dopamine in the brain.[30]

119.    Opiate receptor stimulation by opioids can relieve pain and produce euphoria. These effects have been understood for millennia as properties of opium.

---

[29]    Hasan Pathan & John Williams, *Basic Opioid Pharmacology: An Update*, 6 BRIT. J. PAIN 11 (2012), *available at* https://www.ncbi.nlm.nih.gov/pmc/articles/PMC4590096.

[30]    Nora D. Volkow, *et al.*, *Neurobiologic Advances from the Brain Disease Model of Addiction*, 374 NEW ENG. J. MED. 363 (2016), *available at* http://www.nejm.org/doi/full/10.1056/NEJMra1511480#t=article.

120.    However, a known result of the physiological process for all the opioids (just as it has been for millennia with the opium from the poppy plant) is that if taken daily, tolerance and dependence develop rapidly.

121.    Tolerance results in the need to take higher doses to achieve the same effect.

122.    Dependence results in dysphoria, increased pain sensitivity, anxiety and flu-like symptoms when opioids are discontinued.  These symptoms lead to cravings for continue use.

123.    Commonly prescribed opioids produce effects that are indistinguishable from the effects produced by other semi-synthetic opioids.  Commonly used prescription opioids are also quite similar to heroin on a molecular level, as shown in the charts below:

**Morphine**[31]                                      **Heroin**[32]



---

[31]    Sunghwan Kim, *et al.*, *Compound Summary for CID 5288826: Morphine*, NAT'L CTR. FOR BIOTECHNOLOGY INFO., https://pubchem.ncbi.nlm.nih.gov/compound/5288826 (last updated Dec. 29, 2018).

[32]    Sunghwan Kim, *et al.*, *Compound Summary for CID 5462328: Diamorphine*, NAT'L CTR. FOR BIOTECHNOLOGY INFO., https://pubchem.ncbi.nlm.nih.gov/compound/5462328 (last updated Dec. 29, 2018).

35

**Oxycodone**[33]
(sold as Percocet, OxyContin)

**Hydrocodone**[34]
(sold as Vicodin)



**Oxymorphone**[35]
(sold as Opana)

**Hydromorphone**[36]
(sold as Dilaudid)

---

[33]    Sunghwan Kim, *et al.*, *Compound Summary for CID 5284603: Oxycodone*, NAT'L CTR. FOR BIOTECHNOLOGY INFO., https://pubchem.ncbi.nlm.nih.gov/compound/5284603 (last updated Dec. 29, 2018).

[34]    Sunghwan Kim, *et al.*, *Compound Summary for CID 5284569: Hydrocodone*, NAT'L CTR. FOR BIOTECHNOLOGY INFO., https://pubchem.ncbi.nlm.nih.gov/compound/5284569 (last updated Dec. 29, 2018).

[35]    Sunghwan Kim, *et al.*, *Compound Summary for CID 5284604: Oxymorphone*, NAT'L CTR. FOR BIOTECHNOLOGY INFO., https://pubchem.ncbi.nlm.nih.gov/compound/5284604 (last updated Dec. 29, 2018).

[36]    Sunghwan Kim, *et al.*, *Compound Summary for CID 5284570: Hydromorphone*, NAT'L CTR. FOR BIOTECHNOLOGY INFO., https://pubchem.ncbi.nlm.nih.gov/compound/5284570 (last updated Dec. 29, 2018).

**Fentanyl**[37]
(sold as Subsys)



124.    It is simple to see from these charts how chemically similar the natural morphine, heroin, and semi-synthetic opioids are to one another. The opioid pain relievers ("OPRs") all share the same five-ring structure that allows them to react with opioid receptors in the brain. While fentanyl and other synthetic opioids do not share the same five-ring structure, they nevertheless interact with opioid receptors in the brain the same way. Dr. Andrew Kolodny, Senior Scientist and Co-Director of Opioid Policy Research at the Heller School for Social Policy and Management, and co-founder of Physicians for Responsible Opioid Prescribing, called prescription opioids "heroin pills":

> Like heroin, most OPRs are made from opium. Their molecular structure is nearly identical to that of heroin and the effects they produce in the brain are indistinguishable from heroin. What this means is that when we talk about OPRs, we are essentially talking about "heroin pills."[38]

125.    Commonly prescribed opioid analgesics have the same pain-relieving, euphoria-inducing, intensely addictive qualities of morphine and heroin.

---

[37]    Sunghwan Kim, *et al.*, *Compound Summary for CID 3345: Fentanyl*, NAT'L CTR. FOR BIOTECHNOLOGY INFO., https://pubchem.ncbi.nlm.nih.gov/compound/3345 (last updated Dec. 29, 2018).

[38]    *America's Addiction to Opioids: Heroin and Prescription Drug Abuse: Hearing Before the U.S. S. Caucus on Int'l. Narcotics Control*, 113th Cong. 2 (2014) (statement of Andrew Kolodny, M.D., Chief Medical Officer, Phoenix House Foundation, at 2), *available at* https://www.drugcaucus.senate.gov/sites/default/files/Kolodny%20Testimony.pdf.

126.    A Columbia University study found that experienced heroin users preferred the effects of oxycodone over the effects of heroin.[39]

### 2.    Biology of Why a Person with a Prescription Opioid Addiction Frequently Turns to Street Drugs

127.    With daily use of opioids, in as little as one week, patients can experience withdrawal symptoms if the opioids are discontinued (commonly referred to as "dependence"). Once dependent, cessation of use produces deeply unpleasant symptoms such as nausea, vomiting, headaches, tremors, insomnia, and pain.

128.    Dr. Kolodny has described the effect of opioids as akin to "hijack[ing] the brain's reward system," which, in turn, convinces a user that "the drug is needed to stay alive."[40]

129.    When under the continuous influence of opioids over a period of time, patients grow tolerant to the analgesic or pain-relieving effects.  As tolerance increases, a patient typically requires progressively higher doses in order to obtain the same levels of pain reduction he or she has become accustomed to – up to, and including, doses that are considered to be "frighteningly high."[41]  At higher doses, the effects of withdrawal are more substantial, and the risk of addiction increases.  The FDA has acknowledged that available data suggests a relationship between increased doses and the risk of adverse effects.[42]

---

[39]    Sandra D. Comer, *et al.*, *Relative Abuse Liability of Prescription Opioids Compared to Heroin in Morphine-Maintained Heroin Abusers*, 33 NEUROPSYCHOPHARMACOLOGY 1179 (Jun. 20, 2007), available at https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3787689.

[40]    David Montero, *Actor's death sows doubt among O.C.'s recovering opioid addicts*, ORANGE CTY. REGISTER (Feb. 4, 2014), https://www.ocregister.com/2014/02/04/actors-death-sows-doubt-among-ocs-recovering-opioid-addicts.

[41]    Mitchell H. Katz, *Long-term Opioid Treatment of Nonmalignant Pain: A Believer Loses His Faith*, 170 ARCHIVES OF INTERNAL MED. 1422 (2010), *available at* https://jamanetwork.com/journals/jamainternalmedicine/article-abstract/225880?redirect=true.

[42]    Volkow Testimony, *supra* n.11.

130.    As addiction science shows, once an individual is addicted to any of these

products, a series of biochemical reactions and physiological changes in the brain make it very

difficult to break the addiction, even if the patient desperately wants to do so.  These known

brain changes in addicted persons also explain why addiction is a relapsing disease.

131.    As the New England Journal of Medicine explains:

> This attenuated release of dopamine renders the brain's reward system much less
> sensitive to stimulation by both drug-related and non-drug-related rewards.  As a
> result, persons with addiction no longer experience the same degree of euphoria
> from a drug as they did when they first started using it.  It is for this same reason
> that persons with addiction often become less motivated by everyday stimuli (e.g.,
> relationships and activities) that they had previously found to be motivating and
> rewarding.  Again, it is important to note that these changes become deeply
> ingrained and cannot be immediately reversed through the simple termination of
> drug use (e.g., detoxification).[43]

132.    As addiction deepens, the changes in the brain of the addict become more

profound.  The deadened mood affect and pre-occupation with continued use to the exclusion of

previously pleasurable activities are aggravated by a lessened ability to control impulses.

Further:

> [t]he changes that occur in the reward and emotional circuits of the brain are
> accompanied by changes in the function of the prefrontal cortical regions, which
> are involved in executive processes.    Specifically the down-regulation of
> dopamine signaling that dulls the reward circuits' sensitivity to pleasure also
> occurs in prefrontal brain regions and their associated circuits, seriously impairing
> executive processes, among which are the capacities for self-regulation, decision
> making, flexibility in the selection and initiation of action, attribution of salience
> (the assignment of relative value), and the monitoring of error.[44]

133.    Recent research on the brains of addicted individuals makes clear why that person

would substitute heroin for prescription opioids, and further, why the changes in the individual's

---

[43]     *Id.*

[44]     *Id.*

brain caused by the addiction to prescription opioids makes it almost impossible to resist the need for continued use, even to the point of death.

134.    In short, the progression of addiction is, first, the initial pain relief and feeling of well-being or euphoria experienced by the patient. Next is the craving for more and more of the substance, since the dopamine rewards system has been hijacked and the patient is incapable of experiencing everyday joys. Even greater and more frequent amounts of the opioid do not work, since the patient's dopamine reward system is broken.  As addiction proceeds, the patient becomes increasingly incapable of thinking through the situation, since his prefrontal cortical regions have become affected.  Therefore, a person who has become addicted to opioids feels compelled to continue using and will switch to heroin if it is easier and less expensive to obtain.

### 3.    Biology of Why a Person with an Opioid Addiction Frequently Turns to Crime[45]

135.    Opioid addiction is different from other chronic diseases.  The opioid-addicted individual will behave in ways that appear anti-social.  Even a threat of severe punishment is insufficient to keep them from continuing their opioid use.  They will give up everything and everyone they have ever cared about to maintain their opioid supply.  The anti-social behavior that opioid-addicted individuals engage in is not driven by character flaws or moral failing. Instead, the behavior is secondary to the development of addiction.  Once addicted, good people will behave in ways they never could have imagined.

136.    When an opioid is taken regularly, regions of the brain that modulate behavior and control our higher functions like judgment, decision making, and self-control over our

---

[45]    Nora D. Volkow, *et al.*, *Addiction: Decreased Reward Sensitivity and Increased Expectation Sensitivity Conspire to Overwhelm the Brain's Control Circuit*, 32 BIOESSAYS 748 (2010).

actions begin to change in ways that may be irreversible. In effect, opioids hijack critical regions of the brain, causing a loss of free will, resulting in the need to continue using an opioid to avoid feeling dysphoria.

137.    Opioid addiction is a disease of exposure. Repeated use of opioids, even when taken exactly as prescribed, can result in addiction. The sharp increase in opioid prescribing over the past 20 years has led to parallel increases in opioid addiction and overdose deaths. Overprescribing causes addiction directly in patients prescribed opioids. And overprescribing causes addiction indirectly, as patients' prescriptions are borrowed or shared with family members, friends, or acquaintances.

### 4.    Lack of Evidence that Long-Term Opioid Use Was a Valid Pain Treatment

138.    Manufacturer Defendants have always been aware that there was no real evidence of the safety and efficacy of opioids for long-term use. To the contrary, there was evidence that, with long-term use, opioid drugs would become less effective because of tolerance to the pain-relieving effects.

139.    A 2006 study-of-studies found that opioids as a class did not demonstrate improvement in "function" over other non-addicting treatments. It stated: "For functional outcomes, the other analgesics were significantly more effective than were opioids."[46]

---

[46]    Andrea D. Furlan, *et al.*, Opioids for Chronic Noncancer Pain: A Meta-Analysis of Effectiveness and Side Effects, 174 CAN. MED. ASS'N J. 1589 (2006). This same study revealed that efficacy studies do not typically include data on opioid addiction. In many cases, patients who may be more prone to addiction are pre-screened out of the study pool. This does not reflect how doctors actually prescribe the drugs, because even patients who have past or active substance use disorders tend to receive higher doses of opioids. *See* Karen H. Seal, *et al.*, *Association of Mental Health Disorders With Prescription Opioids and High-Risk Opioid Use in US Veterans of Iraq and Afghanistan*, 307 J. AM. MED. ASS'N 940 (2012).

140. Endo's own research shows that patients taking opioids, as opposed to other prescription pain medicines, report higher rates of obesity (30% to 39%); insomnia (9% to 22%); and self-described fair or poor health (24% to 34%).

141. In the fall of 2009, as a pain specialist noted in an article titled, *Are We Making Pain Patients Worse?*, "[O]pioids may work acceptably well for a while, but over the long term, function generally declines, as does general health, mental health, and social functioning. Over time, even high doses of potent opioids often fail to control pain, and these patients are unable to function normally."[47]

142. Workers' compensation data has also long revealed the lack of evidence for the efficacy of opioids for long-term chronic pain. Claims involving workers who take opioids are almost four times as likely to reach costs of over $100,000 than claims without opioids, as these patients suffer greater side effects and are slower to return to work. Even adjusting for injury severity and self-reported pain score, receiving an opioid for more than seven days and receiving more than one opioid prescription increased the risk that the patient would still be on work disability one year later. A prescription for opioids as the first treatment for a workplace injury doubled the average length of the claim.

143. In the face of this body of evidence and medical orthodoxy questioning the efficacy and safety of opioids, the Manufacturer Defendants mounted their disinformation campaign to open the market for their drugs, despite the known risk of addiction.

---

[47]    Andrea Rubenstein, *Are We Making Pain Patients Worse?*, SONOMA MED. (Fall 2009), http://www.nbcms.org/about-us/sonoma-county-medical-association/magazine/sonoma-medicine-are-we-making-pain-patients-worse.aspx?pageid=144&tabid=747.

42

**B.    Campaign of Misinformation and Unlawful Conduct by Manufacturer Defendants**

1.    **Summary of Manufacturer Defendants' Disinformation Campaign**

144.    Manufacturer Defendants, through a sophisticated and highly deceptive and unfair marketing campaign that began in the late 1990s and continues to the present, set out to and succeeded in reversing the popular and medical understanding of opioids.    Chronic opioid therapy – the prescribing of opioids to treat chronic pain long-term – is now a commonplace and highly dangerous practice in the United States.

145.    Since Insys did not begin selling its fentanyl-based product, Subsys, until 2012, and Collegium did not begin selling its oxycodone-based product, Xtampza ER, until April 2016, they did not participate in the activity preceding that date.    Nevertheless, both Insys and Collegium did profit from the collusive campaign of other Manufacturer Defendants to change medical orthodoxy solely for reasons of greed, rather than scientific basis, and they continue to misrepresent the safety and efficacy of opioid treatment for chronic pain.

146.    To accomplish this reversal, Manufacturer Defendants spent hundreds of millions of dollars (a) developing and disseminating *seemingly truthful* scientific and educational materials and advertising that misrepresented the risks, benefits, and superiority of opioids for treating chronic pain; (b) funding, assisting, encouraging, and directing KOLs to deliver scripted talks, publish misleading studies, and present CMEs that disseminated false and incomplete information to medical practitioners; (c) infiltrating the boards and committees of professional societies and patient advocacy groups that delivered messages and developed guidelines supporting chronic opioid therapy; (d) funding, assisting, directing, and encouraging seemingly neutral and credible professional societies and patient advocacy groups (referred to as "Front Groups") that developed misleading educational materials and treatment guidelines that were

43

then distributed by Distributor Defendants, urging doctors to prescribe, and patients to use, opioids long-term to treat chronic pain; (e) deploying sales representatives, who visited doctors and other prescribers to market their opioids for "non-indicated" or off-label purposes not approved by the FDA, thereby violating 21 U.S.C. §§331(a)-(b), 352(a); and (f) targeting public ads to vulnerable populations, such as the elderly and veterans.

147. Manufacturer Defendants (a) overstated the benefits of chronic opioid therapy, promised improvement in patients' function and quality of life, and failed to disclose the lack of evidence supporting long-term use; (b) trivialized or obscured opioids' serious risks and adverse outcomes, including the risks of addiction, overdose, and death; (c) overstated their superiority compared with other treatments, such as other, non-opioid analgesics, physical therapy, and other alternatives; and (d) mischaracterized the difficulty of withdrawal from opioids and prevalence of withdrawal symptoms.    There is not, and never has been, reliable scientific evidence to support Manufacturer Defendants' marketing claims.  There has long been, and continues to be, substantial scientific evidence that these claims are false.

## 2.    False Messaging

### a.    Drug Companies Must Deal Honestly with Patients, Consumers, and Governmental Payors

148. Like every other business in Virginia, pharmaceutical manufacturers have a duty to deal honestly and truthfully with consumers and to refrain from using unfair and deceptive acts to boost profits at the consumer's expense.

149. A drug company's representations about its drug must (a) be consistent with its label and supported by substantial scientific evidence; (b) not include false or misleading statements or material omissions; and (c) fairly balance the drug's benefits and risks.

150.    Furthermore, drug companies are not permitted to sell any drugs that are "misbranded," which means, among other things, that the "label" cannot be false or misleading. "Labeling" includes more than the drug's physical label; it also includes "all . . . other written, printed, or graphic matter . . . accompanying" the drug, including promotional material.[48]   The term "accompanying" includes promotional materials – posters, websites, brochures, books, etc. that are disseminated by, or on behalf of, the manufacturer of the drug.[49]   Thus, Manufacturer Defendants' promotional materials are part of their drugs' labels and are required to be accurate, balanced, and not misleading.

151.    Labeling is misleading if it is not based on substantial evidence, materially misrepresents the benefits of a drug, or omits material information about or minimizes the frequency or severity of a product's risks.[50]   Promotion that fails to present the most important risks of a drug as prominently as its benefits lacks fair balance and is therefore deceptive.

152.    Drug companies are also prohibited from distributing evidence or information about a drug's safety or efficacy or presenting conclusions that "clearly cannot be supported by the results of the study."[51]   Further, drug companies must not make comparisons between their drugs and other drugs in ways that represent or suggest that "a drug is safer or more effective than another drug in some particular when it has not been demonstrated to be safer or more effective in such particular by substantial evidence or substantial clinical experience."[52]

---

[48]    21 U.S.C. §321(m).

[49]    See *id.*; Annotation, Notes of Decisions: Accompanying the Article, Labeling, 21 U.S.C.A. §321 (West).

[50]    21 U.S.C. §321(n).

[51]    21 C.F.R. §99.101(a)(4).

[52]    21 C.F.R. §202.1(e)(6)(ii).

153.   The Manufacturer Defendants' responsibilities to not engage in false, untrue, misleading, and deceptive statements of material fact to physicians, consumers, payors, and Plaintiff are consistent with their duties under the laws of the Commonwealth of Virginia *and* the FD&C Act.   Plaintiff expressly denies that the reference to the FD&C Act in this Complaint means that any claims "arise under" federal law within the meaning of 28 U.S.C. §1331.

154.   Manufacturer Defendants long maintained that prescription opioids carry little to no risk of addiction, when they knew that not to be true.  For example, Purdue claimed that the risk of addiction was negligible, even though its own studies had shown that between 8% and 13% of OxyContin patients became addicted.

155.   Manufacturer Defendants have said that specific characteristics of their drugs made them less addictive, when there was no evidence to support their assertions.  For example, Endo marketed Opana ER as being crush-resistant and, as a result, hard to abuse and harder to become addicted to. In fact, Endo knew that there was no evidence to support this assertion. Sales representatives for Purdue, Janssen, Endo and Actavis promoted their drugs as having "steady-state" properties with the intent and expectation that prescribers would understand this to mean that their drugs caused less of a rush or a feeling of euphoria, which can trigger misuse and addictions.

156.   Cephalon-sponsored *Treatment Options: A Guide for People Living with Pain* (American Pain Foundation, 2007) stated that addiction is limited to extreme cases of unauthorized dose escalations, getting opioids from multiple sources, or theft.  In truth, Cephalon knew there was no basis for this depiction that addiction occurred only in rare cases.

157.   Manufacturer Defendants have maintained that addiction risk can be managed by the prescribing physician by asking patients to fill out a questionnaire to assess their risk of

addiction (known as "screening"). Actavis trained its sales force to advise prescribers that they can use risk screening tools to limit the development of addiction. However, there is not, and there never has been, evidence to suggest that such screening is reliable.

158.   Manufacturer Defendants falsely suggested or even blatantly proclaimed that withdrawal from opioids was not a problem. Actavis trained its sales force to assert that discontinuing opioid therapy can be handled "simply" and done at home, with the withdrawal period approximately taking a week, even in addicted patients. Janssen training materials between 2009 and 2011 repeatedly proclaimed "low incidence of withdrawal symptoms" as a "core message" for their sales force. In addition to claiming a low rate of withdrawal symptoms, Janssen relied upon a study that only began tracking withdrawal symptoms in patients 2-4 days after discontinuing opioid use. Janssen knew, or should have known, that these symptoms peak earlier than that for most patients.

159.   Contrary to Manufacturer Defendants' assertions, opioids have been found time and again to be addictive. A patient's fear of the unpleasant effects of discontinuing opioids, combined with the negative reinforcement during a period of actual withdrawal, can push a patient to seek further opioid treatment – even where ineffective or detrimental to quality of life – simply to avoid the deeply unpleasant effects of withdrawal.

   **b.   Falsehood: No Upper Limit on Amount of Opioids to Consumer**

160.   Manufacturer Defendants have misrepresented and even denied entirely the dangers posed by large doses of opioids. Manufacturer Defendants claimed that dosages could be escalated continuously to match high pain tolerance, even though studies showed that such escalation could be deadly.   This false advice has been disseminated even though the Manufacturer Defendants, their executives, researchers, and sales staff have knowledge that

increasing a dosage or starting a patient with a high dosage may be fatal. *See supra* at ¶90; *infra* at ¶159.

161.    This falsehood is of particular concern because none of the Manufacturer Defendants' opioids has a cap on dosage. Thus, the guidance of manufacturers (and the medical community, informed by manufacturers) has a critical role to play in preventing overdose.

162.    There is not now, and there never has been, any scientifically based support for the Manufacturer Defendants' statements that there are no upper limits for opioids.

163.    High doses pose real risk. The 2016 CDC Guidelines states, in pertinent part: "[b]enefits of high-dose opioids for chronic pain are not established," while the "risks for serious harms related to opioid therapy increase at higher opioid dosage." They further state that there are "increased risks for opioid use disorder, respiratory depression, and death at higher dosages[.]"    As a result, the CDC advised doctors to "avoid increasing dosage" above 90 morphine milligram equivalents per day.

164.    When under the continuous influence of opioids over time, patients grow tolerant to their analgesic effects. As tolerance increases, a patient typically requires progressively higher doses to obtain the same levels of pain reduction to which he or she has become accustomed – up to, and including, doses that are "frighteningly high."[53]    *Supra* at ¶125, *infra* at §IV(C)(9).    At higher doses, the effects of withdrawal are more substantial, thus leaving a patient at a much higher risk of addiction.    A patient can take the opioids at the continuously escalating dosages to match pain tolerance and still overdose at recommended levels.

165.    Upon information and belief, Purdue required its sales representatives to "practice verbalizing the titration [dosing] message."    Purdue believed increasing titration was a key

---

[53]    Katz, *supra* n.41.

marketing objective and even monitored the pace at which doctors increased doses of its opioids. Sales representatives were warned when the doses were not increased fast enough by their target physicians. This ruthless sales tactic was memorialized by Purdue in a sales guide, entitled, "Initiation, Conversion, and Titration Discussions with the Appropriate Selling Tools."





*Purdue opioid promotion from 2008.*

*Purdue opioid promotion from 2013.*

166.    Upon information and belief, rather than applaud public health efforts, Purdue lambasted in internal documents such efforts to limit total daily dose and length of therapy by saying that such efforts "would *negatively impact business*." [Emphasis added.]    To push back

50

against the public demands in 2014 to decrease dosage, Purdue defensively pursued a "strategic initiative" to fight back and "maintain 2013 dose mix."



**Impact of changes in dose mix**
(For illustration purposes)

|  | | | % shift from 20mg and 15mg down to 10mg | | |
| Dose | Forecast (Rx) | Forecast ($) | 1% Shift | 2% Shift | 3% Shift |
|---|---|---|---|---|---|
| 10 mg | 1,226,840 | $ 135,005,554 | 1,242,664 | $ 136,746,931 | $ 138,488,308 | $ 140,229,686 |
| 15mg | 180,831 | $ 33,261,232 | 179,023 | $ 32,928,620 | $ 32,596,008 | $ 32,263,395 |
| 20mg | 1,401,616 | $ 361,951,330 | 1,387,599 | $ 358,331,817 | $ 354,712,303 | $ 351,092,790 |
| 30mg | 519,945 | $ 193,796,793 | 519,945 | $ 193,796,793 | $ 193,796,793 | $ 193,796,793 |
| 40mg | 1,085,624 | $ 577,483,835 | 1,085,624 | $ 577,483,835 | $ 577,483,835 | $ 577,483,835 |
| 60mg | 436,272 | $ 326,705,155 | 436,272 | $ 326,705,155 | $ 326,705,155 | $ 326,705,155 |
| 80mg | 768,198 | $ 931,583,802 | 768,198 | $ 931,583,802 | $ 931,583,802 | $ 931,583,802 |
| Total | 5,619,324 | $ 2,559,787,701 | 5,619,324 | $ 2,557,576,952 | $ 2,555,366,204 | $ 2,553,155,456 |

$2,210,748   $4,421,496   $6,632,244

A small shift of roughly 15K prescriptions from 20mg or 15mg down to 10mg has a $2MM impact

*Purdue internal strategy presentation from 2012.*

167.    According to Purdue's 2015 Price List, a patient taking Purdue's 80 mg OxyContin pill twice a day for a week earned Purdue $210. If that same patient could be kept on the drug for a year, Purdue received far more money: $10,959. Purdue's confidential internal analysis, revealed in the June 12, 2018 Complaint against the company by the Massachusetts Attorney General, "found that there is greater loss [in sales] in the 60mg and 80mg strengths (compared to other strengths) when we don't make primary sales calls." Purdue's business plans emphasized that "OxyContin is promotionally sensitive, specifically with the higher doses, and recent research findings reinforce the value of sales calls."

168.    Purdue promoted the assertion that "[o]pioid dose was not a risk factor for opioid overdose," even while it admitted in internal private documents that "it is very likely" that there is a "dose-related overdose risk in [chronic non-cancer pain] patients on [chronic opioid therapy]."

169.    Purdue's deception about the risk of higher doses was deliberate. Purdue recorded in an internal "Publication Plan" that its' "KEY MESSAGES" would say that "dose alone" is not "the reason for overdose deaths," and "opioid overdose is controlled by good prescribing practice and patient monitoring, not by arbitrary dosage limitations."

### c.    Falsehood: Opioids Are the Optimal Solution for Pain

170.    Manufacturer Defendants have consistently exaggerated the benefits and downplayed the side effects of opioids as compared to other analgesics. Specifically, Manufacturer Defendants have ignored the effects of long-term opioid therapy, which include addiction, hyperalgesia, hormonal dysfunction, decline in immune function, increased bone fractures in the elderly, neonatal abstinence syndrome, and potentially fatal interaction with other medication taken to treat disorders frequently co-existing with chronic pain. At the same time, Manufacturer Defendants have greatly exaggerated the incidence of side-effects and the risk of death from medicines, such as aspirin or ibuprofen, technically known as non-steroidal anti-inflammatory drugs ("NSAIDs"). Manufacturer Defendants have suggested 10,000-20,000 annual deaths are attributable to NSAIDs, when the real number is approximately 3,200 and shrinking.[54]

---

[54]    *See* Courtney Krueger, *Ask the Expert: Do NSAIDs Cause More Deaths Than Opioids?*, PRACTICAL PAIN MGMT. (Nov./Dec. 2013), https://www.practicalpainmanagement.com/treatments/pharmacological/opioids/ask-expert-do-nsaids-cause-more-deaths-opioids.

171.    On the contrary, there is evidence that opioid drugs are less effective at treating chronic pain and may worsen patients' health.  As noted, a comprehensive study in 2006 found that opioids as a class did not demonstrate improvement in functional outcomes over other non-addicting treatments.    Rather, the study concluded: "[f]or functional outcomes, the other analgesics were significantly more effective than were opioids."[55]  The above study and similar ones that were antithetical to the position of the Manufacturer Defendants were simply not presented by the KOLs in their speeches to practitioners, in the lectures presented at CMEs controlled by the Manufacturer Defendants, or in the Front Groups used to disseminate the Manufacturer Defendants' false message that opioids are a superior pain treatment.

172.    The Manufacturer Defendants knew their disparagement of NSAIDs and other analgesics was unfounded.  Indeed, Endo's own internal research shows that patients taking opioid-based pain medicines specifically reported higher rates of obesity, insomnia, and self-described fair or poor health.

173.    The Manufacturer Defendants deceptively exaggerated the risks associated with high doses of acetaminophen and NSAIDs (such as aspirin and ibuprofen) and instead pushed their opioids, which they claimed to have "no ceiling dose" and are "the gold standard of pain medications."

        **d.    Falsehood: The Promise of a Pain-Free Life and Vigorous Existence**

174.    Manufacturer Defendants misrepresented that opioids improve functioning over time.  For example, Janssen sponsored a patient education guide in 2009, *Finding Relief: Pain*

---

[55]    Furlan, *supra* n.46.

53

*Management for Older Adults*, which states, as a fact, that "opioids may make it easier for people to live normally."

175.   Purdue also conceived and funded third-party publications to proclaim that opioids give patients the "quality of life we deserve." This was a lie. Purdue's internal documents admit that "Purdue has no clinical studies or other substantial evidence demonstrating that a Purdue Product will improve the quality of a person's life." There is not, and there never has been, any data to support the claim that they do so; in fact, there is data to suggest that long-term opioid usage reduces functioning. Data from workers' compensation claims indicates that there is a negative correlation between opioid prescriptions and a person returning to work.[56]

176.   The 2016 CDC Guidelines (*supra* at ¶¶28, 159) state that "[a]lthough opioids can reduce pain during short-term use, the clinical evidence review found insufficient evidence to determine whether pain relief is sustained and whether function or quality of life improves with long-term opioid therapy." The CDC further found that "evidence is limited or insufficient for improved pain or function with long-term use of opioids for several chronic pain conditions for which opioids are commonly prescribed, such as low back pain, headache, and fibromyalgia."

### e.   Falsehood: Tapering Is an Effective Way to Manage Any Withdrawal

177.   Manufacturer Defendants also falsely represent that withdrawal is easily managed, for example, by tapering off a patient's dosage. For instance, Endo's CME, *Persistent Pain in the Older Adult*, taught prescribers that withdrawal can be avoided by tapering off dosage by 10-20% per day for ten days.

---

[56]   *See, e.g.*, Cindy L. Kidner, *et al.*, *Higher Opioid Doses Predict Poorer Functional Outcome in Patients with Chronic Disabling Occupational Musculoskeletal Disorders*, 91 J. BONE JOINT SURG. AM. 919 (2009).

178.    The 2010 Mallinckrodt/C.A.R.E.S. publication, *Defeat Chronic Pain Now!*, advised potential opioid users that tolerance to opioids is "easily remedied," and that "[a]ll patients can be safely taken off opioid medication if the dose is slowly tapered down by their doctor."[57]

179.    Janssen's training materials asserted that Nucynta ER has a low incidence of withdrawal symptoms, based on a study of withdrawal symptoms two to four days after discontinuing use (when, in fact, the symptoms peak much earlier).

180.    On its current website, PrescribeResponsibly.com, in an article titled *What a Prescriber Should Know Before Writing the First Prescription*, Janssen states that opioid addiction "can usually be managed" with such tools as Opioid Agreements between the prescribing physician and patient.

181.    There is no reliable data, nor has there ever been, supporting the statements made by each Manufacturer Defendant that gradual tapering would alleviate the risk of withdrawal.

### f.    Falsehood: Pseudoaddiction

182.    Pharmaceutical manufacturers tried to dismiss signs of addiction in patients by using the term "pseudoaddiction," invented by Dr. David Haddox, later Vice President of Health Policy at Purdue.  Pseudoaddiction was a term used for patients showing signs of addiction, and Defendants explained that what these patients were actually exhibiting was "under-treated pain."

183.    With no reliable data, the Manufacturer Defendants grabbed hold of the concept of pseudoaddiction, with the intent and result that treating physicians would ignore signs of actual addiction in their patients (such as seeking early refills, agitation, etc.).  Instead of advising the treating physician that the patient is likely in the throes of addiction, the

---

[57]    BRADLEY S. GALER & CHARLES E. ARGOFF, DEFEAT CHRONIC PAIN NOW! (2010).



Manufacturer Defendants advocated that the patient is still undertreated and should be prescribed a higher potency of the opioid.

184. A pamphlet, entitled *Clinical Issues in Opioid Prescribing* (2008), urged doctors to look for pseudoaddiction:

> A term which has been used to describe patient behaviors that may occur when pain is undertreated. Patients with unrelieved pain may become focused on obtaining medications, may "clock watch," and may otherwise seem inappropriately "drug-seeking." Even such behaviors as illicit drug use and deception can occur in the patient's efforts to obtain relief. Pseudoaddiction can be distinguished from true addiction in that the behaviors resolve when the pain is effectively treated.

185. In another pamphlet, *Providing Relief, Preventing Abuse: A reference guide to controlled substances prescribing practices* (2008), Purdue admonished doctors that "[u]ndertreatment of pain is a serious problem" and "pain should be treated aggressively." Purdue stated: "Fact[] About Addiction: 'Misunderstanding of addiction and mislabeling of patients as addicts results in unnecessary withholding of opioid medications.'"

186. Purdue released a second edition of *Providing Relief, Preventing Abuse* in 2011, which continued to urge higher doses and added a new deception about the scientific "literature": "*The term pseudoaddiction has emerged in the literature to describe the inaccurate interpretation of [drug-seeking] behaviors in patients who have pain that has not been effectively treated.*" This revised pamphlet and the claims it disseminated cited to no scientific or medical evidence that supported pseudoaddiction as a diagnosis separate from addiction. The pamphlet failed to disclose that all of the cited "literature" included was linked to organization and doctors paid by Purdue.

187. Purdue also urged doctors to prescribe higher doses in the Purdue-sponsored book, *Responsible Opioid Prescribing* (2011), which again suggested that patients, who appear to be addicted, were instead "receiving an inadequate dose" and needed more drugs. In Purdue's

*Opioid Clinical Management Guide* (2009), Purdue told doctors that the greatest risk of addiction was giving patients *too little* of its addictive drugs: "The primary risk factor for misuse is uncontrolled or inadequately treated pain."

188.    Janssen sponsored, funded, and edited a website publication, entitled *Let's Talk Pain*, which stated "pseudoaddiction refers to patient behaviors that may occur when pain is under-treated[.] . . . Pseudoaddiction is different from true addiction because such behaviors can be resolved with effective pain management."

189.    While the term "pseudoaddiction" is no longer prevalent and not currently posted on any of the Manufacturer Defendants' websites, it was in common use and widely disseminated to physicians through at least 2012. Upon information and belief, as a result of the Manufacturer Defendants' false information campaign, the signs of addiction in opioid-treated patients are still being misconstrued as pseudoaddiction in the community of practicing physicians, including those physicians in Virginia who serve the population of the City of Portsmouth.

190.    There never was any scientifically valid evidence for the concept of pseudoaddiction. The Manufacturer Defendants knew there was no scientific basis for the concept and their statements about it were false when made.

### 3.    Means of Disinformation

191.    Manufacturer Defendants strengthened the effects of their misinformation by disseminating it through varied sources in a number of settings, targeting both doctors and patients.

192.    Manufacturer Defendants have poured significant resources into branded advertisements for their own particular opioids. In 2011, Manufacturer Defendants spent over

57

$14 million advertising in medical journals, including $8.3 million by Purdue, $4.9 million by Janssen, and $1.1 million by Endo.[58]

193.    These advertisements have run in publications aimed at pain specialists (*e.g.*, the Journal of Pain, and the Clinical Journal of Pain), as well as those aimed at the entire medical community (*e.g.*, Journal of the American Medical Association).

194.    These advertisements have contained misleading claims about Manufacturer Defendants' opioid products. For example, a 2005 Purdue advertisement in the Journal of Pain described OxyContin as an "around-the-clock analgesic . . . for an extended period of time." The advertisement featured a man and boy fishing and proclaimed that *There Can Be Life With Relief,* falsely suggesting (on both counts) that OxyContin provides effective long-term pain relief and functional improvement. Endo's Opana ER was advertised with photos of people engaged in demanding jobs, suggesting that the drug could provide long-term relief and functional improvement.

195.    Since Insys entered the opioid pain market in 2012, after many of these means to disseminate false information were already under way, it is not known at this time to what extent Insys participated in them. Upon information and belief, Insys was able to effectively sell Subsys off-label due to the wide dissemination of misinformation propagated by the other Manufacturer Defendants.

196.    Since Collegium made only minimal sales of its opioid product before April 2016, it is not known at this time to what extent Collegium participated in the dissemination of the false information before that time. However, in its marketing effort to sell its opioid product,

---

[58]    While Actavis spent less than $100,000 and Cephalon spent nothing on medical advertisement in 2011, these companies' expenditures peaked earlier, with Actavis spending $11.7 million in 2005 and Cephalon spending about $4 million over 2007 and 2008.

Xtampza ER, Collegium continues to utilize many of the discredited marketing methods used by other Manufacturing Defendants, including a heavy use of detailers to spread deceptions about the safety of opioids on one-to-one bases, use of KOLs, and sponsorship of Front Groups, such as the American Pain Foundation (*infra* at ¶¶258, 260), and mischaracterizes the epidemic as "an abuse or misuse of opioids" rather than "an over-use of opioids," the true cause of the epidemic. In its March 7, 2018 Form 10-K SEC filing ("March 2018 Form 10-K"), Collegium stated as follows:

> Chronic pain, typically defined as pain that lasts beyond the healing of an injury or that persists longer than three months, is a worldwide problem with serious health and economic consequences . . . . Common types of chronic pain include lower back pain, arthritis, headache, and face and jaw pain. The prevalence of chronic pain is expected to rise in the future, as the incidence of associated illnesses such as diabetes, arthritis and cancer increases in the aging population.
>
> * * *
>
> Prescription opioids remain the primary treatment for chronic pain.[59]

### a.    Unsupported Research

197.    Manufacturer Defendants have misrepresented scientific research and evidence surrounding the addictiveness of their pharmaceutical products.

198.    Manufacturer Defendants led people to reasonably believe that they had tested the safety and efficacy of opioids for long-term use by creating a body of false, misleading, and unsupported literature about opioids that appeared to be the result of independent, objective research, and was thus more likely to shape the perceptions of prescribers, patients, and payors.

199.    Manufacturer Defendants coordinated the timing and publication of manuscripts, abstracts, posters and oral presentations, and educational materials in peer-reviewed journals and

---

[59]    Collegium Pharm., Inc., Annual Report at 5 (Form 10-K) (Mar. 7, 2018) [hereinafter "Collegium 10-K"].

other publications to support the launch and sales of their drugs. Manufacturer Defendants'
internal documents show plans to submit research papers and "studies" to long lists of journals,
including back-up options and last resort "fast-track" application journals, which they could use
if a pending paper was rejected everywhere else.

200.    Manufacturer Defendants worked to ensure that favorable articles were
disseminated and cited widely in medical literature, even where references distorted the
significance or meaning of the underlying study. One of the most frequently used distortions is
the instance of a five-sentence letter written to the New England Journal of Medicine ("NEJM")
in 1980 by Dr. Hershel Jick and his assistant, Ms. Jane Porter.

201.    In 1980, Dr. Jick and his assistant, Ms. Porter, who both worked at the Boston
University Medical Center, sent the Porter/Jick Letter to the prestigious NEJM:

ADDICTION RARE IN PATIENTS TREATED WITH NARCOTICS

To the Editor: Recently, we examined our current files to determine the incidence
of narcotic addiction in 39,946 hospitalized medical patients who were monitored
consecutively. Although there were 11,882 patients who received at least one
narcotic preparation, there were only four cases of reasonably well documented
addiction in patients who had no history of addiction. The addiction was
considered major in only one instance. The drugs implicated were meperidine in
two patients, Percodan in one, and hydromorphone in one. We conclude that
despite widespread use of narcotic drugs in hospitals, the development of
addiction is rare in medical patients with no history of addiction.

Jane Porter
Hershel Jick, M.D.
Boston Collaborative Drug
Surveillance Program
Boston University Medical Center
Waltham, MA 02154.[60]

---

[60]    Jane Porter & Hershel Jick, *Addiction Rare in Patients Treated with Narcotics*, 302 NEW
ENG. J. MED. 123 (1980), www.nejm.org/doi/pdf/10.1056/NEJM198001103020221.

202.    Manufacturer Defendants and their Front Groups have twisted this letter and misused it as scientific confirmation for their assertion that widespread and long-term opioid use does not pose a substantial threat of addiction. The Manufacturer Defendants knew, but failed to disclose, the material information that undermined the validity of the five-sentence letter for the sweeping proposition for which it was cited.

203.    Manufacturer Defendants knowingly misrepresented the findings and scientific value of the letter in several ways:

(a)    By omitting the fact that Ms. Porter and Dr. Jick's observations were made in a letter to the editor, and implying – or outright stating – that the results were the published results of a peer-reviewed scientific clinical trial study, they misrepresented the scientific validity of its findings;

(b)    Based on when the letter was written, in 1980, the use of opioids being described in the letter could only have been for acute pain or end-of-life care because medical practice at the time prohibited opioids from being used to treat chronic pain. Nevertheless, Manufacturer Defendants cited the Porter/Jick Letter as evidence for the proposition that opioids pose a low risk of addiction in all contexts, including long-term use for chronic pain;

(c)    Since the Porter/Jick Letter is not based on a clinical trial, there is no level of confidence that patients were regularly being monitored for signs of addiction. Thus, there may have been false negatives;

(d)    The letter is written about patients who were given a few opioid doses in a hospital, rather than those who were given prescriptions to take home. Nonetheless, it

was trumpeted by Manufacturer Defendants as scientific evidence that opioids pose a low risk of addiction when used long-term; and

(e)     There is no evidence that these patients were followed up with after leaving the hospital regarding the presence of any addiction.   But it was cited by Manufacturer Defendants as showing that opioids pose no long-term risk of addiction.

204.     Manufacturer Defendants mis-cited the Porter/Jick Letter again and again as evidence of the minimal risk of addiction from using opioids as a treatment for chronic pain, despite its limited credibility and the existence of much more significant evidence to the contrary.

205.     Two papers funded by Purdue in 1998 showed that between 8% and 13% of patients studied subsequently became addicted to opioids.  Ignoring this study, the Porter/Jick Letter was cited and relied upon in two CME courses put on by Purdue and Endo in 2012 to support the assertion that opioids are not addictive.

206.     The Porter/Jick Letter was not extensively cited as evidence of opioids' low risk of addiction until it first appeared in a 1986 paper by the American Pain Society, one of Defendants' Front Groups.  From there, its use as a tool of misinformation mushroomed.  It has been cited over 900 times, in contrast to the 11 other letters to the editor contemporaneously published in NEJM, which were cited a median of 11 times.

207.     Dr. Hershel Jick, the primary author, later stated that his own letter had been misused and distorted. He has said that he is "mortified that that letter to the editor was used as

an excuse to do what these drug companies did," referring to the fact that "they used this letter to spread the word that these drugs were not very addictive."[61]

208.    A 2017 statement in the NEJM (probably the first of its kind) was published as a meta-study on the misuse of the letter. It says that the letter "was heavily and uncritically cited as evidence that addiction was rare with long-term opioid therapy," which statement "contributed to the North American opioid crisis[.]"[62]

209.    The 2017 study reports that 80.8% of articles citing the 1980 letter did not mention that it was limited to the hospital setting and 72.2% of articles citing it used it to support the conclusion that addiction is rare in patients treated with opioids.

210.    "It's difficult to overstate the role of this letter," said Dr. David Juurlink of the University of Toronto, who led the analysis. "It was the key bit of literature that helped the opiate manufacturers convince front-line doctors that addiction is not a concern."[63]

211.    Manufacturer Defendants also worked to discredit or bury negative information. Manufacturer Defendants – often with the help of third-party consultants – targeted a broad range of media to disseminate their message, including negative review articles, letters to the editor, commentaries, case-study reports, and newsletters disparaging reports of the link between opioids and addiction.

---

[61]    Derek Hawkins, *How a Short Letter in a Prestigious Journal Contributed to the Opioid Crisis*, WASH. POST (Jun. 2, 2017), https://www.washingtonpost.com/news/morning-mix/wp/2017/06/02/how-the-opioid-crisis-traces-back-to-a-five-sentence-scholarly-letter-from-1980/?utm_term=.836d02c52301.

[62]    Pamela T.M. Leung, *et al.*, *A 1980 Letter on the Risk of Opioid Addiction*, 376 NEW ENG. J. MED 2194 (2017).

[63]    Marilynn Marchione, *Painful Words: How a 1980 Letter Fueled the Opioid Epidemic*, STAT NEWS (May 31, 2017), https://www.statnews.com/2017/05/31/opioid-epidemic-nejm-letter.

212.    Manufacturer Defendants' strategies were intended to, and did, knowingly and intentionally distort the truth regarding the risks, benefits, and superiority of opioids for chronic pain relief, resulting in distorted prescribing patterns.

### b.    Key Opinion Leaders

213.    Manufacturer Defendants used KOLs (who are generally distinguished physicians and neutral sources of guidance in their medical field) as sources of pro-opioid misinformation for regular practicing doctors, including those in the Commonwealth of Virginia treating Portsmouth residents.

214.    The KOLs have been central to the Manufacturer Defendants' diffuse marketing efforts. KOLs have written, consulted on, edited, and lent their names to books and articles, and given speeches and CMEs supportive of chronic opioid therapy.   They have served on committees that developed treatment guidelines strongly encouraging the use of opioids to treat chronic pain and the boards of pro-opioid advocacy groups and professional societies that develop, select, and present CMEs.  Manufacturer Defendants were able to exert control over each of these modalities through their KOLs.

215.    In exchange for these services of the KOLs, Manufacturer Defendants provided them with money, prestige, recognition, research funding, and avenues to publish.   This positioned the KOLs to exert even more influence in the medical community.

216.    Opioid-makers were not the first to mask their deceptive marketing efforts in purported science.  The tobacco industry also used KOLs in its efforts to persuade the public and regulators that tobacco was not addictive or dangerous.  For example, tobacco companies funded a research program at Harvard and chose as its chief researcher a doctor who had expressed views in-line with industry's views.  He was dropped when he criticized low-tar cigarettes as potentially more dangerous, and later described himself as a pawn in the industry's campaign.

64

217.    Manufacturer Defendants cultivated and promoted only those KOLs who could be relied upon to help broaden the chronic pain opioid therapy market. Manufacturer Defendants selected, funded, and elevated those doctors whose public positions were unequivocally supportive of using opioids to treat chronic pain. These doctors' professional reputations were then dependent on continuing to promote a pro-opioid message, even in activities not directly funded by the drug companies.

218.    Manufacturer Defendants cited and promoted favorable studies or articles by these KOLs. By contrast, Manufacturer Defendants did not disseminate the publications of doctors critical of the use of chronic opioid therapy. One prominent KOL sponsored by many of the Manufacturer Defendants, Dr. Russell Portenoy, stated that he was told by a drug company that research critical of opioids (and the doctors who published that research) would never obtain funding.

219.    Collegium Vice President, Steven Passik, has proudly identified Dr. Portenoy as one of his mentors, stating that Dr. Portenoy, among others, "taught me everything I know about pain and encouraged and supported me long before I had any idea of what I was talking about."[64]

220.    Some KOLs have even gone on to become direct employees and executives of Manufacturer Defendants, like Dr. Haddox, Purdue's Vice President of Health Policy, or Dr. Bradley Galer, Endo's former Chief Medical Officer.

221.    Manufacturer Defendants provided substantial opportunities for KOLs to author articles or research studies on topics Manufacturer Defendants suggested or chose, with the predictable effect of ensuring that many favorable studies appeared in the academic literature.

---

[64]    *Pundit Profiles: Steven D. Passik, PhD*, PAINWEEK (Jan. 4, 2017), https://www.painweek.org/brainfood_post/steven-d-passik-phd.html.

As described by Dr. Portenoy, drug companies would approach him with a study that was well under way and ask if he would serve as the study's author. Dr. Portenoy regularly agreed.

222.    Manufacturer Defendants also paid KOLs to serve as consultants or on their advisory boards and to give talks or present CMEs, often over meals or at conferences. Since 2000, Cephalon, for instance, has paid doctors more than $4.5 million for programs relating to its opioids.

223.    Manufacturer Defendants kept close tabs on the content of the misleading materials published by these KOLs. In many instances, they also scripted what these KOLs said -- as they did with all their recruited speakers.

224.    There was a group of KOLs who received funding and benefits from all of the Manufacturer Defendants, who participated in an enterprise to pay these KOLs, to disseminate misinformation about the safety and efficacy of opioids as a treatment for chronic pain in order to enable the Manufacturer Defendants to unlawfully expand their profits.

225.    Dr. Portenoy received research support, counseling fees, and honoraria from Manufacturer Defendants Purdue, Cephalon, Janssen, and others. He was also president of the Front Group American Pain Society ("APS") and board member of Front Group American Pain Foundation ("APF").

226.    Dr. Lynn Webster was the author of numerous CMEs sponsored by Purdue, Cephalon, Endo, and Collegium. He was also president of the Front Group American Academy of Pain Medicine ("AAPM") and board member of APF. Dr. Webster also currently serves as the Scientific Advisor to Collegium.[65]   In addition, Dr. Webster has disclosed receiving

---

[65]    *Executive Profile: Lynn R. Webster M.D., FACPM, FASAM*, BLOOMBERG, https://www.bloomberg.com/research/stocks/people/person.asp?personId=24452366&privcapId =7490189 (last visited Dec. 14, 2018).

"honoraria, consultant fees and/or travel expenses" from Collegium, Insys, Mallinckrodt, and Cephalon.[66]

227.    Dr. Scott Fishman was a KOL who authored *Responsible Opioid Prescribing*, a publication sponsored by Manufacturer Defendants Purdue and Cephalon. Dr. Fishman was also a president of APF and AAPM.

228.    Dr. Perry Fine was a KOL who received funding from Manufacturer Defendants Purdue, Cephalon, Janssen, and Endo. He was also president of AAPM and board member of APF.

### c.    Continuing Medical Education

229.    Virginia physicians are required to attend CMEs every two years in order to renew their medical licenses. Manufacturer Defendants sponsored CMEs and made sure that the content supported their position on opioids. They were thereby able to promulgate their teaching to a large number of doctors that they should be prescribing more opioids.

230.    Because CMEs are typically delivered by KOLs who are highly respected in their fields, and are thought to reflect these physicians' medical expertise and "cutting edge" practices, these CMEs can be especially influential to doctors.

231.    The countless doctors and other healthcare professionals, who participate in accredited CMEs, constituted an enormously important audience for opioid reeducation. Manufacturer Defendants targeted general practitioners, who were especially susceptible to Manufacturer Defendants' deceptions because of their lack of specialized training in pain

---

[66]    Lynn R. Webster, *Opioid-Induced Constipation*, 16 PAIN MEDICINE S16 (2015), *available at* https://onlinelibrary.wiley.com/doi/full/10.1111/pme.12911.

management and the likelihood that they would treat patients seeking medical treatment for general pain management issues.

232.    These CMEs, often with names related to treatment of chronic pain, inflated the benefits of opioids, omitted or downplayed their risks, and focused on opioids to the exclusion of alternative treatments.

233.    The influence of Manufacturer Defendants' funding on the content of these CMEs is clear.    One study by a Georgetown University Medical Center professor compared the messages retained by medical students who reviewed an industry-funded CME article on opioids versus another group who reviewed a non-industry-funded CME article. The industry-funded CME did not mention opioid-related death once; the non-industry-funded CME mentioned opioid-related death 26 times.

234.    Students who read the industry-funded article noted more frequently the impression that opioids were underused in treating chronic pain.    The "take-aways" of those reading the non-industry-funded CME included the risks of death and addiction much more frequently than those of the other group.

235.    Neither group could accurately identify whether the article they read was industry-funded, making clear the difficulty medical practitioners (the audience for CMEs) have in screening and accounting for source bias.[67]

236.    By sponsoring CME programs presented by Front Groups, like AAPM, APF, and others, like PAINWeek, Manufacturer Defendants could expect messages to be favorable to them, as these organizations were financially dependent on Manufacturer Defendants for other

---

[67]    Adriane Fugh-Berman, *Marketing Messages in Industry-Funded CME*, PHARMED OUT (June    25,    2010),    http://www.pharmedout.org/pdf/Conf2010/Fugh-BermanPrescriptionfor Conflict6-25-10.pdf.

projects. The sponsoring organizations honored this principle by hiring pro-opioid KOLs to give talks that supported chronic opioid therapy. Manufacturer Defendant-driven content in these CMEs had a direct and immediate effect on prescribers' views on opioids.

### d.    Treatment Guidelines

237.    Manufacturer Defendants produced treatment guidelines for doctors. Such guidelines were crucial for giving legitimacy to extensive opioid prescriptions and providing a framework within which doctors would feel comfortable prescribing them. These guidelines are also cited throughout the scientific literature and referenced by third-party payors in determining whether they should cover treatments for specific indications.

### (i)    Federation of State Medical Boards

238.    The Federation of State Medical Boards ("FSMB") is an organization representing the various state medical boards in the United States, including the Virginia Department of Health Professions, which have the power to license doctors, investigate complaints, and discipline physicians. The FSMB finances opioid- and pain-specific programs through grants from Manufacturer Defendants.

239.    In 1998, the FSMB developed its *Model Guidelines for the Use of Controlled Substances for the Treatment of Pain* ("FSMB Guidelines"), which FSMB conceded was produced "in collaboration with pharmaceutical companies." From 1997 to 2013, FSMB received more than $2 million from the Manufacturer Defendants (other than Insys or Collegium). The FSMB Guidelines taught that opioids were "essential" for treatment of chronic pain, including as a first prescription option. The FSMB Guidelines failed to mention risks relating to respiratory depression and overdose and discussed addiction only in the sense that "inadequate understanding" of addiction can lead to "inadequate pain control."

240.    The publication of *Responsible Opioid Prescribing*, a book adapted from the FSMB Guidelines, was backed largely by Manufacturer Defendants, including Cephalon, Endo, and Purdue.   The FSMB financed the distribution of *Responsible Opioid Prescribing* by its member boards by contracting with drug companies, including Endo and Cephalon, for bulk sales and distribution to sales representatives (for distribution to prescribing doctors).   There were 163,131 copies of *Responsible Opioid Prescribing* distributed to state medical boards, including the Virginia Department of Health Professions (and through the boards, to practicing doctors), and the FSMB earned approximately $250,000 in revenue and commissions from their sale.

241.    The FSMB Guidelines conveyed the message that "inadequate pain control" would result in official discipline, but no discipline would result if opioids were prescribed as part of an ongoing patient relationship and prescription decisions were documented.

242.    Through the FSMB Guidelines, the Manufacturer Defendants were able to turn doctors' fear of discipline on its head – doctors, who used to believe that they would be disciplined if their patients became addicted to opioids, were taught that instead, they would be punished if they failed to prescribe opioids to their patients with pain.

### (ii)    AAPM/APS Guidelines

243.    AAPM and APS are professional medical societies, each of which received substantial funding from the Manufacturer Defendants from 2009 to 2013 (with AAPM receiving well over $2 million).

244.    AAPM issued a consensus statement in 1997, *The Use of Opioids for the Treatment of Chronic Pain*, which endorsed opioids for treating chronic pain and claimed that

the risk of addiction to opioids was low.[68]  The co-author of the statement, Dr. Haddox, was at the time a paid speaker for Purdue and subsequently became Vice President of Health Policy at Purdue.  Dr. Portenoy, one of the main KOLs who received funding from Manufacturer Defendants Janssen, Cephalon, Endo, and Purdue, was the sole consultant.  The consensus statement formed the foundation of the FSMB Guidelines.  That statement was actively distributed by AAPM until 2012.

245.   AAPM and APS issued their own guidelines in 2009 ("AAPM/APS Guidelines"), continuing to recommend the use of opioids to treat chronic pain.[69]  Fourteen of the 21 panel members who drafted the AAPM/APS Guidelines, including KOLs Dr. Portenoy and Dr. Fine of the University of Utah, received support from Janssen, Cephalon, Endo, and Purdue.

246.   The AAPM/APS Guidelines promote opioids as "safe and effective" for treating chronic pain, despite acknowledging limited evidence, and conclude that the risk of addiction is manageable for patients regardless of past abuse histories.

247.   One panel member, Dr. Joel Saper, Clinical Professor of Neurology at Michigan State University and founder of the Michigan Headache & Neurological Institute, resigned from the panel because of his concerns that the AAPM/APS Guidelines were influenced by contributions that drug companies, including Manufacturer Defendants, made to the sponsoring organizations and committee members.

---

[68]   The American Academy of Pain and the American Pain Society, *The Use of Opioids for the Treatment of Chronic Pain*, 13 CLINICAL J. PAIN 6 (1997), http://www.jpain.org/article/S1082-3174(97)80022-0/pdf.

[69]   Roger Chou, *et al.*, *Clinical Guidelines for the Use of Chronic Opioid Therapy in Chronic Noncancer Pain*, 10 J. PAIN 113, 130 (2009), http://www.jpain.org/article/S1526-5900(08)00831-6/abstract.

71

248.    The AAPM/APS Guidelines have been a particularly effective channel of deception and have influenced not only treating physicians, but also the body of scientific evidence on opioids.  The AAPM/APS Guidelines have been cited 732 times in academic literature, are still available online, and were reprinted in the Journal of Pain.

249.    Defendants widely referenced and promoted the AAPM/APS Guidelines without disclosing the acknowledged lack of evidence to support them.

### (iii)    American Geriatrics Society

250.    The American Geriatrics Society ("AGS"), a nonprofit organization serving healthcare professionals who work with the elderly, disseminated guidelines regarding the use of opioids for chronic pain in 2002, *The Management of Persistent Pain in Older Persons* (hereinafter "2002 AGS Guidelines"), and 2009, *Pharmacological Management of Persistent Pain in Older Persons* (hereinafter "2009 AGS Guidelines").

251.    The 2009 AGS Guidelines recommended that "[a]ll patients with moderate to severe pain . . . should be considered for opioid therapy" and stated that "the risks [of addiction] are exceedingly low in older patients with no current or past history of substance abuse."[70] These recommendations are not supported by any study or any other reliable scientific evidence. Nevertheless, they have been cited 278 times in Google Scholar since their 2009 publication.

252.    AGS contracted with Manufacturer Defendants Endo, Purdue, and Janssen to disseminate the 2009 AGS Guidelines, and to sponsor CMEs based on them.  The Manufacturer Defendants were aware of the content of the 2009 AGS Guidelines when they agreed to provide funding for these projects.

---

[70]    B. Ferrell, *et al.*, *Pharmacological Management of Persistent Pain in Older Persons*, 57 J. AM. GERIATR. SOC'Y 1331, 1339, 1342 (2009), https://onlinelibrary.wiley.com/doi/abs/10.1111/j.1532-5415.2009.02376.x.

253.    The 2009 AGS Guidelines were first published online on July 2, 2009. AGS submitted grant requests to Manufacturer Defendants, including Endo and Purdue, beginning July 15, 2009. Internal AGS discussions in August 2009 reveal that AGS did not want to receive up-front funding from Manufacturer Defendants, which would suggest drug company influence, but would instead accept commercial support to disseminate the publication. However, by drafting the 2009 AGS Guidelines knowing that pharmaceutical company funding would be needed, and allowing these companies to determine whether to provide support only after they had approved the message, AGS effectively ceded significant control to these companies. Endo, Janssen, and Purdue all agreed to provide support to distribute the 2009 AGS Guidelines.

254.    Five of ten of the experts on the 2009 AGS Guidelines' panel disclosed financial ties to Manufacturer Defendants, including serving as paid speakers and consultants, presenting CMEs sponsored by Manufacturer Defendants, receiving grants from Manufacturer Defendants, and investing in Manufacturer Defendants' stock.

255.    As noted *infra* at ¶¶270-71, the recommendations (in this case, treatment guidelines) of those organizations not financed by Manufacturer Defendants stood in marked contrast to those financed by the Defendants.

### e.    Front Groups and Unbranded Advertising

256.    Manufacturer Defendants Purdue, Endo, Janssen, Collegium, and Cephalon collectively used unbranded, third-party marketing (through KOLs and Front Groups) as part of their national marketing strategies for their branded drugs. Unbranded advertising had the dual advantage of having an appearance of independence and credibility and not being subject to the regulations promulgated by the FDA for branded advertising. The purpose of the FDA regulations on branded advertising, 21 U.S.C. §352(a) and 21 C.F.R. §§1.21(a), 202.1(e)(3), and 202.1(e)(6), is to encourage truthful advertising.

257.     Defendants published print advertisements in a broad array of medical journals, ranging from those geared to a wider audience, such as the Journal of the American Medical Association, to those targeted more at specialists, such as the Journal of Pain.  In 2011 alone, Defendants' advertising budgets exceeded $14 million on the medical journal advertising of opioids, which was nearly three times what they spent in 2001.

258.     Manufacturer Defendants Purdue, Cephalon, Janssen, Endo, and Actavis engaged in a series of actions designed to thwart federal advertising guidelines, market themselves by way of seemingly neutral third parties, and appear distanced from these organizations, while simultaneously funneling large amounts of money into them.  By doing so, they were able to engage in a multi-pronged effort to misrepresent the risks and overstate the benefits of using opioids.  These Manufacturer Defendants were also able to change prescribing practices through materials that appeared not to be marketing.

259.     One part of this approach was to influence the stances of Front Groups by heavily contributing to the organizations' income.  Manufacturer Defendants then turned around and cited materials produced by these groups as evidence of their positions.

### (i)     APF's Role as a Front Group for Defendants' Deceptive Marketing

260.     APF was a prominent Front Group for Manufacturer Defendants.  The group's name is meant to sound official and impartial, but, in fact, this organization was a front for promotional material and advocacy on behalf of the Manufacturer Defendants.

261.     Between 2007 and until its closure in May 2012, APF received upwards of $10 million from Manufacturer Defendants.  In 2009 and 2010, it received from them more than 80% of its operating budget.  In 2010, for example, APF received more than $1 million from Endo.

74

262.   APF issued "education guides" for patients, policymakers, and the news media that advocated the benefits opioids provided for chronic pain and trivialized their risks, particularly the risk of addiction. APF engaged in a significant multimedia campaign through television, radio, and the internet to purportedly "educate" patients about their "right" to pain treatment with opioids.

263.   The publications available from APF extolled the benefits of opioids, and these publications were underwritten by Manufacturer Defendants Purdue, Cephalon, Janssen, and Endo. For example, one board member published a study in 2010 sponsored by Cephalon, finding that Cephalon's drug Fentora was "generally safe and well-tolerated" in non-cancer patients, even though it was only approved for severe cancer pain.

264.   APF held itself out as an independent patient advocacy organization. In reality, APF functioned largely as an advocate for the interests of Defendants, not patients. APF engaged in grassroots lobbying efforts against various legislative initiatives that might limit opioid prescribing, exemplifying APF's true interest, which was to make money for the manufacturers, and ignoring patient pain concerns.

265.   In practice, APF operated in close collaboration with Manufacturer Defendants. APF submitted grant proposals seeking to fund activities and publications they suggested and assisted in marketing projects for them.

266.   APF and APS submitted *amicus* briefs in defense of opioids: in one case, in support of Defendant Purdue; in another, in support of a doctor on trial for over-prescribing pain medication (who was subsequently found guilty of 16 counts of drug trafficking).

267.   By 2011, APF was entirely dependent on incoming grants from Defendants Purdue, Cephalon, Endo, and others for funding, which also thereby enabled APF to avoid using



its line of credit. APF board member, KOL Dr. Portenoy, explained that the lack of funding diversity was one of the biggest problems at APF.

268.    All of APF's programs and materials were intended to, and did, reach a national audience, including persons within the City of Portsmouth.

269.    A 2012 U.S. Senate Finance Committee investigation between manufacturers and APF resulted in an abrupt halt to this funding. APF's board of directors dissolved the group within days of this investigation.

### (ii)    The Role of Other Front Groups in Defendants' Deceptive Marketing

270.    AAPM similarly has received more than $2 million from opioid manufacturers since 2009. This group issues treatment guidelines and hosts CME courses, while espousing positions consistent with opioid manufacturers. Presidents of this organization include many of the KOLs mentioned above. A yearly meeting put on by AAPM allows the group to interface with opioid manufacturers, who pay to present "medical education programs" to AAPM and attending doctors.

271.    Other Front Groups include the University of Wisconsin Pain & Policy Studies Group, which received $2.5 million from opioid manufacturers to lobby and otherwise promote opioid use; and APS, incorporated in 1977, whose primary corporate supporter is pharmaceutical manufacturer Mallinckrodt. Similarly, the Pain Care Forum, a Front Group sponsored by Collegium, comprises a group of over 100 drug manufacturers and advocacy groups that coordinates efforts to influence legislation concerning prescription pain medications on both federal and state levels.

272.    These Front Groups provided important services for the Manufacturer Defendants. They prepared and disseminated unbranded materials promoting the use of opioids

to doctors and the public, including by conducting CMEs and issuing treatment guidelines for doctors, and by outreach targeting particularly vulnerable groups, such as veterans and elderly people. They also advocated against regulatory guidelines that would limit opioid prescriptions, and responded negatively to journal articles not supporting the use of opioids. The significant funding and regular interfacing between these sets of organizations ensured that the Front Groups would issue messages supporting the position(s) of the opioid manufacturers.

273.   Defendants Purdue, Endo, Janssen, Cephalon, and Actavis collectively exercised substantial control over the content of the messages third parties generated and disseminated and distributed certain of those materials themselves.   These Defendants took an active role in guiding, reviewing, and approving many of the misleading statements issued by these third parties, ensuring that Manufacturer Defendants were consistently aware of their content.   By funding, directing, editing, and distributing these materials, Manufacturer Defendants exercised control over their deceptive messages and acted in concert with these third parties to fraudulently promote the use of opioids for the treatment of chronic pain.

274.   The behavior and positions of those groups that did not accept funding from manufacturers contrasts significantly with that of the Front Groups. The American Society of Interventional Pain Physicians only recommends high doses of long-acting opioids "in specific circumstances with severe intractable pain" along with "continuous adherence monitoring, in well-selected populations, in conjunction with or after failure of other modalities of treatments with improvement in physical and functional status and minimal adverse effects."[71]

---

[71]   Bradley W. Wargo, *et al.*, Am. Soc'y of Interventional Pain Physicians (ASIPP), Guidelines for Responsible Opioid Prescribing in Chronic Non-Cancer Pain (pts. 1 & 2), 15 Pain Physician      S1      (2012),      https://www.ncbi.nlm.nih.gov/pubmed/22786448      & https://www.ncbi.nlm.nih.gov/pubmed/22786449.

275.    The American College of Occupational and Environmental Medicine similarly discourages "routine use of opioids in the management of patients with chronic pain," though conceding that for some patients it may be appropriate.[72]    The U.S. Department of Veteran Affairs ("VA") and the U.S. Department of Defense ("DoD") note risks of abuse and misuse, and "the lack of solid evidence based research on the efficacy of long-term opioid therapy."[73]

### f.    Defendants Inappropriately Used Their Sales Force and "Speakers Bureaus" to Unfairly and Deceptively Promote Use of Their Drugs

276.    Like most drug manufacturers, the Manufacturer Defendants made extensive use of their sales force—sometimes called "detailers"—to meet with physician groups one-on-one and promote their products through intimate settings, with promotions being advanced by paid speakers. The degree to which the Defendants organized their sales force to "lock-step" sell their products, based on falsehoods and material omissions, is what rendered their marketing efforts unlawful.

277.    Defendants' marketing plans, which often operated in parallel to one another, targeted physician groups far afield from pain specialists and anesthesiologists (or cancer doctors) to include physician groups, such as general practice physicians, sports medicine physician groups, etc., with no correlation to the demonstrated needs of the physicians' patients for opioid therapy, or to the risk of abuse.

---

[72]    AM. C. OF OCCUPATIONAL & ENVTL. MED., ACOEM'S GUIDELINES FOR THE CHRONIC USE OF OPIOIDS (2011), https://www.nhms.org/sites/default/files/Pdfs/ACOEM%202011-Chronic%20Pain%20Opioid%20.pdf.

[73]    U.S. Dep't of Veterans Affairs, The Management of Opioid Therapy for Chronic Pain Working Group, (May 2010), https://www.va.gov/painmanagement/docs/cpg_opioidtherapy_summary.pdf.

278.    The expanded market of prescribers tended to be, as a group, less informed about opioids and more susceptible to Defendants' marketing.    The prescribers included nurse practitioners and physician assistants considered to be "share acquisition" opportunities because they were "3x more responsive than MDs to detail," according to an Endo business plan.

279.    The expanded market also included internists and general practitioners with a stated goal, for example, according to an Actavis plan, to move beyond "Kadian loyalists" to an "expanded audience" of "low morphine writers."

280.    Each Manufacturer Defendant relied upon "influence mapping," which meant using decile ranking identifying high-volume prescribers, so that the manufacturer's sales force would get the biggest impact from sales calls.    Defendants also closely monitored a doctor's prescribing after a sales representative's visit to allow them to fine-tune their messaging.

281.    Each Defendant studiously trained its sales representatives – through detailed action plans, trainings, tests, scripts, role-plays, and supervision tag-alongs – to ensure that the individual sales representatives stayed strictly on script, which involved selling their opioids for off-label uses.

282.    Purdue rewarded its high-prescribing doctors, and rewarded them well.    Purdue showered these doctors with attention, meals, gifts, and money.

283.    In addition to the sales calls, sales representatives were required to identify "product loyalists" – who were high prescribers of drugs – to be selected to be speakers on behalf of the Manufacturer Defendants and invited to give speeches to their peers proclaiming the effectiveness of the respective manufacturer's opioid.    The speakers were paid handsomely for this service with honoraria ranging from about $800 to $2,000 per program.

284.   The Manufacturer Defendants all tracked the effectiveness of the speakers program by monitoring the prescription writing of the attending physicians after the speaker program.  It was an effective strategy.  Endo noted that "physicians who came into our speaker programs wrote more prescriptions for Opana ER after attending than before."

285.   Defendants devoted substantial resources to these direct sales contacts with prescribers.  In 2014, Defendants collectively spent $168 million on detailing branded opioids to physicians nationwide.  This figure includes $108 million spent by Purdue, $34 million by Janssen, $13 million by Cephalon, $10 million by Endo, and $2 million by Actavis.  The total figure is more than double Defendants' collective spending on detailing in 2000.  Detailers' role in Defendants' overall promotional efforts was also carefully calibrated; Endo, for example, found that devoting 61% of its marketing budget to sales representatives reflected an "[a]ppropriate combination of personal . . . and non-personal . . . selling initiatives."

286.   Defendants spent hundreds of millions of dollars promoting their opioids through their large sales forces because their monitoring showed that the sales forces' face-to-face meetings with prescribers had a significant influence on prescribing rates.  As a routine matter, the Defendants incentivized their sales representatives to sell by basing their compensation on a low salary/high commission format.

287.   Upon information and belief, Purdue gave its salespeople explicit instructions to "extend average treatment duration."  Purdue's business plans valued patients by how long they could be kept on Purdue's opioids.  Purdue developed tactics specifically to keep patients hooked on opioids longer, which it called by the euphemism: *Improving the Length of Therapy* – sometimes abbreviated as "LOT" or "LoT."  Purdue taught its employees that there is "a direct relationship" between getting patients on higher doses and keeping them on Purdue's opioids

longer. Purdue's internal marketing plan showed a graph that broke down exactly how getting patients on higher doses of opioids would get more patients to stay on drugs longer:



*Purdue internal strategy presentation from 2012*

288. Upon information and belief, hundreds or thousands of visits from sales representatives from each of the Manufacturer Defendants were made to prescribers in Portsmouth and the surrounding area, where the message regarding the use and safety of opioid therapy for the prescribers' patients was untethered from any scientific basis, as the Defendants well knew.

289. A national study of tens of thousands of medical and pharmacy claims records published in the Journal of General Internal Medicine found that two-thirds of patients who took opioids for 90 days were still taking opioids *five years later*.

290. Collegium is continuing the practice of sending sales representatives or detailers directly to physicians' offices increase sales, despite the practice being severely criticized. For example, Collegium's March 2018 Form 10-K states, as follows:

> We have a dedicated field sales force, consisting of approximately 131 sales professionals, to call on the approximately 11,000 physicians who write approximately 58% of the branded extended-release oral opioid prescriptions in

81

> the United States, with a primary focus on pain specialists. In addition, we deploy a focused sales force of approximately 14 specialty sales representatives to call on hospitals."[74]

The sales force, therefore, constitutes more than half of Collegium's full time staff.

291.    Upon information and belief, members of those sales force personnel are marketing the use of Xtampza ER to physicians and nurse practitioners with prescription-writing authority within Portsmouth and its surrounding area, and are falsely representing that their oxycodone product Xtampza ER should be used even where safer methods of pain relief have not been tried and failed.   Collegium escalated its use of detailers while other opioid manufacturers have finally disavowed this discredited practice.

292.    Upon information and belief, Collegium is now responsible for a significant amount of the detailing of prescribers by opioid manufacturers in the Portsmouth area.

293.    In a lawsuit filed in Massachusetts state court, LeighAnne Pendlebury, a discharged salesperson referred to as a "Therapeutic Specialist" for Collegium, alleged that she, and other sales representatives, was directly ordered by her supervisors at Collegium, upon orders from Michael Heffernan, Collegium's CEO and President, to:

use marketing materials in their sales visits to prescribers that had not been approved by the FDA;

end all sales pitches to providers by having the sales representatives cross their arms in the shape of an "X" and say "Xtampza crosses out tampering," even though the FDA warned Collegium that use of the term "tamper-proof" was misleading because the drug was not tamper-proof; and

fabricate phony doctors' names on attendance sheets for Collegium's dinner programs as a way of covering up excessive payments to targeted physicians for expensive (over $10,000) meals.

294.    Collegium is also utilizing the discredited method of relying on KOLs to market the use of its opioid.  Its March 2018 Form 10-K states, as follows:

---

[74]    Collegium 10-K, *supra*, n.59 at 15.



> We are continuing to execute our commercialization strategy with the input of key opinion leaders in the field of pain management, as well as healthcare practitioners. We have developed positioning and messaging campaigns, a publication strategy, initiatives with payor organizations, and distribution and national accounts strategies. Our marketing strategy includes increasing awareness of the differentiated features of Xtampza and the Nucynta Products and increasing awareness of solutions for patients with CPD [Chronic Pain Disorder] who require or would benefit from extended-release opioids.[75]

### g.    Direct-to-Consumer Marketing

295.    Manufacturer Defendants targeted patients so that they would ask doctors for those medications specifically.    Endo's research, for example, found that such direct-to-consumer communications resulted in greater patient "brand loyalty," with longer durations of Opana ER therapy and fewer discontinuations. Patient-focused advertising, especially direct-to-consumer marketing, is seen by marketing experts within the pharmaceutical industry as substantially valuable in "increas[ing] market share . . . by bringing awareness to a particular disease that the drug treats."[76] An Actavis marketing plan, for example, noted that "[d]irect-to-consumer marketing affects prescribing decisions."

296.    Defendants marketed to consumers through patient-focused "education and support" materials. These took the form of pamphlets, videos, or other publications that patients could view in their physicians' offices. Endo also targeted employer and workers' compensation plan initiatives.    This marketing was intended to, and did, result in patients requesting opioids in reliance on Defendants' statements that contained falsehoods and material omissions.

297.    Defendants also recognized the obstacle that out-of-pocket costs to patients posed to their bottom-line sales figures. They overcame this obstacle by providing patients financial

---

[75]    *Id.*

[76]    Kanika Johar, An Insider's Perspective: Defense of the Pharmaceutical Industry's Marketing Practices, 76 ALBANY L. REV. 299, 308 (2013).

assistance with their insurance co-payments through vouchers and coupons distributed by Defendants' sales representatives when they visited prescribers. For example, in 2012, Janssen planned to distribute 1.5 million savings cards worth $25 each.

298.    Defendant Insys brought the effort to get insurance to pay for its product to an entirely new level of fraud. As the *Fueling an Epidemic* Senate report describes, Insys created a separate department, the Insys Reimbursement Center ("IRC"), that was designed to obtain quick approvals for insurance reimbursement for Insys's product, Subsys, which is an orally administered spray of fentanyl. The IRC unit exercised fraud and deception (such as pretending to be calling from a physician's office and falsely representing that the prescription was for a cancer patient, which was the only FDA-approved indication for Subsys). The head of the IRC unit, Elizabeth Guerrieri, pleaded guilty in federal court in June 2017 for "having conspired to defraud insurers." On November 28, 2018, Alec Burlakoff, the former Vice President of Sales at Insys, also pleaded guilty in federal court to a racketeering conspiracy.

### (i)     The Elderly

299.    Defendants have promoted the unfounded notion that the elderly are particularly unlikely to become addicted to opioids. The 2009 AGS Guidelines, for example, which Purdue, Endo, and Janssen publicized, described the risk of addiction as "exceedingly low in older patients with no current or past history of substance abuse." There is not now, nor has there ever been, any scientifically based evidence to support this statement.

300.    On the contrary, a 2010 study examining overdoses among long-term opioid users found that patients 65 or older were among those with the largest number of serious overdoses.[77]

---

[77]     Kate M. Dunn, *et al.*, *Opioid Prescriptions for Chronic Pain and Overdose: A Cohort Study*, 152 ANNALS INTERNAL MED. 85 (2010), available at http://annals.org/aim/article-abstract/745518/opioid-prescriptions-chronic-pain-overdose-cohort-study.

301.    Elderly patients taking opioids have been found to be exposed to elevated fracture risks, greater risk for hospitalizations, increased vulnerability to adverse drug effects and interactions, such as respiratory depression, and a significantly higher rate of deaths, heart attacks, and strokes than users of NSAIDs.

302.    Defendants' targeted marketing to the elderly, and the absence of cautionary language in their promotional materials flies in the face of scientific evidence, their own labels, and creates a heightened risk of serious injury to elderly patients.

303.    Defendants' efforts have paid off. Since 2007, prescriptions for the elderly have grown at twice the rate of prescriptions for adults between the ages of 40 and 59.

304.    Upon information and belief, Purdue trained its representatives to show doctors charts emphasizing Medicare coverage for its opioids, and use profiles of fake elderly patients in chronic pain, complete with staged photographs, to convince doctors to prescribe its drugs.

305.    Manufacturing Defendants saw the opportunity to earn millions of dollars by getting elderly patients on opioids because the public would pay through Medicare. Manufacturing Defendants disregarded and obscured the risks to the health of elderly patients in its deceptive sales campaign.

### (ii)    Veterans

306.    Veterans, too, were specifically targeted for Defendants' misleading marketing strategy. A 2008 survey showed that prescription drug abuse among military personnel had doubled from 2002 to 2005, and then nearly tripled again over the following three years.[78]

---

[78]    RTI INTERNATIONAL, 2008 DEPARTMENT OF DEFENSE SURVEY OF HEALTH RELATED BEHAVIORS AMONG ACTIVE DUTY MILITARY PERSONNEL (2009), https://prhome.defense.gov/Portals/52/Documents/RFM/Readiness/DDRP/docs/2009.09%20200 8%20DoD%20Survey%20of%20Health%20Related%20Behaviors%20Among%20Active%20D uty%20Military%20Personnel.pdf.

307.    In 2009, military doctors prescribed 3.8 million narcotic pain pills – four times as many as they had prescribed in 2001.  Further, one-third of veterans who were prescribed opioids, as of 2012, remained on take-home opioids for more than 90 days.  Although many of these veterans are returning from service with traumatic injuries, the increase in opioid prescribing is disproportionate to the population and, in far too many cases, unsuited for their treatment.

308.    Among former service members receiving VA services nationally, in a single year (2005), 1,013 died of an accidental drug overdose – almost double the rate of the civilian population (19.85 people out of 100,000 per year vs. 10.49 people out of 100,000 per year).[79]

309.    Opioids are particularly dangerous to veterans.  According to a study published in the 2013 Journal of American Medicine, veterans returning from Iraq and Afghanistan, who were prescribed opioids, have a higher incidence of adverse clinical outcomes, such as overdoses and self-inflicted and accidental injuries; 40% of veterans with post-traumatic stress disorder received opioids and benzodiazepines (anti-anxiety drugs) that, when mixed with alcohol, can cause respiratory depression and death.

310.    According to a VA Office of Inspector General report, despite the risks, 92.6% of veterans prescribed opioid drugs were also prescribed benzodiazepines.[80]

---

[79]    Amy S.B. Bohnert, *et al.*, *Accidental Poisoning Mortality Among Patients in the Department of Veterans Affairs Health System*, 49 MED. CARE 393 (2011), *available at* https://journals.lww.com/lww-medicalcare/Abstract/2011/04000/Accidental_Poisoning_Mortality_Among_Patients_in.11.aspx.

[80]    U.S. DEPT. OF VETERANS AFFAIRS, OFF. INSPECTOR GEN., REP. NO. 14-00895-163, HEALTHCARE INSPECTION – VA PATTERNS OF DISPENSING TAKE-HOME OPIOIDS AND MONITORING PATIENTS ON OPIOID THERAPY (2014), https://www.va.gov/oig/pubs/vaoig-14-00895-163.pdf.

311.    As with elderly patients, Defendants both purposefully sought to increase opioid prescribing to this vulnerable group and omitted from their promotional materials the known, serious risks opioids pose to them.

312.    *Exit Wounds*, a 2009 publication sponsored by Purdue, distributed by APF with grants from Janssen and Endo, and written as if it were a personal narrative of one veteran, describes opioids as "underused" and the "gold standard of pain medications" and fails to disclose the risk of addiction, overdose, or injury.

313.    *Exit Wounds* notes that opioid medications "increase a person's level of functioning" and that "[l]ong experience with opioids shows that people who are not predisposed to addiction are unlikely to become addicted to opioid pain medications."

314.    The publication also asserts that "[d]enying a person opioid pain medication because he or she has a history of substance abuse or addiction is contrary to the model guidelines for prescribing opioids, published by the U.S. Federation of State Medical Boards." As laid out above, the FSMB itself received support from Defendants during the time it created and published its guidelines.

315.    *Exit Wounds* minimizes the risks of chronic opioid therapy and does not disclose the risk that opioids may have fatal interactions with benzodiazepines, which were taken by a significant number of veterans.[81]    The deceptive nature of *Exit Wounds* is obvious when compared to guidance on opioids published by the VA and DoD in 2010 and 2011. The VA's

---

[81]    FDA draft guidance states that materials designed to target a particular audience should disclose risks particular to that audience. *See* U.S. FOOD & DRUG ASS'N, BRIEF SUMMARY AND ADEQUATE DIRECTIONS FOR USE: DISCLOSING RISK INFORMATION IN CONSUMER-DIRECTED PRINT ADVERTISEMENTS AND PROMOTIONAL LABELING FOR PRESCRIPTION DRUGS (2015), https://www.fda.gov/downloads/drugs/guidancecomplianceregulatoryinformation/guidances/ucm 069984.pdf.



*Taking Opioids Responsibly* describes opioids as "dangerous." It cautions against taking extra doses and mentions the risk of overdose and the dangers of interactions with alcohol. The list of side effects from opioids includes decreased hormones, sleep apnea, hyperalgesia, addiction, immune system changes, birth defects, and death – none of which is mentioned in *Exit Wounds*.

316.    Approximately 11,481 U.S. veterans reside in the City of Portsmouth according to the U.S. Census Bureau estimates for 2013-2017. Upon information and belief, many of these veterans were wrongfully prescribed opioids and received misinformation about their usefulness and safety by reading *Exit Wounds* and other means of public dissemination of misinformation promulgated by Defendants.

### 4.    Purdue-Specific Misrepresentation: The 12-Hour Dosing Lie

317.    In the late 1980s, Purdue (a relatively small pharmaceutical company at the time) was facing a serious revenue threat. Its main drug was a morphine pill for cancer patients with the trade name MS Contin. The patent on MS Contin was about to expire, which meant the drug would face serious downward pricing pressure from generics that were likely to enter the market of an opioid treatment for cancer patients.

318.    To solve its "vulnerability of the . . .generic threat," Defendant Purdue decided to devote a huge effort and funding into the launch of another opioid product that it trade-named OxyContin. OxyContin was classified as an oxycodone similar to Percocet (that was already on the market), but Purdue combined the oxycodone with a time release technique and claimed that the new drug, OxyContin, would control pain for up to 12 hours.

319.    Purdue's claim that its opioid could provide 12 hours of pain relief was a primary selling point for the new drug, OxyContin. In its 1992 submission to the U.S. Patent Office, Purdue touted that OxyContin was a medical breakthrough that controlled pain for 12 hours "in approximately 90% of patients."

320.     Armed with its new product, Purdue launched OxyContin in 1996 after obtaining FDA approval in 1995.  A Purdue marketing executive stated in a 1995 internal memo (that was obtained by the *Los Angeles Times* and reported on in a May 5, 2016 exposé), "[w]e do not want to niche OxyContin just for cancer pain."

321.     However, the promise of 12-hour pain relief was not true, which Purdue knew.  The effects of OxyContin (both the pain relief and the euphoria) wore off for most of the patients in Purdue's clinical trials well before 12 hours.  Many patients would start to crave another dose within eight hours, or even less time.

322.     OxyContin tablets provide an initial absorption of approximately 40% of the active medical.  This fact causes two results, both of which made OxyContin particularly addictive.  First, the initial rush of almost half of the powerful opioid triggers a powerful psychological response.  Thus, OxyContin – which is approximately twice as powerful as morphine – acts more like an immediate-release opioid.  Second, since there is less of the drug at the end of the 12-hour dosing periods, many patients begin to experience withdrawal symptoms before the 12 hours expire.  The combination of fast onset and end-of-dose withdrawal symptoms makes OxyContin powerfully addictive.

323.     Although Purdue was well aware of the shorter duration of the drug's effects for many patients, it withheld this information from prescribing physicians and, to the contrary, instructed its sales force (which had ballooned to over 200 by 1997, one year after launch), to recommend to the prescribers that they increase the strength of the dose rather than its frequency.

324.     By use of this falsehood, Purdue kept its competitive advantage of being able to claim that OxyContin gives a full 12 hours of relief, allowing the convenience of twice-a-day dosing.

325. This strategy was a triple win for Purdue. First, the maximum strength 80 mg of OxyContin netted Purdue more than $630, rather than the $97 for a 10 mg bottle. Second, if the patient, in the throes of opioid withdrawal, started to take the drug at shorter intervals, Purdue could claim it was "not their problem." Third, the increased dose made the drug even more addictive, thereby making it likely that Purdue would have a customer for life.

326. To this day, Purdue continues to misrepresent OxyContin to doctors as a 12-hour drug.[82]

327. The *Los Angeles Times* exposé stated that, as of 2014, more than 52% of patients taking OxyContin longer than three months were prescribed doses greater than 60 mg per day. Dr. Debra Houry of the CDC stated in 2017 that those doses were "really concerning" because "the higher you go, the more likely you are to die."

### 5. Insys-Specific Misrepresentation

328. Insys is the next to last entrant into the prescription opioid market among the Manufacturer Defendants, preceding only Collegium, having acquired FDA approval for its drug, trade-named Subsys in 2012.

329. As discussed *supra* at ¶83, Subsys is a highly addictive synthetic opioid form of fentanyl mouth-spray approved by the FDA for a very limited indication:   treatment of

---

[82]     *OxyContin® CII (Oxycodone HCl) Extended-Release Tablets*, PURDUE PHARMA, http://www.purduepharma.com/healthcare-professionals/products/oxycontin (last visited Dec. 14, 2018); *OxyContin®: Highlights of Prescribing Information*, PURDUE PHARMA, http://app.purduepharma.com/xmlpublishing/pi.aspx?id=o (last updated Sep. 2018); *Medication Guide: OXYCONTIN® (ox-e-KON-tin)(oxycodone hydrochloride) extended-release tablets, CII, PURDUE PHARMA*, http://app.purduepharma.com/xmlpublishing/pi.aspx?id=o&medguide=1 (last updated Dec. 2016); *Setting The Record Straight On Oxycontin's FDA-Approved Label*, PURDUE PHARMA (May 5, 2016), http://www.purduepharma.com/news-media/get-the-facts/setting-the-record-straight-on-oxycontins-fda-approved-label/ (responding to the *Los Angeles Times* article by doubling down on its claims).

breakthrough cancer pain only in patients who have already been administered other opioids, so they have established a tolerance for opioids.

330. Insys has mounted an aggressive and unlawful off-label marketing strategy for Subsys in violation of the FD&C Act, 21 U.S.C. §301, *et seq*., knowingly marketing its product for uses that were not approved by the FDA, which led to the submission of false and improper payment requests to government programs Medicare and Medicaid and indictments and/or pleas of many of its key executives.

331. There is a limited customer base for cancer patients who are already taking an opioid to manage cancer pain, but still need an additional boost to treat breakthrough cancer pain. Accordingly, Insys determined to sell its potent and dangerous opioid to a wider class of patients. Their sales force, whose pay was largely dependent on commissions, visited dentists, chiropractors, general practitioners, and others throughout the country, including in Virginia, the City of Portsmouth, and surrounding area, to market Subsys for a wide variety of ailments, from root canals to back pain.

332. The Senate report, *Fueling an Epidemic*, revealed, among other things, how the Insys sales force was incentivized and indoctrinated to sell Subsys as a safe treatment for many conditions far afield from breakthrough cancer pain. Moreover – and just as dangerously – the sales staff was instructed to induce their physicians to write prescriptions for higher, more expensive doses.

333. Manufacturer Defendant Insys, and Individual Defendant Kapoor, knew that the off-label use of Subsys could be fatal and, at the very least, could lead to addiction in the user. Despite this knowledge, Manufacturer Defendant Insys unlawfully, recklessly, and with wanton,

willful, and criminal intent continued to market its product for the use of innocent persons for whom it was foreseeable that it would cause grave and perhaps fatal harm.

334. On December 16, 2016, the U.S. Attorney for the District of Massachusetts announced the indictment of six former Insys executives and managers on a host of charges stemming from "a nationwide conspiracy to profit by using bribes and fraud to cause the illegal distribution of a Fentanyl spray [i.e. Subsys] intended for cancer patients experiencing breakthrough pain." On October 24, 2017, a superseding indictment named and incorporated Individual Defendant Kapoor for his role in that conspiracy. Kapoor's trial is expected to start in January 2019.

335. In April 2018, the U.S. Department of Justice intervened in five civil False Claims Act cases filed against Manufacturer Defendant Insys in the Central District of California that allege FCA violations arising from the payment of kickbacks to physicians to induce the doctors to prescribe Subsys for their patients, as well as other fraudulent activity.

336. On August 12, 2013, Maris Guzman—a former Insys employee and resident of Virginia—filed a whistleblower suit against Insys under the False Claims Act, *United States ex rel. Guzman v. Insys Therapeutics, Inc.* No. CV 13-5861. Ms. Guzman alleged that her former employer requested illegal reimbursement from Medicare and Medicare, defrauding taxpayers. Ms. Guzman was fired in 2013, allegedly after objecting to the scheme. The Commonwealth of Virginia joined the U.S. Department of Justice (*see* ¶331) and four other states to intervene in five SUBSYS-related lawsuits filed under the False Claims Act, including Ms. Guzman's. In August 2018, Insys announced that it has agreed to pay at least $150 million and a potential $75 million in additional fines to settle the False Claims Act cases against it.

92

### 6. Actavis-Specific Misrepresentation

337.    Actavis distributed a product advertisement that claimed that use of Kadian to treat chronic pain would allow patients to return to work, relieve "stress on your body and mental health," and cause patients to enjoy their lives. The FDA warned Actavis that such claims were misleading, disclaiming: "We are not aware of substantial evidence or substantial clinical experience demonstrating that the magnitude of the effect the drug has in alleviating pain, taken together with any drug-related side effects patients may experience . . . results in an overall positive impact on a patient's work, physical and mental functioning, daily activities, or enjoyment of life."[83]

338.    Actavis disregarded the FDA's 2010 warning and Actavis sales representatives continued to market the falsehood that prescribing Actavis's opioids would improve patients' ability to function and improve their quality of life.

339.    Actavis's sale training modules severely downplayed the association of Kadian and other opioids as to the risk of addiction. A 2010 module represented that "there is no evidence that simply taking opioids for a period of time will cause substance abuse or addiction," and instead, "[i]t appears likely that most substance-abusing patients in pain management practices have an abuse problem before entering the practice." Not only did Actavis falsely suggest the low likelihood of addiction in patients, but also shifted culpability to the patients, the same people they were entrusted to treat.

---

[83]    Letter from Thomas Abrams, Dir., Div. of Mktg., Adver., & Commc'ns, to FDA, Doug Boothe, CEO, Actavis Elizabeth LLC (Feb. 18, 2010), https://www.fdanews.com/ext/resources/files/archives/a/ActavisElizabethLLC.pdf (Warning letter).

### 7. The Sackler Family Defendants Control and Direct Purdue's Misconduct

340.    Purdue's misconduct has been directed and encouraged by its own board of directors. This small group of people controlled Purdue and sanctioned the unlawful conduct perpetrated by those companies.

341.    The directors control both Purdue Pharma Inc. and Purdue Pharma L.P. and run the companies as their personal enterprise.

342.    Richard Sackler, Jonathan Sackler, Beverly Sackler, Theresa Sackler, Mortimer D.A. Sackler, Kathe Sackler, Ilene Sackler Lefcourt, and David Sackler hold seats on the board of directors of Purdue Pharma Inc. Their family owns the company. Richard Sackler, Jonathan Sackler, Beverly Sackler, Theresa Sackler, Mortimer Sackler, Kathe Sackler, and Ilene Sackler Lefcourt have been on the board since the 1990s. David Sackler has been on the board since 2012.

343.    Richard Sackler was as an inventor of the original patent for OxyContin. He testified that the family has made more than $1 billion from OxyContin alone.

344.    Each of the Sackler Family Defendants had an obligation, which each one violated, to manage Purdue in a lawful manner, rather than allow it to engage in widespread wrongdoing.

345.    Upon information and belief, the Sackler Family Defendants are intimately involved in the activities of Purdue Pharma Inc. and Purdue Pharma L.P.

346.    Upon information and belief, as members of the Purdue board of directors the Sackler Family Defendants directed Purdue's sales representatives to make visits to doctors in and around Portsmouth to implement a deceptive marketing scheme that killed Portsmouth residents and burdened the community's resources.

347.    Upon information and belief, as members of the Purdue board of directors the Sackler Family Defendants directed payments to Virginia doctors – including doctors in the Portsmouth area – to promote Purdue's drugs.

348.    Upon information and belief, as members of the Purdue board of directors the Sackler Family Defendants directed Purdue to deceive doctors and patients about its opioids and to continue promoting opioids to target doctors even after it found evidence of improper prescribing by those doctors.

349.    This misconduct caused injury to the City of Portsmouth by, among other things, creating a severe public health emergency that killed and harmed many residents, threatened public health and safety, burdened public services, and caused the deterioration of its public spaces.

### 8.    Guilty Pleas and Prior Attorney General Settlements with Certain Defendants in Connection with Improper Opioid Marketing

#### a.    Purdue's 2007 Guilty Plea for OxyContin Marketing Misrepresentations

350.    In 2007, Purdue and three top executives were indicted in federal court in Virginia. All pleaded guilty to fraud in promoting OxyContin as non-addictive and appropriate for chronic pain.

351.    As part of its guilty plea, Purdue admitted that:

Beginning on or about December 12, 1995, and continuing until on or about June 30, 2001, certain PURDUE supervisors and employees, with the intent to defraud or mislead, marketed and promoted OxyContin as less addictive, less subject to abuse and diversion, and less likely to cause tolerance and withdrawal than other pain medications, as follows:

* * *

b.    [Purdue] told Purdue sales representatives they could tell health care providers that OxyContin potentially creates less chance for addiction than immediate-release opioids;

c.      [Purdue] sponsored training that taught PURDUE sales supervisors that OxyContin had fewer "peak and trough" blood level effects than immediate-release opioids resulting in less euphoria and less potential for abuse than short-acting opioids;

d.      [Purdue] told certain health care providers that patients could stop therapy abruptly without experiencing withdrawal symptoms and that patients who took OxyContin would not develop tolerance to the drug; and

e.      [Purdue] told certain health care providers that OxyContin did not cause a "buzz" or euphoria, caused less euphoria, had less addiction potential, had less abuse potential, was less likely to be diverted than immediate-release opioids, and could be used to "weed out" addicts and drug seekers.[84]

352.    Under the plea agreement, Purdue agreed to pay $600 million in criminal and civil penalties – one of the largest settlements in history for a drug company's marketing misconduct.[85] Also, Purdue's CEO, General Counsel, and Chief Medical Officer pleaded guilty and agreed to pay a total of $34.5 million in penalties.[86]

353.    Even after this plea, Purdue's wrongdoing continued, including its improper marketing campaign, which, along with the other Manufacturer Defendants, conditioned physicians to believe that opioids were safe and effective treatments for the long-term treatment of chronic pain.

354.    Purdue made many subsequent misleading statements regarding its own opioid products and opioids generally, continuing long after its 2007 guilty plea as alleged herein.

---

[84]    Agreed Statement of Facts, *United States v. Purdue Frederick Co., Inc.*, No. 07-CR-29 (W.D. Va. May 10, 2007), ECF No. 5-2.

[85]    *Id.*

[86]    *Id.*

b.    **Cephalon Enters a Criminal Plea for Off-Label Marketing of Actiq.**

355.    The FDA approved the powerful fentanyl drug, Actiq, in the form of a lollipop for use only in opioid-tolerant cancer patients (meaning those patients for whom morphine-based painkillers were no longer effective).

356.    From 2001 through at least 2006, Cephalon, the manufacturer of Actiq, promoted the drug for non-cancer patients to use for such maladies as migraines, sickle-cell pain crises, and injuries, and in anticipation of changing wound dressings or radiation therapy. Cephalon also promoted Actiq for use in patients who were not opioid-tolerant and for whom the drug could be fatal.

357.    Using the mantra "pain is pain," Cephalon instructed the Actiq sales representatives to focus on physicians other than oncologists, including general practitioners, and to promote the drug for many ordinary types of pain.

358.    Cephalon was charged in a criminal violation with off-label selling of Actiq, and two of its other drugs, by the U.S. Attorney for the Eastern District of Pennsylvania. In a plea agreement with the United States, entered into in September 2008, Cephalon agreed to pay $50 million in settlement of the off-label marketing charges and, in a separate civil agreement, it agreed to pay $375 million plus interest to resolve False Claims Act charges arising from the off-label selling.

359.    Acting U.S. Attorney Laurie Magid stated:

These are potentially harmful drugs that were being peddled as if they were, in the case of Actiq, actual lollipops instead of a potent pain medication intended for a specific class of patients. . . . This company subverted the very process put in place to protect the public from harm, and put patients' health at risk for nothing more than boosting its bottom line. People have an absolute right to their doctors' best medical judgment. They need to know the recommendations a doctor makes



are not influenced by sales tactics designed to convince the doctor that the drug being prescribed is safe for uses beyond what the FDA has approved.[87]

### c.    Purdue's 2015 Settlement with the New York Attorney General

360.    On August 19, 2015, the New York Attorney General ("NYAG") entered into a settlement agreement with Purdue regarding Purdue's marketing of opioids.

361.    In the settlement agreement, the NYAG noted that, from at least March 2014 to March 2015, the Purdue website, www.inthefaceofpain.com, failed to disclose that doctors who provided testimonials on the site were paid by Purdue.  The NYAG concluded that Purdue's failure to disclose these financial connections misled consumers regarding the objectivity of the testimonials.

362.    The settlement agreement stated, in relevant part:

Purdue maintains an unbranded pain management advocacy website, www.inthefaceofpain.com.  From March 2014 to March 2015, the website received a total of 251,648 page views.  Much of the video content on www.inthefaceofpain.com is also available on YouTube. . . .

Written and video testimonials from several dozen "Advocates," whose faces appear on the website and many of whom are HCPs [health care providers], comprise a central component of the site.  For example, Dr. Russell Portenoy, the recipient of almost $4,000 from Purdue for meeting and travel costs, was quoted on the website as follows: "The negative impact of unrelieved pain on the lives of individuals and their families, on the healthcare system, and on society at large is no longer a matter of debate.  The unmet needs of millions of patients combine into a major public health concern.  Although there have been substantive improvements during the past several decades, the problem remains profound and change will require enormous efforts at many levels.  Pressure from patients and the larger public is a key element in creating momentum for change."

Although Purdue created the content on www.inthefaceofpain.com . . . the site creates the impression that it is neutral and unbiased.

---

[87]    Press Release, U.S. DOJ, *Biopharmaceutical Company Cephalon to Pay $425 Million for Off-Label Drug Marketing* (Sept. 29, 2008), https://www.justice.gov/archive/opa/pr/2008/September/08-civ-860.html.

*Purdue's failure to disclose its financial connections with certain Advocates has the potential to mislead consumers by failing to disclose the potential bias of these individuals.[88]*

[Emphasis added].

363.    As part of the settlement, Purdue agreed to make certain disclosures on www.inthefaceofpain.com, and its similar websites, and to pay a monetary penalty.[89]

364.    Again, however, Purdue's improper marketing of opioids has continued, following its prior regulatory settlements, all as alleged more fully herein. An October 30, 2017 article in *The New Yorker* states, in pertinent part:

> Purdue has continued to fight aggressively against any measures that might limit the distribution of OxyContin, in a way that calls to mind the gun lobby's resistance to firearm regulations.    Confronted with the prospect of modest, commonsense measures that might in any way impinge on the prescribing of painkillers, Purdue and its various allies have responded with alarm, suggesting that such steps will deny law-abiding pain patients access to medicine they desperately need.    Mark Sullivan, a psychiatrist at the University of Washington, distilled the argument of Purdue:    "Our product isn't dangerous – it's *people* who are dangerous."[90]

[Emphasis in original].

365.    Further, according to that article, Purdue has continued to search for new users through the present, both domestically and now increasingly overseas and in August 2015, even sought to market OxyContin to children as young as 11.[91]

---

[88]    Settlement Agreement between New York Attorney General and Purdue Pharma at 7-8, *In the Matter of Purdue Pharma L.P.*, 2015 N.Y. Op. Att'y Gen. 151 (2015), https:/ag.ny.gov/pdfs/Purdue-AOD-Executed.pdf ("NYAG-Purdue Settlement Agreement").

[89]    *Id.* at 15-17.

[90]    Patrick Radden Keefe, *The Family That Built an Empire of Pain*, NEW YORKER (Oct. 30, 2017),    https://www.newyorker.com/magazine/2017/10/30/the-family-that-built-an-empire-of-pain.

[91]    *Id.*

d.      **Endo's 2016 Settlement with the New York Attorney General**

366.    On March 1, 2016, the NYAG entered into a settlement agreement with Endo regarding its marketing and sales of Opana ER.

367.    On Endo's website, www.opana.com, Endo claimed, until at least April 2012, that "[m]ost healthcare providers who treat patients with pain agree that patients treated with prolonged opioid medicines usually do not become addicted."[92] The NYAG found that Endo had no evidence for that statement.[93]

368.    Endo also provided training materials to its sales representatives stating that addiction to opioids is not common and "symptoms of withdrawal do not indicate addiction."[94] The NYAG found that those statements were unwarranted.[95]

369.    Endo also trained its sales representatives to distinguish addiction from "pseudoaddiction." *The NYAG found that "the 'pseudoaddiction' concept has never been empirically validated and in fact has been abandoned by some of its proponents,"* all as alleged above.[96] [Emphasis added].

---

[92]    Settlement Agreement between New York Attorney General and Endo at 20, *In the Matter of Endo Health Solutions Inc.*, 2015 N.Y. Op. Att'y Gen. 228 (2016), https://ag.ny.gov/pdfs/Endo_AOD_030116-Fully_Executed.pdf ("NYAG-Endo Settlement Agreement").

[93]    *Id.*

[94]    *Id.* at ¶22.

[95]    *Id.*

[96]    *Id.* at ¶23.

370.    The NYAG also noted that Endo omitted information about certain studies in its marketing pamphlets distributed to health care providers, and that Endo "omitted . . . adverse events from marketing pamphlets."[97]

371.    As part of the NYAG settlement, Endo paid a $200,000 penalty and agreed to refrain from doing the following in New York: (i) "make statements that Opana ER or opioids generally are non-addictive"; (ii) "make statements that most patients who take opioids do not become addicted"; and (iii) "use the term 'pseudoaddiction' in any training or marketing."[98]

### e.    Mallinckrodt's 2017 Settlement with the DEA and U.S. Attorneys

372.    In 2008, the DEA and federal prosecutors launched an investigation into Mallinckrodt, charging that the company ignored red flags by continuing to supply and failing to report suspicious orders for its generic oxycodone between 2008 and 2012.[99] The investigation uncovered that, from 2008 to 2012, Mallinckrodt sent, for example, 500 million tablets of oxycodone into a single state, Florida – "66 percent of all oxycodone sold in the state."[100]

373.    Furthermore, despite learning from the DEA that generic opioids seized in a 2009 Tennessee drug sting operation were traceable to one of its distributors, Sunrise Wholesale ("Sunrise"), Mallinckrodt, in the ensuing six weeks, blithely continued to send an additional 2.1 million tablets of oxycodone to Sunrise. In turn, Sunrise sent at least 92,400 oxycodone tablets to a single doctor over an 11-month period, who, in one day, prescribed 1,000 tablets to a single

---

[97]    *Id.* at ¶30.

[98]    *Id.* at ¶41.

[99]    Lenny Bernstein & Scott Higham, *The Government's Struggle to Hold Opioid Manufacturers Accountable*, WASH. POST (Apr. 2, 2017), https://www.washington post.com/graphics/investigations/dea-mallinckrodt/?utm_ term=.7ce8c975dd86.

[100]    *Id.*

patient.[101]  According to the internal government documents obtained by *The Washington Post*, Mallinckrodt's failure to report could have resulted in "nearly 44,000 federal violations and exposed it to $2.3 billion in fines."[102]

374.    During the DEA's investigation, Mallinckrodt sponsored the HDA (known as the Healthcare Distribution Management Association until 2016), an industry-funded organization that represents pharmaceutical distributors.[103]  The HDA initiated the Ensuring Patient Access and Effective Drug Enforcement Act of 2016 (enacted April 19, 2016), which requires the DEA to give notice of violation and an opportunity to comply, to pharmacies and distributors, before withdrawing licenses.    This Act substantially weakened the DEA's ability to regulate manufacturers and wholesalers.[104]

375.    In May 2014, Mallinckrodt posted a video, entitled "Red Flags". The video is a thinly veiled attempt to divert responsibility for the opioid epidemic away from manufacturers and wholesalers and toward individual pharmacists.  The video was sponsored by the Anti-Diversion Industry Working Group, which is composed of Cardinal, Actavis, McKesson, Mallinckrodt, ABDC, and Qualitest (a part of Endo) – all of whom are also missing from the list of those responsible for the opioid epidemic.[105]

---

[101]    *Id.*

[102]    *Id.*

[103]    *Sponsors: HDA's Annual Circle Sponsors*, HEALTHCARE DISTRIBUTION ALLIANCE, https://www.healthcaredistribution.org/hda-sponsors (last visited Dec. 14, 2018).

[104]    Chris McGreal, *Opioid Epidemic: Ex-DEA Official Says Congress is Protecting Drug Makers*, GUARDIAN (Oct. 31, 2016) https://www.theguardian.com/us-news/2016/oct/31/opioid-epidemic-dea-official-congress-big-pharma.

[105]    National Association of Boards of Pharmacy & Anti-Diversion Industry Working Group, *Red Flags*, VIMEO (May 20, 2014), https://vimeo.com/95912158.

376.    In April 2017, Mallinckrodt reached an agreement with the DEA and the U.S.

Attorneys for the Eastern District of Florida and Northern District of New York to pay $35

million to resolve a probe of its distribution of its opioid medications.[106]  Mallinckrodt finalized

the settlement on July 11, 2017, agreeing to pay $35 million while admitting no wrongdoing.[107]

9.    **Summary of Manufacturer Defendants' Unlawful Marketing Claims and Practices**

| Purdue | **Falsehood that scientific evidence supports the long-term use of opioids to improve patients' function and quality of life** |
|---|---|
| | a. Purdue ran a series of advertisements for OxyContin in 2012 in medical journals titled "Pain vignettes," which were case studies featuring patients, each with pain conditions persisting over several months, recommending OxyContin for each. One such patient, "Paul," is described to be a "54-year old writer with osteoarthritis of the hands," and the vignettes imply that an OxyContin prescription will help him work more effectively. |
| | b. Purdue sponsored APF's *A Policymaker's Guide to Understanding Pain & Its Management*, which inaccurately claimed that "multiple clinical studies" have shown that opioids are effective in improving daily function, psychological health, and health-related quality of life for chronic pain patients." The sole reference for the functional improvement claim noted the absence of long-term studies and actually stated: "For functional outcomes, the other analgesics were significantly more effective than were opioids." The *Policymaker's Guide* is still available online. |
| | c. Purdue sponsored APF's *Treatment Options: A Guide for People Living with Pain* (2007), which counseled patients that opioids, when used properly, "give [pain patients] a quality of life we deserve." APF distributed 17,200 copies in one year alone, according to its 2007 |

---

[106]    Linda A. Johnson, *Mallinckrodt to Pay $35M in Deal to End Feds' Opioid Probe*, U.S. NEWS & WORLD REPORT (Apr. 3, 2017, 6:47 PM), https://www.usnews.com/news/business/articles/2017-04-03/mallinckrodt-to-pay-35m-in-deal-to-end-feds-opioid-probe.

[107]    Press Release, U.S. Department of Justice, Mallinckrodt Agrees to Pay Record $35 Million Settlement for Failure to Report Suspicious Orders of Pharmaceutical Drugs and for Recordkeeping Violations (July 11, 2017), https://www.justice.gov/opa/pr/mallinckrodt-agrees-pay-record-35-million-settlement-failure-report-suspicious-orders.



Annual Report, and the guide currently is available online.

d. Purdue sponsored APF's *Exit Wounds* (2009), which taught veterans that opioid medications "increase your level of functioning." *Exit Wounds* also omits warnings of the risk of interactions between opioids and benzodiazepines, which would increase fatality risk. Benzodiazepines are frequently prescribed to veterans diagnosed with post-traumatic stress disorder.

e. Purdue sponsored the FSMB's *Responsible Opioid Prescribing* (2007), which taught that relief of pain itself improved patients' function. *Responsible Opioid Prescribing* explicitly describes functional improvement as the goal of a "long-term therapeutic treatment course." Purdue also spent over $100,000 to support distribution of the book.

f. Purdue sales representatives told prescribers that opioids would increase patients' ability to function and improve their quality of life. On information and belief, these deceptive representations were made to practitioners in the Portsmouth area.

**Defendant misrepresents the risk of addiction**

a. Purdue published a prescriber and law enforcement education pamphlet in 2011 entitled *Providing Relief, Preventing Abuse*, which under the heading, "Indications of Possible Drug Abuse," shows pictures of the stigmata of injecting or snorting opioids – skin popping, track marks, and perforated nasal septa. In fact, opioid addicts who resort to these extremes are uncommon; the far more typical reality is patients who become dependent and addicted through oral use. Thus, these misrepresentations wrongly reassure doctors that as long as they do not observe those signs, they need not worry that their patients are abusing or addicted to opioids.

In this same pamphlet, Purdue wrote that addiction "is not caused by drugs." Instead, Purdue assured doctors addiction happens when the wrong patients get drugs and abuse them: "it is triggered in a susceptible individual by exposure to drugs, most commonly through abuse."

b. Purdue sponsored APF's *A Policymaker's Guide to Understanding Pain & Its Management*, which inaccurately claimed that less than 1% of children prescribed opioids will become addicted. This publication is still available online. This publication also asserted that pain is undertreated due to "misconceptions about opioid addiction."

c. Purdue sponsored APF's *Treatment Options: A Guide for People Living with Pain* (2007), which asserted that addiction is rare and limited to extreme cases of unauthorized dose escalations, obtaining

opioids from multiple sources, or theft.

d. A Purdue-funded study with a Purdue co-author claimed that "evidence that the risk of psychological dependence or addiction is low in the absence of a history of substance abuse."[108] The study relied only on the 1980 Porter-Jick letter to the editor concerning a chart review of hospitalized patients, not patients taking Purdue's long-acting, take-home opioid. Although the term "low" is not defined, the overall presentation suggests the risk is so low as not to be a worry.

e. Purdue contracted with AGS to produce a CME promoting the 2009 guidelines for the *Pharmacological Management of Persistent Pain in Older Persons*. These guidelines falsely claim that "the risks [of addiction] are exceedingly low in older patients with no current or past history of substance abuse." None of the references in the guidelines corroborates the claim that elderly patients are less likely to become addicted to opioids, and the claim is, in fact, untrue. Purdue was aware of the AGS guidelines' content when it agreed to provide this funding, and AGS drafted the guidelines with the expectation it would seek drug company funding to promote them after their completion.

f. APF's *Exit Wounds* (2009), sponsored by Purdue, counseled veterans that "[l]ong experience with opioids shows that people who are not predisposed to addiction are very unlikely to become addicted to opioid pain medications." Although the term "very unlikely" is not defined, the overall presentation suggests it is so low as not to be a worry.

g. Purdue sales representatives told prescribers that its drugs were "steady state," the implication of which was that they did not produce a rush or euphoric effect, and therefore were less addictive and less likely to be abused. On information and belief, these deceptive representations were made to practitioners in the Portsmouth area.

h. Purdue sales representatives told prescribers that Butrans has a lower abuse potential than other drugs because it was essentially tamperproof and, after a certain point, patients no longer experience a "buzz" from increased dosage. On information and belief, these deceptive representations were made to practitioners in the Portsmouth area.

i. Advertisements that Purdue sent to prescribers stated that OxyContin ER was less likely to be favored by addicts, and, therefore, less likely to be abused or diverted, or result in addiction. On information and belief, these deceptive representations were made to practitioners in the

---

[108]    C. Peter N. Watson, *et al.*, *Controlled-Release Oxycodone Relieves Neuropathic Pain: A Randomized Controlled Trial in Painful Diabetic Neuropathy*, 105 PAIN 71 (2003).

Portsmouth area.

j. In discussions with prescribers, Purdue sales representatives omitted discussion of addiction risks related to Purdue's drugs. On information and belief, these material omissions were made in presentations to practitioners in the Portsmouth area.

k. Another Purdue publication, the *Resource Guide for People with Pain* (2010), falsely assured patients and doctors that opioid medications are not addictive:

> *Many people living with pain and even some healthcare providers believe that opioid medications are addictive. The truth is that when properly prescribed by a healthcare professional and taken as directed, these medications give relief – not a "high."*

Purdue falsely denied the risk of addiction, implied that addiction requires a "high," and promised that patients would not become addicted if they took opioids as prescribed.

*Opioid Prescribing: Clinical Tools and Risk Management Strategies* (2009) told doctors that "addiction is rare in patients who become physiologically dependent on opioids while using them for pain control," and that "behaviors that suggest abuse may only reflect a patient's attempt to feel normal."

**Defendant deceptively claimed without scientific support that the risk of addiction could be avoided or managed.**

a. Purdue's unbranded website, *In the Face of Pain* (inthefaceofpain.com), states that policies that "restrict[] access to patients with pain who also have a history of substance abuse" and "requiring special government-issued prescription forms for the only medications that are capable of relieving pain that is severe" are "at odds with" best medical practices.[109]

b. Purdue sponsored a 2012 CME program titled *Chronic Pain Management and Opioid Use: Easing Fears, Managing Risks, and Improving Outcomes*. This presentation recommended that use of screening tools, more frequent refills, and switching opioids could treat

---

[109]   *See In the Face of Pain Fact Sheet: Protecting Access to Pain Treatment*, PURDUE PHARMA                                                                L.P., https://web.archive.org/web/20140423105047/http://www.inthefaceofpain.com:80/content/uploads/2011/12/factsheet_ProtectingAccess.pdf (last updated Apr. 2013).

a high-risk patient showing signs of potentially addictive behavior.

c. Purdue sponsored a 2011 webinar taught by KOL Dr. Lynn Webster, titled *Managing Patients' Opioid Use: Balancing the Need and Risk*. This publication taught prescribers that screening tools, urine tests, and patient agreements have the effect of preventing "overuse of prescriptions" and "overdose deaths."

d. Purdue sales representatives told prescribers that screening tools can be used to select patients appropriate for opioid therapy and to manage the risks of addiction.  On information and belief, these false representations were made to practitioners in the Portsmouth area.

e. To "extend average treatment duration," Purdue deceptively claimed that patients' becoming dependent on its drugs was not dangerous or deadly, but "normal." Purdue taught doctors that: "Healthcare professionals should recognize that tolerance and physical dependence are normal consequences of sustained use of opioid analgesics and are not the same as addiction." Purdue deceptively claimed that physical dependence on its opioids was "a normal physiologic response" and "an expected occurrence," and no more dangerous than "many classes of medications" that are not addictive, including drugs used to treat high blood pressure.

Purdue set as one of its "key messages" that "data support the use of opioids beyond 90 days and maintained through 52 weeks."

**Defendant falsely stated or suggested the concept of "pseudoaddiction" and patients who only need more opioids, and should be treated as such.**

a. Purdue published a prescriber and law enforcement education pamphlet in 2011 entitled *Providing Relief, Preventing Abuse*, which described pseudoaddiction as a concept that "emerged in the literature to describe the inaccurate interpretation of [drug-seeking behaviors] in patients who have pain that has not been effectively treated."

b. Purdue distributed to physicians at least as of November 2006, and posted on its unbranded website, *Partners Against Pain*, a pamphlet copyrighted in 2005 and titled *Clinical Issues in Opioid Prescribing*. This pamphlet included a list of conduct including "illicit drug use and deception," which it defined as indicative of pseudoaddiction or untreated pain. It also states:

"Pseudoaddiction is a term which has been used to describe patient behaviors that may occur when *pain is undertreated*. . . . Even such behaviors as illicit drug use and deception can occur in the patient's efforts to obtain relief. Pseudoaddiction can be *distinguished from*

*true addiction* in that the behaviors resolve when the pain is effectively treated." (Emphasis added).

c. Purdue sponsored FSMB's *Responsible Opioid Prescribing* (2007), which taught that behaviors such as "requesting drugs by name," "demanding or manipulative behavior," seeing more than one doctor to obtain opioids, and hoarding, are all signs of pseudoaddiction. Purdue also spent over $100,000 to support distribution of the book.

d. Purdue sponsored APF's *A Policymaker's Guide to Understanding Pain & Its Management*, which states: "Pseudo-addiction describes patient behaviors that may occur when *pain is undertreated*. . . . Pseudo-addiction can be distinguished from true addiction in that this behavior ceases when pain is effectively treated." (Emphasis added).

**Defendant falsely stated or suggested that withdrawal from opioids was not a problem and prescribing or using opioids should be without hesitation**

a. Purdue sponsored APF's *A Policymaker's Guide to Understanding Pain & Its Management*, which taught that "[s]ymptoms of physical dependence can often be ameliorated by gradually decreasing the dose of medication during discontinuation," but did not disclose the significant hardships that often accompany cessation of use.

b. Purdue sales representatives told prescribers that the effects of withdrawal from opioid use can be successfully managed. On information and belief, these false representations were made to practitioners in the Portsmouth area.

c. Purdue sales representatives told prescribers that the potential for withdrawal on Butrans was low due to Butrans' low potency and its extended release mechanism. On information and belief, these false representations were made to practitioners in the Portsmouth area.

**Defendant suggested that high-dose opioid therapy was safe**

a. Purdue's *In the Face of Pain* website, along with initiatives of APF, promoted the notion that if a patient's doctor does not prescribe them what – in their view – is a sufficient dose of opioids, they should find another doctor who will. In so doing, Purdue exerted undue, unfair, and improper influence over prescribers who face pressure to accede to the resulting demands.

b. Purdue sponsored APF's *A Policymaker's Guide to Understanding Pain & Its Management*, which taught that dose escalations are "sometimes necessary," even indefinitely high ones, which suggested



that high-dose opioids are safe and appropriate and did not disclose the risks from high-dose opioids. This publication is still available online.

c. Purdue sponsored APF's *Treatment Options: A Guide for People Living with Pain* (2007), which taught patients that opioids have "no ceiling dose" and are therefore the most appropriate treatment for severe pain. The guide also claimed that some patients "need" a larger dose of the drug, regardless of the dose currently prescribed. This language fails to disclose heightened risks at elevated doses.

d. Purdue sponsored a CME issued by the American Medical Association in 2003, 2007, 2010, and 2013. The CME, *Overview of Management Options*, was edited by KOL Dr. Russell Portenoy, among others, and taught that other drugs, but not opioids, are unsafe at high doses. The 2013 version is still available for CME credit.

e. Purdue sales representatives told prescribers that opioids were just as effective for treating patients long-term and omitted any discussion that increased tolerance would require increasing, and increasingly dangerous, doses. On information and belief, these deceptive representations were made to practitioners in the Portsmouth area.

**Defendant deceptively omitted the risks of opioids, including in comparison to NSAIDs**

a. Purdue sponsored APF's *Exit Wounds* (2009), which omits warnings of the risk of interactions between opioids and benzodiazepines, which would increase fatality risk.

b. Purdue sponsored APF's *Treatment Options: A Guide for People Living with Pain* (2007), which advised patients that opioids differ from NSAIDs in that they have "no ceiling dose" and are therefore the most appropriate treatment for severe pain. The publication attributes 10,000 to 20,000 deaths annually to NSAID overdose. *Treatment Options* also warned that risks of NSAIDs increase if "taken for more than a period of months," with no corresponding warning about opioids.

c. Purdue sponsored a CME issued by the American Medical Association in 2003, 2007, 2010, and 2013, and the 2013 version is still available for CME credit. The CME, *Overview of Management Options*, was edited by KOL Dr. Russell Portenoy, among others, and taught that NSAIDs and other drugs, but not opioids, are unsafe at high doses.

d. Purdue sales representatives told prescribers that NSAIDs were more toxic than opioids. On information and belief, these false representations were made to practitioners in the Portsmouth area.

| Cephalon | **Falsehood that scientific evidence supports the long-term use of** |
|----------|------------------------------------------------------------------------|

**opioids to improve patients' function and quality of life**

a. Cephalon sponsored the FSMB's *Responsible Opioid Prescribing* (2007), which taught that relief of pain itself improved patients' function. *Responsible Opioid Prescribing* explicitly describes functional improvement as the goal of a "long-term therapeutic treatment course." Cephalon also spent $150,000 to purchase copies of the book in bulk and distributed the book through its pain sales force to 10,000 prescribers and 5,000 pharmacists.

b. Cephalon sponsored the APF's *Treatment Options: A Guide for People Living with Pain* (2007), which taught patients that opioids when used properly "give [pain patients] a quality of life we deserve." The *Treatment Options* guide notes that non-steroidal anti-inflammatory drugs have greater risks with prolonged duration of use, but there was no similar warning for opioids. APF distributed 17,200 copies in one year alone, according to its 2007 annual report, and the publication is currently available online.

c. Cephalon sponsored a CME written by KOL Dr. Lynn Webster, titled *Optimizing Opioid Treatment for Breakthrough Pain*, which was offered online by Medscape, LLC from September 28, 2007, through December 15, 2008. The CME taught that Cephalon's Actiq and Fentora improve patients' quality of life and allow for more activities when taken in conjunction with long-acting opioids.

d. Cephalon sales representatives told prescribers that opioids would increase patients' ability to function and improve their quality of life. On information and belief, these false representations were made to practitioners in the Portsmouth area.

**Defendant misrepresented the risk of addiction**

a. Cephalon sponsored and facilitated the development of a guidebook, *Opioid Medications and REMS: A Patient's Guide*, which claims, among other things, that "patients without a history of abuse or a family history of abuse do not commonly become addicted to opioids."

b. Cephalon sponsored APF's *Treatment Options: A Guide for People Living with Pain* (2007), which taught that addiction is rare and limited to extreme cases of unauthorized dose escalations, obtaining opioids from multiple sources, or theft.

c. In discussions with prescribers, Cephalon sales representatives omitted any discussion of addiction risks related to Cephalon's drugs. On information and belief, these deceptive representations were made to practitioners in the Portsmouth area.



**Defendant deceptively claimed without scientific support that the risk of addiction could be avoided or managed**

a. Cephalon sponsored APF's *Treatment Options: A Guide for People Living with Pain* (2007), which taught patients that "opioid agreements" between doctors and patients can "ensure that you take the opioid as prescribed."

**Defendant falsely stated or suggested the concept of "pseudoaddiction" and patients who only need more opioids, and should be treated as such**

a. Cephalon sponsored FSMB's *Responsible Opioid Prescribing* (2007), which taught that behaviors such as "requesting drugs by name," "demanding or manipulative behavior," seeing more than one doctor to obtain opioids, and hoarding are all signs of pseudoaddiction. Cephalon also spent $150,000 to purchase copies of the book in bulk and distributed it through its pain sales force to 10,000 prescribers and 5,000 pharmacists.

**Defendant suggested that high-dose opioid therapy was safe**

a. Cephalon sponsored APF's *Treatment Options: A Guide for People Living with Pain* (2007), which claims that some patients "need" a larger dose of their opioid, regardless of the dose currently prescribed.

b. Cephalon sponsored a CME written by KOL Dr. Lynn Webster, *Optimizing Opioid Treatment for Breakthrough Pain*, which was offered online by Medscape, LLC from September 28, 2007 through December 15, 2008. The CME taught that non-opioid analgesics and combination opioids that include aspirin and acetaminophen are less effective to treat breakthrough pain because of dose limitations.

c. Cephalon sales representatives assured prescribers that opioids were safe, even at high doses. On information and belief, these false representations were made to practitioners in the Portsmouth area.

**Defendant deceptively omitted the risks of opioids, including in comparison to NSAIDs**

a. Cephalon sponsored APF's *Treatment Options: A Guide for People Living with Pain* (2007), which taught patients that opioids differ from NSAIDs in that they have "no ceiling dose" and are therefore the most appropriate treatment for severe pain. The publication attributed 10,000 to 20,000 deaths annually to NSAID overdose. *Treatment Options* also warned that risks of NSAIDs increase if "taken for more than a period

| | |
|---|---|
| | of months," with no corresponding warning about opioids.

b. Cephalon sales representatives told prescribers that NSAIDs were more toxic than Cephalon's opioids.  On information and belief, these false representations were made to practitioners in the Portsmouth area. |
| **Collegium** | **Defendant misrepresents the risk of addiction**

a. In September 2016, the FDA's Office of Prescription Drug Promotion ("OPDP") sent advisory comments to Collegium regarding the company's presentations for Xtampza ER. In these advisory comments, OPDP recommended that Collegium revise its proposed presentations so that they did not misrepresent the approved indication or omit important context; misrepresent or omit important risk information; or omit other material information. In those comments, the OPDP also cautioned Collegium about failing to present risk information for Xtampza ER with a prominence and readability reasonably comparable to the presentation of its benefits.

On February 9, 2018, the FDA sent a warning letter to Collegium regarding Collegium's exhibit booth advertisement of Xtampza ER at the American Society Health-System Pharmacists (ASHP) Summer Meetings & Exhibition, which was held on June 3-7, 2017. The warning letter referenced its September 2016 advisory comments to Collegium and voiced "concern[ ] that Collegium is promoting Xtampza ER in a manner that fails to adequately present the very serious risks of the drug, despite this direction from OPDP." The warning letter stated that Collegium's exhibit booth "failed to adequately provide material information about the drug's limitations of use and the serious and life-threatening consequences that may result from the use of the drug, thereby creating a misleading impression about the drug's safety." The warning letter further stated that "the exhibit booth presentation included a principal display panel that prominently presented benefit claims about the abuse-deterrent properties of Xtampza ER, but failed to include any information with respect to the drug's limitations of use, which state that due to the risks of addiction, abuse, misuse, overdose and death, Xtampza ER should only be used in patients for whom alternative treatment options are ineffective, not tolerated, or would be otherwise inadequate to provide sufficient management of pain. Nor did the principal display panel include any information with respect to the indication or serious and life-threatening risks. . . ."

b. Collegium Vice President Steven Passik, speaking at the Insight Exchange Network's 2018 conference "Responding to the Opioid Crisis: Litigation, Regulation & Reform," minimized risks of prescription opioids for the elderly, suggesting that the risk was minimal or |

nonexistent.

**Defendant deceptively omitted the risks of opioids, including in comparison to NSAIDs**

a. Collegium falsely stated in their presentation at the 2014 Jefferies Global Healthcare Conference that "prescription opioids remain the primary treatment for chronic pain[,]" although this was not (and is not) the case. Collegium repeated this false information in its March 2018 Form 10-K SEC filing.

b. Defendant deceptively suggested that opioids with "abuse-deterrence technology" are safe. This is misleading and dangerous for several reasons: (1) many types of "abuse deterrent technology" are reversible, making the drug just as easily abused; (2) even where an opioid is less prone to abuse by adulteration, it remains prone to abuse in its pill form; (3) the primary danger of prescription opioids is addiction from overuse, which danger is not at all removed by changing a drug from immediate release to extended release; and (4) the focus on abuse intentionally confuses, even for the medical community, the issues of abuse and addiction, with many persons including those in the medical community misunderstanding that "abuse deterrent" somehow makes the use of the drug less addicting.

| Janssen | **Falsehood that scientific evidence supports the long-term use of opioids to improve patients' function and quality of life**<br><br>a. Janssen sponsored a patient education guide titled *Finding Relief: Pain Management for Older Adults* (2009), which its personnel reviewed and approved and its sales force distributed. On the cover, this guide features a man playing golf and lists examples of expected functional improvement from opioids, like sleeping through the night, returning to work, recreation, sex, walking, and climbing stairs. The guide states as a "fact" that "opioids may make it *easier* for people to live normally" (emphasis in the original). The myth/fact structure implies authoritative backing for the claim that does not exist. The targeting of older adults also ignored heightened opioid risks in this population.<br><br>b. Janssen sponsored, developed, and approved content of a website, *Let's Talk Pain* in 2009, acting in conjunction with the APF, AAPM, and ASPMN, whose participation in *Let's Talk Pain* Janssen financed and orchestrated. This website featured an interview, which was edited by Janssen personnel, claiming that opioids were what allowed a patient to "continue to function," inaccurately implying her experience would be representative. |
|---|---|

c. Janssen provided grants to APF to distribute *Exit Wounds* to veterans, which taught that opioid medications *"increase* your level of functioning"* (emphasis in the original). *Exit Wounds* also omits warnings of the risk of interactions between opioids and benzodiazepines, which would increase fatality risk. Benzodiazepines are frequently prescribed to veterans diagnosed with post-traumatic stress disorder.

d. Janssen sales representatives told prescribers that opioids would increase patients' ability to function and improve their quality of life by helping them become more physically active and return to work. On information and belief, these false representations were made to practitioners in the Portsmouth area.

**Defendant misrepresents the risk of addiction**

a. Janssen sponsored a patient education guide titled *Finding Relief: Pain Management for Older Adults* (2009), which its personnel reviewed and approved and which its sales force distributed. This guide described a "myth" that opioids are addictive, and asserts as fact that "[m]any studies show that opioids are *rarely* addictive when used properly for the management of chronic pain." Although the term "rarely" is not defined, the overall presentation suggests the risk is so low as not to be a worry. The language also implies that as long as a prescription is given, opioid use is not a problem.

b. Janssen contracted with AGS to produce a CME promoting the 2009 guidelines for the *Pharmacological Management of Persistent Pain in Older Persons*. These guidelines falsely claim that "the risks [of addiction] are exceedingly low in older patients with no current or past history of substance abuse." The study supporting this assertion does not analyze addiction rates by age and, as already noted, addiction remains a significant risk for elderly patients. Janssen was aware of the AGS guidelines' content when it agreed to provide this funding, and AGS drafted the guidelines with the expectation it would seek drug company funding to promote them after their completion.

c. Janssen provided grants to APF to distribute *Exit Wounds* (2009) to veterans, which taught that "[l]ong experience with opioids shows that people who are not predisposed to addiction are very unlikely to become addicted to opioid pain medications." Although the term "very unlikely" is not defined, the overall presentation suggests the risk is so low as not to be a worry.

d. Janssen currently runs a website, *PrescribeResponsibly.com* (last modified July 2, 2015), which claims that concerns about opioid



addiction are "overstated."

e. A June 2009 Nucynta Training module warns Janssen's sales force that physicians are reluctant to prescribe controlled substances like Nucynta, but this reluctance is unfounded because "the risks . . . are much smaller than commonly believed."

f. Janssen sales representatives told prescribers that its drugs were "steady state," the implication of which was that they did not produce a rush or euphoric effect, and therefore were less addictive and less likely to be abused.    On information and belief, these deceptive representations were made to practitioners in the Portsmouth area.

g. Janssen sales representatives told prescribers that Nucynta and Nucynta ER were "not opioids," implying that the risks of addiction and other adverse outcomes associated with opioids were not applicable to Janssen's drugs. In truth, however, as set out in Nucynta's FDA-mandated label, Nucynta "contains tapentadol, an opioid agonist and Schedule II substance with abuse liability similar to other opioid agonists, legal or illicit."    On information and belief, these false representations were made to practitioners in the Portsmouth area.

h. Janssen sales representatives told prescribers that Nucynta's unique properties eliminated the risk of addiction associated with the drug.  On information and belief, these false representations were made to practitioners in the Portsmouth area.

i. In discussions with prescribers, Janssen sales representatives omitted discussion of addiction risks related to Janssen's drugs.  On information and belief, these deceptive representations were made to practitioners in the Portsmouth area.

**Defendant falsely stated or suggested the concept of "pseudoaddiction" and patients who only need more opioids, and should be treated as such**

a. Janssen's website, *Let's Talk Pain,* stated from 2009 through 2011 that "pseudoaddiction . . . refers to patient behaviors that may occur when *pain is under-treated*" and "[p]seudoaddiction is *different from true addiction* because such behaviors can be resolved with effective pain management." (Emphasis added).

**Defendant falsely stated or suggested that withdrawal from opioids was not a problem and prescribing or using opioids should be without hesitation**

a. A Janssen PowerPoint presentation used for training its sales



| | representatives, titled "Selling Nucynta ER," indicates that the "low incidence of withdrawal symptoms" is a "core message" for its sales force. This message is repeated in numerous Janssen training materials between 2009 and 2011. The studies supporting this claim did not describe withdrawal symptoms in patients taking Nucynta ER beyond 90 days, or at high doses, and would therefore not be representative of withdrawal symptoms in the chronic pain population. Patients on opioid therapy long-term and at high doses will have a harder time discontinuing the drugs and are more likely to experience withdrawal symptoms. In addition, in claiming a low rate of withdrawal symptoms, Janssen relied upon a study that only began tracking withdrawal symptoms in patients two to four days after discontinuing opioid use, when Janssen knew or should have known that these symptoms peak earlier than that for most patients. Relying on data after that initial window painted a misleading picture of the likelihood and severity of withdrawal associated with chronic opioid therapy. Janssen also knew or should have known that the patients involved in the study were not on the drug long enough to develop rates of withdrawal symptoms comparable to rates of withdrawal suffered by patients who use opioids for chronic pain—the use for which Janssen promoted Nucynta ER.<br><br>b. Janssen sales representatives told prescribers that patients on Janssen's drugs were less susceptible to withdrawal than those on other opioids.  On information and belief, these false representations were made to practitioners in the Portsmouth area.<br><br>**Defendant suggested that high-dose opioid therapy was safe**<br><br>a. Janssen sponsored a patient education guide entitled *Finding Relief: Pain Management for Older Adults* (2009), which its personnel reviewed and approved and its sales force distributed. This guide listed dose limitations as "disadvantages" of other pain medicines but omitted any discussion of risks of increased doses from opioids. The publication also falsely claimed that it is a "myth" that "opioid doses have to be bigger over time." |
|---|---|
| Endo | **Falsehood that scientific evidence supports the long-term use of opioids to improve patients' function and quality of life**<br><br>a. Endo sponsored a website, painknowledge.com, through APF and the National Initiative of Pain Control ("NIPC"), which claimed in 2009 that with opioids, "your level of function should improve; you may find you are now able to participate in activities of daily living, such as work and hobbies, that you were not able to enjoy when your pain was worse." Endo continued to provide funding for this website through 2012, and closely tracked unique visitors to it.<br><br>b. A CME sponsored by Endo, titled *Persistent Pain in the Older* |

116

*Patient*, taught that chronic opioid therapy has been "shown to reduce pain and improve depressive symptoms and cognitive functioning."

c. Endo distributed handouts to prescribers that claimed that use of Opana ER to treat chronic pain would allow patients to perform work as a chef. This flyer also emphasized Opana ER's indication without including equally prominent disclosure of the "moderate to severe pain" qualification.[110]

d. Endo's sales force distributed FSMB's *Responsible Opioid Prescribing* (2007). This book taught that relief of pain itself improved patients' function. *Responsible Opioid Prescribing* explicitly describes functional improvement as the goal of a "long-term therapeutic treatment course."

e. Endo provided grants to APF to distribute *Exit Wounds* to veterans, which taught that opioid medications "*increase* your level of functioning" (emphasis in the original). *Exit Wounds* also omits warnings of the risk of interactions between opioids and benzodiazepines, which would increase fatality risk. Benzodiazepines are frequently prescribed to veterans diagnosed with post-traumatic stress disorder.

f. Endo sales representatives told prescribers that opioids would increase patients' ability to function and improve their quality of life by helping them become more physically active and return to work.   On information and belief, these false representations were made to practitioners in the Portsmouth area.

**Defendant misrepresented the risk of addiction**

a. Endo trained its sales force in 2012 that use of long-acting opioids resulted in increased patient compliance, without any supporting evidence.

b. Endo's advertisements for the 2012 reformulation of Opana ER claimed it was *designed to be crush resistant*, in a way that conveyed that it was less likely to be abused. This claim was false; the FDA warned in a May 10, 2013 letter that there was no evidence Endo's design "would provide a reduction in oral, intranasal or intravenous abuse" and Endo's "postmarketing data submitted are insufficient to support any conclusion about the overall or route-specific rates of

---

[110]   FDA regulations require that warnings or limitations be given equal prominence in disclosure, and failure to do so constitutes "misbranding" of the product. 21 C.F.R. §202.1(e)(3); *see also* 21 U.S.C. §331(a).



abuse." Further, Endo instructed its sales representatives to repeat this claim about "design," with the intention of conveying Opana ER was less subject to abuse.

c. Endo sponsored a website, painknowledge.com, through APF and NIPC, which claimed in 2009 that: "[p]eople who take opioids as prescribed usually do not become addicted." Although the term "usually" is not defined, the overall presentation suggests the risk is so low as not to be a worry. The language also implies that as long as a prescription is given, opioid use will not become problematic. Endo continued to provide funding for this website through 2012, and closely tracked unique visitors to it.

d. Endo sponsored a website, PainAction.com, which stated "Did you know? Most chronic pain patients do not become addicted to the opioid medications that are prescribed for them."

e. Endo sponsored CMEs published by APF and NIPC, of which Endo was the sole funder, titled *Persistent Pain in the Older Adult* and *Persistent Pain in the Older Patient*. These CMEs claimed that opioids used by elderly patients present "possibly less potential for abuse than in younger patients[,]" which statement lacks evidentiary support and deceptively minimizes the risk of addiction for elderly patients.

f. Endo distributed an education pamphlet with the Endo logo titled *Living with Someone with Chronic Pain*, which inaccurately minimized the risk of addiction: "Most health care providers who treat people with pain agree that most people do not develop an addiction problem."

g. Endo distributed a patient education pamphlet edited by KOL Dr. Russell Portenoy titled *Understanding Your Pain: Taking Oral Opioid Analgesics*. It claimed that "[a]ddicts take opioids for other reasons [than pain relief], such as unbearable emotional problems." This implies that pain patients prescribed opioids will not become addicted, which is unsupported and untrue.

h. Endo contracted with AGS to produce a CME promoting the 2009 guidelines for the *Pharmacological Management of Persistent Pain in Older Persons*. These guidelines falsely claim that "the risks [of addiction] are exceedingly low in older patients with no current or past history of substance abuse." None of the references in the guidelines corroborates the claim that elderly patients are less likely to become addicted to opioids, and there is no such evidence. Endo was aware of the AGS guidelines' content when it agreed to provide this funding, and AGS drafted the guidelines with the expectation it would seek drug company funding to promote them after their completion.

i. Endo sales representatives told Portsmouth prescribers that its drugs were "steady state," the implication of which was that they did not produce a rush or euphoric effect, and therefore were less addictive and less likely to be abused. On information and belief, these false representations were made to practitioners in the Portsmouth area.

j. Endo provided grants to APF to distribute *Exit Wounds* (2009) to veterans, which taught that "[l]ong experience with opioids shows that people who are not predisposed to addiction are very unlikely to become addicted to opioid pain medications." Although the term "very unlikely" is not defined, the overall presentation suggests that the risk is so low as not to be a worry.

k. In discussions with prescribers, Endo sales representatives omitted discussion of addiction risks related to Endo's drugs. On information and belief, these material omissions were made in representations to practitioners in the Portsmouth area.

**Defendant deceptively claimed without scientific support that the risk of addiction could be avoided or managed**

a. An Endo-supported publication, titled *Pain Management Dilemmas in Primary Care: Use of Opioids*, recommended screening patients using tools like the Opioid Risk Tool or the Screener and Opioid Assessment for Patients with Pain, and advised that patients at high risk of addiction could safely (*e.g.*, without becoming addicted) receive chronic opioid therapy using a "maximally structured approach" involving toxicology screens and pill counts.

**Defendant falsely stated or suggested the concept of "pseudoaddiction" and patients who only need more opioids, and should be treated as such**

a. Endo distributed copies of a book by KOL Dr. Lynn Webster entitled *Avoiding Opioid Abuse While Managing Pain* (2007). Endo's internal planning documents describe the purpose of distributing this book as to "[i]ncrease the breadth and depth of the Opana ER prescriber base." The book claims that, when faced with signs of aberrant behavior, the doctor should regard it as pseudoaddiction and thus, increasing the dose *in most cases . . . should be the clinician's first response.*" (Emphasis added).

b. Endo spent $246,620 to buy copies of FSMB's *Responsible Opioid Prescribing* (2007), which was distributed by Endo's sales force. This book asserted that behaviors such as "requesting drugs by name," "demanding or manipulative behavior," seeing more than one doctor to obtain opioids, and hoarding, are all signs of "pseudoaddiction."

119



**Defendant falsely stated or suggested that withdrawal from opioids was not a problem and prescribing or using opioids should be without hesitation**

a. A CME sponsored by Endo, titled *Persistent Pain in the Older Adult*, taught that withdrawal symptoms can be avoided entirely by tapering the dose by 10-20% per day for ten days.

**Defendant suggested that high-dose opioid therapy was safe**

a. Endo sponsored a website, painknowledge.com, through APF and NIPC, which claimed in 2009 that opioids may be increased until "you are on the right dose of medication for your pain," and once that occurs, further dose increases would not occur. Endo funded the site, which was a part of Endo's marketing plan, and tracked visitors to it.

b. Endo distributed a patient education pamphlet edited by KOL Dr. Russell Portenoy, titled *Understanding Your Pain: Taking Oral Opioid Analgesics*. In Q&A format, it asked: "If I take the opioid now, will it work later when I really need it?" The response was: "The dose can be increased . . . . You won't 'run out' of pain relief."

**Defendant deceptively omitted the risks of opioids, including in comparison to NSAIDs**

a. Endo distributed a "case study" to prescribers, titled *Case Challenges in Pain Management: Opioid Therapy for Chronic Pain*. The study cites an example, meant to be representative, of a patient "with a massive upper gastrointestinal bleed believed to be related to his protracted use of NSAIDs" (over eight years), and recommends treating with opioids instead.

b. Endo sponsored a website, painknowledge.com, through APF and NIPC, which contained a flyer called "Pain: Opioid Therapy." This publication included a list of adverse effects from opioids that omitted significant adverse effects like hyperalgesia, immune and hormone dysfunction, cognitive impairment, tolerance, dependence, addiction, and death. Endo continued to provide funding for this website through 2012, and closely tracked unique visitors to it.

c. Endo provided grants to APF to distribute *Exit Wounds* (2009), which omitted warnings of the risk of interactions between opioids and benzodiazepines, which would increase fatality risk. *Exit Wounds* also contained a lengthy discussion of the dangers of using alcohol to treat chronic pain but did not disclose dangers of mixing alcohol and opioids.

| | d. Endo sales representatives told prescribers that NSAIDs were more toxic than opioids. On information and belief, these false representations were made to practitioners in the Portsmouth area. |
|---|---|
| **Actavis** | **Falsehood that scientific evidence supports the long-term use of opioids to improve patients' function and quality of life** |
| | a. Documents from a 2010 sales training indicate that Actavis trained its sales force to instruct prescribers that "***most*** chronic benign pain patients do have ***markedly improved ability to function*** when maintained on chronic opioid therapy." (Emphasis added). |
| | b. Documents from a 2010 sales training indicate that Actavis trained its sales force that increasing and restoring function is an expected outcome of chronic Kadian therapy, including physical, social, vocational, and recreational function. |
| | c. Actavis distributed a product advertisement that claimed that use of Kadian to treat chronic pain would allow patients to return to work, relieve "stress on your body and your mental health," and "cause patients to enjoy their lives." The FDA warned Actavis such claims were misleading, writing: "We are not aware of substantial evidence or substantial clinical experience demonstrating that the magnitude of the effect the drug has in alleviating pain, taken together with any drug-related side effects patients may experience . . . results in an overall positive impact on a patient's work, physical and mental functioning, daily activities, or enjoyment of life."[111] |
| | d. Actavis sales representatives told prescribers that prescribing Actavis's opioids would improve their patients' ability to function and improve their quality of life. On information and belief, these false representations were made to practitioners in the Portsmouth area. |
| | **Defendant misrepresented the risk of addiction** |
| | a. Documents from a 2010 sales training indicate that Actavis trained its sales force that long-acting opioids were less likely to produce addiction than short-acting opioids, although there is no evidence that either form of opioid is less addictive or that any opioids can be taken long-term without the risk of addiction. |
| | b. Kadian sales representatives told prescribers that Kadian was "steady state" and had extended release mechanisms, the implication of which was that it did not produce a rush or euphoric effect, and therefore was |

---

[111]  Abrams, *supra* n.87.



less addictive and less likely to be abused. On information and belief, these false representations were made to practitioners in the Portsmouth area.

c. Kadian sales representatives told prescribers that the contents of Kadian could not be dissolved in water if the capsule was opened, implying that Kadian was less likely to be abused—and thereby less addictive—than other opioids. On information and belief, these deceptive representations were made to practitioners in the Portsmouth area.

d. In discussions with prescribers, Kadian sales representatives omitted any discussion of addiction risks related to Actavis's drugs. On information and belief, these material omissions were made in presentations to practitioners in the Portsmouth area.

**Defendant deceptively claimed without scientific support the risk of addiction could be avoided or managed**

a. Documents from a 2010 sales training indicate that Actavis trained its sales force that prescribers can use risk screening tools to limit the development of addiction.

**Defendant falsely stated or suggested the concept of "pseudoaddiction" and patients who only need more opioids, and should be treated as such**

a. Documents from a 2010 sales training indicate that Actavis trained its sales force to instruct physicians that aberrant behaviors like self-escalation of doses constituted "pseudoaddiction."

**Defendant falsely stated or suggested that withdrawal from opioids was not a problem and prescribing or using opioids should be without hesitation**

a. Documents from a 2010 sales training indicate that Actavis trained its sales force that discontinuing opioid therapy can be handled "simply" and that it can be done at home. Actavis sales representative training claimed opioid withdrawal would take only a week, even in addicted patients.

**Defendant suggested that high-dose opioid therapy was safe**

a. Documents from a 2010 sales training indicate that Actavis trained its sales force that "individualization" of opioid therapy depended on increasing doses "until patient reports adequate analgesia" and to "set dose levels on [the] basis of patient need, not on [a] predetermined



maximal dose." Actavis further counseled its sales representatives that the reasons some physicians had for not increasing doses indefinitely were simply a matter of physician "comfort level," which could be overcome or used as a tool to induce them to switch to Actavis's opioid, Kadian.

**Defendant deceptively omitted the risks of opioids, including in comparison to NSAIDs**

a. Documents from a 2010 sales training indicate that Actavis trained its sales force that the ability to escalate doses during long-term opioid therapy, without hitting a dose ceiling, made opioid use safer than other forms of therapy that had defined maximum doses, such as acetaminophen or NSAIDs.

b. Actavis also trained physician-speakers that "maintenance therapy with opioids can be safer than long-term use of other analgesics," including NSAIDs, in older persons.

c. Kadian sales representatives told prescribers that NSAIDs were more toxic than opioids.   On information and belief, these false representations were made to practitioners in the Portsmouth area.

| Mallinckrodt | **Defendant Mallinckrodt funded false publications and presentations.**<br><br>a. In 2010, Mallinckrodt sponsored an initiative called "Collaborating and Acting Responsibly to Ensure Safety (C.A.R.E.S.), through which it published and promoted the book "Defeat Chronic Pain Now!" aimed at chronic pain patients. The book is still available for sale and is available online at www.defeatchronicpainnow.com.<br><br>b. Until at least February 2009, Mallinckrodt provided an educational grant to Pain-Topics.org, a now-defunct website that touted itself as "a noncommercial resource for healthcare professionals, providing open access to clinical news, information, research, and education for a better understanding of evidence-based pain-management practices."[112] Among other content, the website included a handout titled "Oxycodone |
|---|---|

---

[112]    *Pain Treatment Topics*, PAIN-TOPICS.ORG, https://web.archive.org/web/20070104235709/ http://www.pain-topics.org:80 (last updated Jan. 3, 2007).

Safety Handout for Patients," which advised practitioners that: "Patients' fears of opioid addiction should be dispelled."[113]

c. In November 2016, Mallinckrodt paid Dr. Scott Gottlieb ("Gottlieb"), the current commissioner of the FDA, $22,500 for a speech in London, shortly after the U.S. presidential election.[114] Gottlieb has also received money from the Healthcare Distribution Alliance ("HDA"), an industry-funded organization that pushes the agenda of large pharmaceutical wholesalers, and he has often criticized efforts aimed at regulating the pharmaceutical opioid market.[115]

**Defendant misrepresents the risk of addiction**

a. "Defeat Chronic Pain Now!" advises laypeople who are considering taking opioid drugs that "[o]nly rarely does opioid medication cause true addiction."[116]

b. "Oxycodone Safety Handout for Patients" included false and misleading statements concerning the risk of addiction associated with prescription opioids:

> Will you become dependent on or addicted to oxycodone?
> - After a while, oxycodone causes physical dependence. That is, if you suddenly stop the medication you may experience uncomfortable withdrawal symptoms, such as diarrhea, body aches, weakness, restlessness, anxiety, loss of appetite, and other ill feelings. These may take several days to develop.
> - This is not the same as addiction, a disease involving craving for the drug, loss of control over taking it or compulsive use, and using it despite harm. Addiction to oxycodone in persons

---

[113]    Lee A. Kral & Stewart B. Leavitt, *Oxycodone Safety Handout for Patients*, PAIN-TOPICS.ORG    (June    2007),    http://paincommunity.org/blog/wp-content/uploads/OxycodoneHandout.pdf.

[114]    Lee Fang, *Donald Trump's Pick to Oversee Big Pharma Is Addicted to Opioid-Industry Cash*, INTERCEPT (Apr. 4, 2017, 2:15 PM), https://theintercept.com/ 2017/04/04/scott-gottlieb-opioid/.

[115]    *Id.*

[116]    Galer, *supra* n.57.

124

without a recent history of alcohol or drug
problems is rare.[117]

**Defendant deceptively claimed without scientific support that the
risk of addiction could be avoided or managed.**

a. "Defeat Chronic Pain Now!" states that the issue of tolerance is
"overblown," because "[o]nly a minority of chronic pain patients who
are taking long-term opioids develop tolerance." In response to a
hypothetical question from a chronic back pain patient who expresses a
fear of becoming addicted, the book advises that "[i]t is very uncommon
for a person with chronic pain to become 'addicted' to narcotics IF (1)
he doesn't have a prior history of any addiction and (2) he only takes the
medication to treat pain."

**Defendant  falsely  stated  or  suggested  the  concept  of
"pseudoaddiction" and patients who only need more opioids, and
should be treated as such.**

a. The FAQ section of Pain-Topics.org contained the following false
and misleading information downplaying the dangers of prescription
opioid use:

> **Pseudoaddiction** – has been used to describe aberrant
> patient behaviors that may occur when pain is
> undertreated (AAPM 2001). Although this diagnosis is
> not supported by rigorous investigation, it has been
> widely observed that patients with unrelieved pain may
> become very focused on obtaining opioid medications,
> and may be erroneously perceived as "drug seeking."
> Pseudoaddiction can be distinguished from true addiction
> in that the behaviors resolve when the pain is effectively
> treated. Along with this, two related phenomena have
> been described in the literature (Alford, et al. 2006):
>
> > **Therapeutic dependence** – sometimes patients
> > exhibit what is considered drug-seeking because
> > they fear the reemergence of pain and/or
> > withdrawal symptoms from lack of adequate
> > medication; their ongoing quest for more
> > analgesics is in the hopes of insuring a tolerable
> > level of comfort.
> > **Pseudo-opioid-resistance** – other patients, with
> > adequate pain control, may continue to report
> > pain or exaggerate its presence, as if their opioid

---

[117]    Kral, *et al., supra* n.113.

|  |  |
|---|---|
|  | analgesics are not working, to prevent reductions in their currently effective doses of medication. Patient anxieties about receiving inadequate pain control can be profound, resulting in demanding or aggressive behaviors that are misunderstood by healthcare practitioners and ultimately detract from the provision of adequate pain relief.[118]<br><br>**Defendant's document "Commonsense Oxycodone Prescribing & Safety," falsely suggests that generic oxycodone is less prone to abuse and diversion than branded oxycodone:** "Anecdotally, it has been observed that generic versions of popularly abused opioids usually are less appealing; persons buying drugs for illicit purposes prefer brand names because they are more recognizable and the generics have a lower value 'on the street,' which also makes them less alluring for drug dealers."[119]<br><br>**Defendant misbranded and marketed an unapproved drug**<br><br>a. On March 30, 2009, Mallinckrodt received a letter from the FDA stating that Mallinckrodt was found to have been marketing an unapproved new drug, morphine sulfate concentrate oral solution 20 mg/ml, in violation of 21 U.S.C. §§331(d) and 355(a). Mallinckrodt had been marketing this unapproved formulation since 2005.<br><br>The letter also stated that its unapproved morphine formulation was misbranded under 21 U.S.C. §352(f)(1) because the conditions it was intended to treat were not amenable to self-diagnosis and treatment. Adequate directions for such use, therefore, could not be written. As a result, introduction or delivery for introduction into interstate commerce of its unapproved morphine formulation violated 21 U.S.C. §§331(a) and (d). |
| **Insys** | Defendant sales representatives falsely told prescribers in the Portsmouth area that withdrawal from opioids was not a problem and prescribing or using opioids should be without hesitation.<br><br>Defendant sales representatives falsely told prescribers in the Portsmouth area that high-dose opioid therapy was safe, and advocated |

[118]    *FAQs*,    PAIN-TOPICS.ORG,    https://web.archive.org/web/20080821191924/
http://www.paintopics.org/faqs/index1.php (last updated Jan. 8, 2008).

[119]    Lee A. Kral, *Commonsense Oxycodone Prescribing & Safety*, PAIN-TOPICS.ORG (June 2007), http://paincommunity.org/blog/wp-content/uploads/OxycodoneRxSafety.pdf.

| | starting patients at a higher than approved dosage. |
| | Defendant sales representatives, in false representations to prescribers in the Portsmouth area, deceptively omitted the risks of opioids, including in comparison to NSAIDs |
| | Defendant created a system of insurance reimbursement to get its prescriptions approved that was based on fraud, such as advising the insurance companies that they were calling from the physician's office or falsely advising the insurance companies that the patient had cancer when (s)he did not. |

## C.    Unlawful Conduct of Distributor Defendants

377.    Located between manufacturers and retailers in the prescription opioid supply chain, Distributor Defendants fill wholesale orders for prescription opioids across the United States – including in Virginia and the City of Portsmouth. The three Distributor Defendants are responsible for 85-90% of the prescription opioids flowing through this supply chain.

378.    Prescription opioids – like heroin – are highly addictive and produce desirable narcotic effects in the user; once a user of prescription opioids becomes addicted, the user will seek out prescription opioids at all costs. There exists a major potential black market for prescription opioids. Distributor Defendants are aware of this potential black market, and must exercise due care to prevent the "diversion" of the products they distribute into illegal channels.

379.    A prescription opioid is said to have been diverted when it exits the "closed supply chain" through which prescription opioids are lawfully distributed. This supply chain is "closed" in that participation is limited to actors who have legitimate reasons to be handling and/or using prescription opioids. Each in their turn, manufacturers, distributors, retailers, and prescribers must take concrete steps to ensure that they transfer opioids only to other actors participating in the closed supply chain. Properly-prescribed patients, the end users, should not transfer opioids to anyone.

380.   Because Distributor Defendants handle the greatest volume of opioids and control the most sophisticated and wide-ranging means for monitoring the distribution of opioids, they are the largest and most significant actors in the closed supply chain.  Distributor Defendants possess the means to detect many types of diversion, large and small.  Upon information and belief, Distributor Defendants employ staff that are responsible for tracking and analyzing opioid orders and shipments, raising red flags when orders are, for any reason, suspicious in nature, and, where appropriate, ensuring that such orders are not filled.

381.   Distributor Defendants have publically boasted of the efficacy of their monitoring protocols.  For example, a Cardinal executive claimed that Cardinal used "advanced analytics" to monitor its supply chain and assured the public it was being "as effective and efficient as possible in constantly monitoring, identifying, and eliminating any outside criminal activity."[120] Similarly, McKesson publicly stated that it had a "best-in-class controlled substance monitoring program to help identify suspicious orders" and claimed it was "deeply passionate about curbing the opioid epidemic in our country."[121]   Acting through their trade associates, Healthcare Distribution Management Association ("HDMA") and National Association of Chain Drug Stores ("NACDS"), the Distributor Defendants, filed an *amicus* brief, which stated:

> Distributors take seriously their duty to report suspicious orders, utilizing both computer algorithms and human review to detect suspicious orders based on the generalized information that *is* available to them in the ordering process.

---

[120]   Lenny Bernstein, *et al.*, *How Drugs Intended for Patients Ended Up in the Hands of Illegal Users: 'No One Was Doing Their Job'*, WASH. POST (Oct. 22, 2016), https://www.washingtonpost.com/investigations/how-drugs-intended-for-patients-ended-up-in-the-hands-of-illegal-users-no-one-was-doing-their-job/2016/10/22/10e79396-30a7-11e6-8ff7-7b6c1998b7a0_story.html?utm_term=.30f8a1ea7541.

[121]   Scott Higham, *et al.*, *Drug Industry Hired Dozens of Officials from the DEA as the Agency Tried to Curb Opioid Abuse*, WASH. POST (Dec. 22, 2016), https://www.washingtonpost.com/investigations/key-officials-switch-sides-from-dea-to-pharmaceutical-industry/2016/12/22/55d2e938-c07b-11e6-b527-949c5893595e_story.html.

*Masters Pharm., Inc. v. U.S. Drug Enf't Admin.*, Case No. 15-1335, 2016 WL 1321983, at \*25 (D.C. Cir. Apr. 4, 2016).

382.    Accordingly, the Distributor Defendants are uniquely positioned to monitor and regulate the flow of the dangerous prescription opioids that they distribute, at handsome profits, into America's communities. For example, data collected by Distributor Defendants may show that one or more orders to the City of Portsmouth and/or its environs are of a size (or, in the case of multiple orders, at a frequency) that is out of line with past ordering patterns. A pattern like this may present evidence of a potential diversion. If a Distributor Defendant detects such a pattern, it should follow up by investigating and, if appropriate, halting the order(s) to Portsmouth and/or its environs.

383.    Because the black market for prescription opioids poses giant economic opportunities for professional criminals, diversion can occur at very large scales. So-called "pill mill" pharmacies, leagued with unscrupulous prescribers, may order opioids in extremely large quantities. In just one notorious example, over 9 million hydrocodone pills were shipped to a single pharmacy in Kermit, West Virginia over two years: approximately 23,000 pills for each of the village's 392 residents. Examples like that of Kermit abound. Once delivered to what are manifestly and transparently illegal pill mills, opioids enter a sophisticated—but decidedly open—criminal distribution network. Upon information and belief, an identifiable quantity of the black market prescription opioids in Portsmouth flowed through such networks.

384.    Simply put, Distributor Defendants have a common law duty to monitor orders and shipments for the patterns that result from these attempted diversions, large and small. Where a suspicious pattern is detected, Distributor Defendants have a common law duty to investigate the potential diversion before they ship out dangerous prescription opioid pills.

Where investigation yields evidence of attempted diversion, Distributor Defendants have a common law duty to halt shipment before diversion occurs.

385.    Distributors Defendants' common law duties—rooted in the extremely dangerous nature of the substances they distribute and the severe harm that foreseeably results from their diversion—are mirrored in laws and regulations enacted by the Commonwealth and by the federal government.

386.    For example, the federal CSA presents clear evidence of policymakers' considered judgment that distributors are uniquely situated to monitor and control the opioid supply chain. Under the statutory scheme set out in the CSA, enacted by Congress in 1970, wholesale pharmaceutical distributors were given a statutory obligation to maintain "effective controls" to prevent the "diversion" of controlled substances. 21 C.F.R. §1301.71(a). Once a pharmaceutical distributor detects a "suspicious order" of the controlled substance, it is obligated to take several mandatory steps. It must report the "suspicious order" to the DEA. Additionally, the wholesaler must investigate the suspicious order, document the result of the investigation, and, if not reasonably satisfied that the suspicious order is for the legitimate sale of the Retail End User, it must immediately halt the sale. *See Masters Pharm.*, 861 F.3d at 212-13. Plaintiff expressly denies that the reference to the CSA in this Complaint means that any claims "arise under" federal law within the meaning of 28 U.S.C. §1331.

387.    The State of Virginia has a similar reporting system for monitoring the flow of controlled substances, the Prescription Monitoring Program ("PMP"), originally signed into law in 2002. Under the Virginia Drug Control Act, manufacturers and distributors must register with the Virginia Board of Pharmacy and the DEA. *See, e.g.*, Va. Code Ann. §§ 54.1-3437, 54.1-3442.01(A), 54.1-3435(A) & §54.1-3435.01(A). Virginia regulations require that registrants

130

"provide and maintain appropriate inventory controls in order to detect and document any theft, counterfeiting, or diversion of prescription drugs," 18 Va. Admin. Code 110-50-90, and that they report to the Virginia Board of Pharmacy any time they halt distribution of a suspicious order pursuant to CSA requirements. Va. Code Ann. §§54.1-3435(B) & 54.1-3435.01(D).

388.    These state and federal requirements have helped to create some of the machinery that Distributor Defendants are legally required to have in place for monitoring opioid shipments—and that can help place Distributor Defendants on notice as to potential diversions. For example, a database known as the "Automation of Reports and Consolidated Orders System" ("ARCOS") was set up under the 1970 Controlled Substances Act. ARCOS is a comprehensive reporting system that shows the flow of every controlled substance from its point of manufacture, through the distributor, and on to the Retail End User. Each Manufacturer Defendant and each Distributor Defendant has access to the ARCOS database, and each is under concurrent obligations to enter into the database all transactions with which it is involved for any controlled substance. The ARCOS system tracks the distribution of controlled substances—drug types, quantities, and destinations—to Retail End Users on the basis of their zip code. If the Distributor Defendants would permit access to such information, Plaintiff could document in this Complaint the gross number of suspicious sales made by each Distributor Defendant to the City of Portsmouth and its environs in violation of its common law and other obligation.

389.    The Distributor Defendants will not permit such access, even in response to a FOIA request. Instead, they require the government to assert trade secret and confidentiality exemptions under Exemption 4 of FOIA.

390.   The following chart[122] shows the only information currently publicly available from the ARCOS database, which reveals data from 2006 to 2016 on the basis of the first three digits of a zip code. Based on the first three digits of the relevant zip codes, the ARCOS database reveals the following grams (*i.e.*, thousands of milligrams) were delivered to the Greater Portsmouth area by chemical category of opioid.

ARCOS DATABASE – PORTSMOUTH, VA

| Drug Name/Code | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Buprenorphine/9064 | 53.52 | 102.91 | 111.8 | 137.46 | 182.24 | 282.21 | 309.4 | 389.35 | 367.68 | 467.21 | 427.38 | 415.63 |
| Fentanyl Base/9801 | 363.67 | 345.21 | 360.76 | 328.22 | 335.3 | 297.6 | 296.87 | 278.91 | 274.63 | 247.22 | 212.74 | 176.58 |
| Hydrocodone/9193 | 11,417.95 | 12,547.88 | 12,248.73 | 12,563.54 | 12,817.26 | 19,713.11 | 14,755.68 | 15,252.53 | 14,502.28 | 12,214.64 | 11,013.93 | 8,741 |
| Hydromorphone/9150 | 806.49 | 833.29 | 947.67 | 1,054.52 | 1,243.78 | 1,361.60 | 1,330.37 | 1,440.83 | 1,503.58 | 1,249.46 | 1,205.26 | 994.35 |
| Morphine/9300 | 10,343.46 | 11,302.56 | 10,341.49 | 10,795.59 | 10,545.20 | 11,178.82 | 9,794.20 | 9,320.22 | 9,308.19 | 8,767.68 | 7,979.30 | 7,534.10 |
| Oxycodone/9143 | 16,118.78 | 16,333.71 | 18,179.29 | 18,114.73 | 21,753.22 | 25,866.38 | 28,894.58 | 30,589.17 | 30,284.81 | 30,923.53 | 28,049.56 | 23,601.28 |
| Oxymorphone/9652 | 139.19 | 651.5 | 719.26 | 604.84 | 737.31 | 885.19 | 705.73 | 756.82 | 692.31 | 685.04 | 773.98 | 621.08 |
| Tapentadol/9780 | — | — | — | 815 | 2,090 | 2,827 | 3,726 | 3,994.50 | 3,271 | 3,739.50 | 3,348.50 | 3,313.50 |

391.   Thus, for example, the amount of oxycodone sent to the City of Portsmouth in 2017 was 23,601.28 grams, *or 23,601,280 mg*, the equivalent of 1,180,064 pills of 20 mg each. Similarly, in 2013, its peak distribution year, 30,589.17 grams, *or 30,589,170 mg*, the equivalent of 1,529,458 pills of 20 mg each, of oxycodone was showered on Portsmouth.

392.   Although the publicly available ARCOS information only is only available from 2000-forward, upon information and belief, additional recorded data exists for the period preceding 2000. If Distributor Defendants permitted access to this information, a longer timeline would help document the dramatic increase in pharmaceutical opioid distribution in the City of Portsmouth over the preceding ten years (*i.e.*, 1990-2000). That is to say nothing of the shockingly large quantities of drugs that opioid distributors have shipped to pill mills in places like Kermit, West Virginia, and that foreseeably end up on the streets of places like Portsmouth.

---

[122]    *ARCOS Retail Drug Summary Reports*, U.S. D.O.J. https://www.deadiversion.usdoj.gov/ arcos/retail_drug_summary/index.html (last visited Dec. 5, 2018).

393.    Despite the superabundance of critical data available to Distributor Defendants, each Distributor Defendant has breached its common law duty to the City of Portsmouth. Each has breached its duty by failing to monitor the data available to Distributor Defendants through ARCOS and other means. Each has breached its duty by failing to investigate potential diversions that it should have discerned from the patterns in that data. And each has breached its duty by failing to halt the diversions it would have identified had it investigated.

394.    Moreover, in breaching its common law duty, each Distributor Defendant also violated the Commonwealth and federal laws and regulations that evidence policymakers' considered recognition of Distributor Defendants' responsibilities. These violations speak for themselves.

395.    The three Distributor Defendants, McKesson, Cardinal, and ABDC, control 85-90% of the market share in the United States for the distribution of prescription opioids.

396.    On September 26, 2006, the DEA sent a letter to Distributor Defendants McKesson, Cardinal, and ABDC cautioning them not to "turn a blind eye to the suspicious circumstances." The letter further warned that "even just one distributor that uses its DEA registration to facilitate diversion can cause enormous harm."[123]

397.    On December 27, 2007, the DEA sent another letter to Distributor Defendants McKesson, Cardinal, and ABDC warning them again of the importance of fulfilling their obligation and role as gatekeepers for the safe distribution of opioid prescriptions. The DEA letter stated, in part:

---

[123]    Letter from Joseph T. Rannazzisi, Deputy Assist. Admin., Office of Diversion Control, to Cardinal Health (Sept. 27, 2006) (a copy of the letter is filed at *Cardinal Health, Inc. v. Holder*, No. 12-cv-00185 (D.D.C. Feb. 10, 2012), ECF No. 14-51).

> Registrants are reminded that their responsibility does not end merely with the filing of a suspicious order report. Registrants must conduct an independent analysis of suspicious orders prior to completing a sale to determine whether the controlled substances are likely to be diverted from legitimate channels.[124]

398.    Each Distributor Defendant made the unlawful and unconscionable decision to continue suspicious sales where it had strong reason to believe, or actually knew, that the prescription drugs were being diverted and not being used for legitimate reasons. Distributor Defendants thereby subjected Americans and Virginia residents, including residents of the Portsmouth community, to grievous harm, up to and including death by overdose. Distributor Defendants continued to permit the sales to go through for one reason: the sales enhanced the Defendants' profits.

399.    Defendant McKesson agreed to pay a $150 million civil penalty to the DOJ on January 17, 2017 for violations of the CSA.

400.    Additionally, in 2008, McKesson agreed to a $13.25 million civil penalty and entered into an administrative agreement for its failure to detect and report suspicious sales. The fine was the result of several district investigations by DEA field divisions and U.S. Attorneys' offices.

401.    In connection with the January 2017 fine leveled upon McKesson, the DOJ announced that, notwithstanding the 2008 agreement, "[f]rom 2008 until 2013, McKesson supplied various U.S. pharmacies an increasing amount of oxycodone and hydrocodone pills, frequently misused products that are part of the current opioid epidemic."[125]

---

[124]    Letter from Joseph T. Rannazzisi, Deputy Assist. Admin., Office of Diversion Control, to Cardinal Health (Dec. 27, 2007) (a copy of the letter is filed at *Cardinal Health, Inc. v. Holder*, No. 12-cv-00185 (D.D.C. Feb. 10, 2012), ECF No. 14-8).

[125]    *See* News Release, US DOJ Office of Public Affairs, *supra* n.6.

402.   In December of 2016, Cardinal agreed to pay $44 million to the DOJ for its violations of the CSA ($34 million for itself and $10 million for a subsidiary).

403.   On April 24, 2007, the DEA issued an order to show cause and an immediate suspension order against Defendant ABDC's Orlando, Florida, distribution center. The agency alleged that ABDC failed to maintain effective controls against diversion of controlled substances. On June 22, 2007, the DEA suspended ABDC's DEA registration at that facility. ABDC was allowed to continue shipping controlled substances from its other facilities, so business was not interrupted.

404.   The Distributor Defendants' failure to detect, report, investigate, and halt suspicious orders is a direct and proximate cause of the excessive amounts of opioids that have foreseeably inundated the City of Portsmouth in numbers far beyond any legitimate medical need.

405.   Plaintiff seeks damages from the Distributor Defendants for the costs Plaintiff incurred, is still incurring, and will incur for the foreseeable future. These include costs incurred through Portsmouth's attempt to contain and mitigate the hazards to public health and safety. Additionally, Plaintiff seeks injunctive relief, including payment for the future cost of abating the public nuisance that Distributor Defendants caused through their unlawful and unconscionable acts.

**D.    Defendants Are Estopped from Asserting Statute of Limitations or Laches Defenses**

   **1.    The Manufacturer Defendants Fraudulently Concealed Their Misconduct**

406.   The Manufacturer Defendants, both individually and collectively, made, promoted, and handsomely profited from their misrepresentations and material omissions about the risks and benefits of opioids for chronic pain, even though they knew that their

misrepresentations were false and deceptive. The long-held medical view, along with research and clinical experience prior to the commencement of the Manufacturer Defendants' disinformation campaign, established that opioids are highly addictive and responsible for a long list of very serious adverse outcomes. Upon information and belief, the FDA warned Defendants about the questionable basis for the long-term use of opioids, and Defendants had access to scientific studies, detailed prescription data, and reports of adverse events, including reports of addiction, hospitalization, and death -- all of which clearly described the devastating harm arising from long-term opioid use. More recently, the FDA and CDC have issued pronouncements, based on medical evidence, that conclusively expose the falsity of Defendants' misrepresentations.

407.   Endo and Purdue have recently entered agreements in New York State prohibiting them from making some of the same misrepresentations described in this Complaint. Collegium has been issued an FDA Warning Letter, as recently as February 2018, for engaging in the identical egregious misrepresentations that have caused the opioid addiction and overdose epidemic. More specifically, the Warning Letter asserts that Collegium has materially omitted the description of risks of addiction, abuse, overdose, and death from its oxycodone product and has failed to disclose that the product is only medically indicated for use if safer alternative treatments have been tried by the patient without success.

408.   At all times relevant to this Complaint, the Manufacturer Defendants took steps that were designed to, and did, fraudulently conceal their deceptive marketing and unlawful conduct. For example, the Manufacturer Defendants disguised their role in the deceptive marketing of long-term opioid therapy by secretly funding and working through third parties, like Front Groups and KOLs. The Manufacturer Defendants never disclosed their role in

shaping, editing, and approving the content of materials disseminated by these third parties. They did not reveal that CMEs on pain management had been infiltrated by persons that were being paid to espouse the deceptive position of the Manufacturer Defendants that opioids were a safe modality for the treatment of chronic pain and to suppress the presentation of any other views.

409.    The Manufacturer Defendants ran websites with generic names, such as painknowledge.com, that were actually funded, in substantial part, by the Manufacturer Defendants.

410.    The Manufacturer Defendants manipulated their promotional materials and the scientific literature to make it appear that these documents were accurate, truthful, and supported by objective evidence when they were not. For example, the Manufacturer Defendants, other than Insys and Collegium, distorted the import of the Porter/Jick Letter to the NEJM (*see supra* at ¶¶198-208). The Manufacturer Defendants, other than Insys and Collegium, invented "pseudoaddiction" and promoted it to an unsuspecting medical community (see *supra* at ¶¶178-86). The Manufacturer Defendants provided the medical community with false and misleading information about ineffectual strategies to avoid or control opioid addiction. The Manufacturer Defendants spent tens of millions of dollars over a period of years on a misinformation campaign and so permeated the avenues where information was disseminated to physicians and the medical community that it was difficult, if not impossible, for medical professionals to detect the truth.

411.    The Manufacturer Defendants also promoted false information regarding the relative safety of chronic opioid use directly to the public, especially directing their messages to the elderly and veterans (*see supra* at ¶¶246-51, 295-312). The deception was so widespread that it was difficult for the public to learn the true risk of opioids.

137

412.    Similarly, it was difficult, if not impossible, for Plaintiff to detect the harm that was perpetrated on its community and citizens by the explosive use of opioids for everyday pain. Plaintiff did not, and could not, have known of the existence or scope of the Manufacturer Defendants' industry-wide fraud and could not have acquired such knowledge through the exercise of reasonable diligence.

### 2.    Distributor Defendants Concealed Their Violations of State Statutory and Common Law

413.    Distributor Defendants are equitably estopped from relying upon a statute of limitations defense because they undertook efforts to purposefully conceal their unlawful conduct and fraudulently assured the public, including the State of Virginia, Portsmouth, and the City's medical community, that they were undertaking efforts to comply with their obligations under the state and federal controlled substances laws. *See supra* at ¶¶373-401. Thus, while acknowledging their duty to report suspicious sales, the Distributor Defendants falsely represented that they were acting in compliance with those obligations.

414.    The Distributor Defendants concealed their unlawful conduct and fraudulently assured the public, the Commonwealth of Virginia, and the City of Portsmouth that they were fully compliant with their obligation. For example, a Cardinal executive claimed that Cardinal uses "advanced analytics" to monitor its supply chain and assured the public it was being "as effective and efficient as possible in constantly monitoring, identifying, and eliminating any outside criminal activity."[126]

---

[126]    Lenny Bernstein, *et al.*, *How Drugs Intended for Patients Ended Up in the Hands of Illegal Users: 'No One Was Doing Their Job'*, WASH. POST, Oct. 22, 2016, https://www.washingtonpost.com/investigations/how-drugs-intended-for-patients-ended-up-in-the-hands-of-illegal-users-no-one-was-doing-their-job/2016/10/22/10e79396-30a7-11e6-8ff7-7b6c1998b7a0_story.html?utm_term=.30f8a1ea7541.

415.    Similarly, McKesson publicly stated that it has a "best-in-class controlled substance monitoring program to help identify suspicious orders" and claimed it is "deeply passionate about curbing the opioid epidemic in our country."[127]

416.    Moreover, in furtherance of their effort to affirmatively conceal their conduct and avoid detection, the Distributor Defendants, through their trade associates, Healthcare Distribution Management Association ("HDMA") and National Association of Chain Drug Stores ("NACDS"), filed an *amicus* brief, which stated:

> Distributors take seriously their duty to report suspicious orders, utilizing both computer algorithms and human review to detect suspicious orders based on the generalized information that *is* available to them in the ordering process.

Masters Pharm., 2016 WL 1321983, at *25. Thus, while acknowledging their duty to report suspicious sales, the Distributor Defendants falsely represented that they acted in compliance with those obligations.

417.    The Distributor Defendants have also concealed and prevented discovery of information, including data from the ARCOS and MAPMP databases, that will confirm the extent of their wrongful and illegal activities.  For example, they refused to allow the DEA to reveal the amount of prescription opioids distributed to the Portsmouth area by name of distributor and product trade name, claiming trade secret, confidentiality, or privilege, in response to FOIA requests.

### 3.    The Statute of Limitations and Laches Doctrine Do Not Apply Here

418.    The medical community, patients, their families, the State of Virginia, and Plaintiff were duped by the Manufacturer Defendants' campaign to misrepresent and conceal the

---

[127]    Scott Higham, *et al.*, *Drug Industry Hired Dozens of Officials from the DEA as the Agency Tried to Curb Opioid Abuse*, WASH. POST, Dec. 22, 2016, https://www.washingtonpost.com/investigations/key-officials-switch-sides-from-dea-to-pharmaceutical-industry/2016/12/22/55d2e938-c07b-11e6-b527-949c5893595e_story.html.

truth about the opioid drugs that they were aggressively pushing in the State of Virginia and the
City of Portsmouth.

419.    The medical community, patients, their families, the State of Virginia, and
Plaintiff were duped by the Distributor Defendants' campaign to misrepresent and conceal the
truth that they were dumping opioids into the City of Portsmouth, despite being alerted to the
fact that year-after-year they were ignoring their obligation under state and federal law to protect
the community from suspicious sales.

420.    All Defendants intended that their actions and omissions would be relied upon,
including by Plaintiff.  Plaintiff did not know, and did not have the means to know, the truth due
to Defendants' actions and omissions.

421.    Plaintiff reasonably relied on Defendants' affirmative statements regarding their
purported compliance with their obligations under the law and consent orders.

422.    The purposes of the statute of limitations period and laches doctrine are satisfied
in this case because Defendants cannot claim prejudice where Plaintiff filed suit promptly upon
discovering the facts essential to its claims, described herein, which Defendants knowingly
concealed.  Plaintiff did not, and could not, have known through the exercise of reasonable
diligence of its causes of action as a result of Defendants' conduct.

423.    Defendants' torts based upon misrepresentation and deceit continue to this day.
They continue their deception to avoid compliance with their legal obligations by falsely
characterizing the opioid epidemic in Plaintiff's community, as well as the nation, as one of
"abuse."  In truth, as the Defendants have known for years, the proximate cause of the epidemic
is the "use" of opioids – which have been described as "heroin pills" – for chronic pain, which

140

use was always highly dangerous, medically contraindicated, and likely to cause addiction in the widespread manner exactly as it has occurred.

424. Plaintiff continues to suffer harm from the public nuisance created by the unlawful actions by the Defendants and, until the nuisance is abated, the harm to the Plaintiff will continue for the foreseeable future.

### E. Damages to the City of Portsmouth

425. As a foreseeable, direct, and proximate result of the unlawful conduct of the Defendants, along with those of the third-party Front Groups and KOLs, who were assisted and controlled by the Manufacturer Defendants, the City of Portsmouth, along with many other communities in the United States, has been subjected to devastating public health epidemics of addiction and overdose.

426. As discussed *supra* at ¶¶123-33, it is well-recognized and well-established biology that, once a person becomes addicted to opioid stimulation of opioid receptors in his or her brain, that person is compelled to continue to crave and seek out that stimulation, even if the original prescription drug, which began the addiction, is no longer available, either because it is too expensive or the prescription opioids have become more restricted. Absent treatment, which is often not effective, the opioid-addicted person will use illicit opioids, such as heroin, or fentanyl, or a combination of those opioids, if they are available. People who are addicted to prescription opioid painkillers are 40 times more likely to become addicted to heroin.[128] As of

---

[128] *See Today's Heroin Epidemic*, CTRS. FOR DISEASE CONTROL AND PREVENTION, https://www.cdc.gov/vitalsigns/heroin/index.html (last updated Jul. 7, 2015).



2013, four out of five new street-level heroin users nationally (*i.e.*, 80%) began their addiction through the use of prescription pain medications.[129]

### 1.    Nuisance Abatement Expenditures

427.    Plaintiff has been forced to make extraordinary expenditures each year in its effort to combat the public nuisance created by Defendants. Plaintiff has incurred, and continues to incur, costs resulting from the treatment of indigent and other persons affected by opioid addiction, from the management of and attempts to contain the opioid epidemic, and from the allocation of social services to different aspects of the crisis. These costs include, without limitation, Portsmouth's cost of managing escalated overdose rates; and the cost to Portsmouth of implementing prevention efforts in the community, education efforts in the community and within Portsmouth schools, treating addicted persons within the penal system, among others. Plaintiff's efforts extend not only to the Portsmouth residents who have become afflicted with the terrible disease of addiction. Due to grave need, Plaintiff has already set up, and is working to expand, services for family members (including infants and young children) who are negatively affected by the addiction of family members.

428.    Many of the services that Portsmouth is now forced to provide, oversee, and/or coordinate are not traditionally considered to be municipal services. The City has had to undertake providing these services in order to protect the lives and health of its citizens, and the well-being of the community.

---

[129]    Pradip K. Muhuri, *et al.*, *Associations of Nonmedical Pain Reliever Use and Initiation of Heroin Use in the United States*, CBHSQ DATA REVIEW, (August 2013), https://archive.samhsa.gov/data/2k13/DataReview/DR006/nonmedical-pain-reliever-use-2013.pdf.

429.    The City's need to abate the nuisance caused by Defendants will continue for the foreseeable future. In meeting this need, the City has already incurred extraordinary expenses and rendered extraordinary services, including without limitation:

(a)    decreased funding for Plaintiff's public services due to the diversion of resources into its efforts to address the opioid epidemic;

(b)    costs for providing healthcare and additional therapy, prescription drugs, and other treatments for patients suffering from opioid-related addiction or disease, including costs expended on overdose treatment and prevention;

(c)    costs of training and re-training emergency and/or first responders in the proper treatment of opioid overdoses and addiction;

(d)    costs associated with providing police officers, firefighters, and emergency and/or first responders with opioid antagonists, such as naloxone, used to block opioid overdoses;

(e)    costs associated with continually re-supplying public officials with opioid antagonists, such as Narcan (often, multiple dosages are necessary to revive a person who is experiencing an opioid overdose);

(f)    costs for providing mental-health services, treatment, rehabilitation services, and social services to victims of the opioid epidemic and their families;

(g)    costs of law enforcement and public safety relating to the opioid epidemic, including, but not limited to, costs associated with efforts to limit the flow of opioids into local communities, arrest and prosecute street-level dealers, prevent the current opioid epidemic from spreading and worsening, and address the increased levels of crime that have directly resulted from the increased homeless and drug-addicted population;

(h)     costs associated with additional counseling services provided by Portsmouth Public Schools for school children traumatized by the opioid addiction in their homes or who are forced to enter foster care due to their caretakers' addictions to opioids;

(i)     loss of tax revenue due to the decreased efficiency and size of the working population in Plaintiff's community;

(j)     costs associated with the removal of needles and other opioid-related detritus from parks, public spaces, and facilities of;

(k)     losses caused by diminished property values in neighborhoods where the opioid epidemic has taken root; and

(l)     losses caused by diminished property values in the form of decreased business investment and tax revenue.

430.    The above list is only illustrative and does not include every category of expense that has been, and will continue to be, incurred by Portsmouth as it invests in materials, services, and protocols needed to address the opioid crisis that Defendants' wrongdoing directly and proximately caused.

### 2.     Overdose-related Deaths

#### a.     The State of Virginia

431.    Virginia is experiencing an outbreak of heroin overdoses that continues to worsen despite efforts by government officials to bring it under control. The Virginia Department of Health recently estimated that the number of overdose deaths from prescription painkillers,

heroin, and heroin synthetics rose 40% in a single year – from 811 in 2015 to 1,136 in 2016.[130] In the five years from 2011 to 2016, Virginia witnessed a *77% increase* in fatal opioid overdoses.[131] Attorney General Mark Herring declared in 2017 that "the [statewide] numbers are so big they almost don't seem real . . . [w]e have too many empty bedrooms, too many empty chairs at kitchen tables.[132]

432.    A recent Virginia Commonwealth University study found that "[a]t least two Virginians die from prescription opioid or heroin overdoses every day."[133]   The Virginia Department of Health reported a 38% increase in deaths from prescription opioid and heroin overdoses between 2012 and 2014.[134]   The Commonwealth estimates that its Medicaid program spent $26 million addressing opioid use and misuse in 2013.[135]

433.    Studies have found that increases in opioid overdoses (including fatal overdoses) are a lagging indicator of over-prescription.  Overdoses may not peak until several years after the number of prescription opioids reaching a community was at its highest.

---

[130]    Peter Dujardin, *AG Mark Herring Announces Policy Proposals on Heroin and Opioid Abuse*, DAILY PRESS (September 18, 2017), http://www.dailypress.com/health/dp-nws-herring-heroin-20170918-story.html.

[131]    Telebriefing    Transcript,    VA.    DEP'T    HEALTH    (Nov.    21,    2016), http://www.vdh.virginia.gov/commissioner/opioid-addiction-in-virginia/telebriefing-transcript (Dr. Melissa Levine, State Health Commissioner's Nov. 21, 2106 Telebriefing on Opioid Addiction Public Health Emergency).

[132]    Patricia Sullivan, *Va. Attorney General Urges Collaboration in Battling Opioid Crisis*, WASH. POST (May 26, 2017), https://www.washingtonpost.com/local/virginia-news/va-attorney-general-urges-collaboration-in-battling-opioid-crisis/2017/05/24/2c1ca6b2-3fcc-11e7-9869-bac8b446820a_story.html?utm_term=.a760b4a4fa85.

[133]    ANDREW BARNES ·& KATHERINE NEUHAUSEN, VA. COMMONWEALTH UNIVERSITY SCHOOL OF MEDICINE, THE OPIOID CRISIS AMONG VIRGINIA MEDICAID BENEFICIARIES (Jan. 2016), https://hbp.vcu.edu/media/hbp/policybriefs/pdfs/Senate_OpioidCrisisPolicyBrief_Final.pdf.

[134]    *Id.*

[135]    *Id.*

434.     Tragically, children are not exempt from the overdose epidemic's deadly toll. A study of child overdose deaths in Virginia between 2009 and 2013 found that "[n]early two-thirds of child overdose victims were teenagers between the ages of 13 and 17[.]"[136] Prescription opioid medications "caused or contributed to more child deaths than any other substance."[137] More specifically, methadone and oxycodone were detected in more deaths than any other substances.[138]

<h4 style="text-align:center">b.     City of Portsmouth</h4>

435.     Like the Commonwealth of Virginia, the City of Portsmouth has been struck hard by the influx of opioid drugs and the resulting boom in opioid addiction and overdoses. According to data published by the Virginia Department of Health, the number of fatal opioid overdoses in Portsmouth rose from 8 in 2007 to 30 in 2017 – a 275% increase.[139] Between 2007 and 2017, opioid use contributed to 156 fatal opioid overdoses in the City,[140] and from 2013 to present, the mortality rate for prescription opioid overdoses far outpaced that of the

---

[136]     ALLISON A. CLEVENGER, VA. DEP'T HEALTH, OVERDOSE POISONING DEATHS TO CHILDREN IN VIRGINIA, 2009-2013: EXECUTIVE SUMMARY AND RECOMMENDATIONS (2017), http://www.vdh.virginia.gov/content/uploads/sites/18/2017/04/CFRT-Poisoning-Report-Short-Report.pdf.

[137]     *Id.*

[138]     *Id.*

[139]     VA. DEP'T HEALTH, NUMBER AND RATE OF ALL FATAL OPIOID OVERDOSES BY LOCALITY OF INJURY AND YEAR OF DEATH, 2007-2018* (2018), http://www.vdh.virginia.gov/medical-examiner/forensic-epidemiology.

[140]     *Id.*

Commonwealth.[141]  Although a majority of the Hampton Roads area saw a decline in opioid-related deaths, Portsmouth unfortunately saw an increase from 2016 to 2017.[142]

436.    The impact of the opioid epidemic has become a harsh reality to Portsmouth Police and First Responders. During the span of only three weeks in early 2018 the City's police department recorded nine overdoses.[143]

437.    Despite the tireless work of dedicated Portsmouth employees, as well as its physicians, nurses, and clinicians, the opioid epidemic continues to outpace their efforts.

### 3.    Increased Hospitalizations and Related Health Care Costs

438.    Opioid-related injury and illness in Virginia, in general, particularly in Portsmouth, extends well beyond overdoses.  For instance, in Virginia, the rate of reported Hepatitis C cases is rising, and the primary risk factor for newly acquired Hepatitis C virus infection is injection drug use.[144]  "As [injection drug use] continues to increase, [Hepatitis C virus] can quickly move through a population of drug users, leading to a syndemic of opioid abuse and [Hepatitis C virus] infection."[145]

---

[141]    *Opioid Addiction: Virginia Opioid Addiction Indicators*, VA. DEP'T HEALTH, http://www.vdh.virginia.gov/data/opioid-overdose (last visited Dec. 14, 2018) (select "Locality" for "Geographic Grouping" and "Portsmouth" for "Select Detail").

[142]    Chris Horne, *The Opioid Crisis: Pain and Progress*, WAVY (May 10, 2018, 7:47 PM) https://www.wavy.com/10-on-your-side/investigative/the-opioid-crisis-pain-and-progress/1171206827.

[143]    Laura Caso, *Special Report: The Impact of Overdoses*, WAVY (Feb. 26, 2018, 7:35 AM) https://www.wavy.com/10-on-your-side/special-report-the-impact-of-overdoses/1156539753.

[144]    Jon Zibbell, et al., *Increases in Hepatitis C Virus Infection Related to Injection Drug Use Among Persons Aged ≤30 Years — Kentucky, Tennessee, Virginia, and West Virginia, 2006–2012*, 64 MORBIDITY MORTALITY WKLY. REP. 453 (2015), https://www.cdc.gov/mmwr/pdf/wk/mm6417.pdf.

[145]    VA. DEP'T HEALTH, VIRGINIA HEPATITIS C EPIDEMIOLOGIC PROFILE (2016), http://www.vdh.virginia.gov/content/uploads/sites/10/2016/06/Virginia-Hepatitis-C-Epidemiologic-Profile-2016.pdf.

147

439. In short, opioid addiction creates its own health issues for individuals, as well as exacerbating or making it more difficult to treat other non-opioid-related illnesses and injuries. Increased hospitalizations from opioid overdoses put undue strain on the City's already taxed hospital system and emergency medical system. Defendants' unlawful conduct has resulted in forcing the City to shoulder the burden of these increased costs.

### 4. Neo-Natal Care Costs

440. There has been a dramatic rise in the number of infants born addicted to opioids due to prenatal exposure and suffering from neonatal abstinence syndrome ("NAS"). Once they are born, these infants usually experience painful withdrawal from the drug; they cry nonstop from the pain and stress of withdrawal, experience convulsions or tremors, have difficulty sleeping and feeding, and suffer from diarrhea, vomiting, and low weight gain, among other serious symptoms.

441. The long-term developmental effects are still unknown, though research in other states has indicated that these children are likely to suffer from continued, neurologic and cognitive impacts, including hyperactivity, attention deficit disorder, lack of impulse control, and a higher risk of future addiction. When untreated, NAS can be life-threatening.

442. Opioid-exposed newborns present challenges for doctors, nurses, and hospitals because detoxification can be a complex process requiring weeks of inpatient care.

443. Nationally, approximately 22,000 babies were born with NAS in 2012, a five-fold increase from 2000, according to the National Institute on Drug Abuse. The number of babies born with NAS continues to rise in Virginia: the number of babies born with NAS in Virginia

has doubled from 2.9 per 1,000 live births in 2011 to 6.1 per 1,000 live births in 2015.[146]  In

2016, state health officials found more than 770 Virginia newborns were diagnosed with NAS.[147]

### 5.    Direct Purchases of Opioids and Related Costs

444.    Prescription drug spending has historically been a "major driver" of health care

costs in Virginia.  Plaintiff, which funds a medical insurance plan and workers' compensation

program for its employees, has been directly damaged through its payments for opioid therapy

(and the frequent ensuing payments for addiction-related treatment) that was unwarranted and

potentially dangerous for its employees, retirees, and their families.

445.    The filling of opioid prescriptions pursuant to Portsmouth employees' health

insurance plan coverage is a significant cost to the City.

446.    The fact that the City of Portsmouth would incur the expense of paying for such

ineligible and unnecessary prescriptions on behalf of its employees, retirees, and their families

was the foreseeable and intended consequence of Manufacturer and Individual Defendants'

fraudulent marketing scheme.

447.    The City of Portsmouth has also shouldered significant health-related costs

outside of its health insurance program as a result of Defendants' actions.  For instance, when

Portsmouth employees are prescribed opioids for chronic pain, they are often forced to miss

work because the drugs' effects interfere with their ability to work.

---

[146]    *Virginia Neonatal Perinatal Collaborative Receives State Support for Pregnant Women
with Substance Use Disorders, Infants with Neonatal Abstinence Syndrome*, ALEXANDRIA NEWS
(June   28,   2017),   http://www.alexandrianews.org/2017/06/new-virginia-neonatal-perinatal-
collaborative-committed-to-improving-birth-outcomes-receives-state-support-to-enhance-care-
for-pregnant-women-with-substance-use-disorders-and-infants-with-neonatal-ab.

[147]    *Id.*

448. In fact, recent studies suggest that opioids actually slow recovery times, keeping employees out of work longer than they would have been had they not taken these unnecessary pharmaceuticals. If those employees become addicted to the opioids, they are likely to miss even more work, or become unable to work at all. Because of Defendants' misstatements, Portsmouth's employees have had losses in work time, which result in substantial losses to the City.

449. And as set forth above, the direct costs of filling the opioid prescriptions is just a small part of the total cost to Portsmouth for prescriptions of opioids. Under its workers' compensation plan, the City pays for doctors' visits, lab work, and other costs related to the prescription of opioid painkillers. Had Defendants told the truth about the risks and benefits of opioids, the City would not have had to pay for these drugs or the costs related to their prescriptions.

450. As both the foreseeable and intended consequence of Defendants' fraudulent marketing scheme, and reckless distribution of opioids, health care providers prescribed and Portsmouth paid for opioids to treat chronic pain. Indeed, Defendants' goal in convincing the medical and general community to support chronic opioid therapy was to have doctors prescribe opioids long-term for chronic pain, and payors, like Portsmouth, to pay for long-term treatment, despite the absence of genuine evidence supporting chronic opioid therapy and the existence of evidence to the contrary.

451. The Virginia Workers' Compensation law requires employers or their insurers to pay for, *inter alia,* medical and surgical services, hospital and nursing services, and medicines that are reasonably required to cure or relieve the injured worker of the effects of his or her injury. Va. Code Ann. §65.2-300 *et seq.*

150



452.    Defendants' misrepresentations related to Portsmouth's requirement that medical treatments be medically necessary or reasonably required – a condition of payment for any medical treatment under the City's health plans and workers' compensation program.  But for Defendants' fraudulent and deceptive marketing, prescribers would have understood the risks and benefits of opioids and would not have prescribed opioids where not medically necessary or reasonably required to treat chronic pain.  Misrepresentations as to, for example, whether patients were likely to become addicted to the drug, would be able to resume life activities, and would experience long-term relief were not minor or insubstantial matters, but the core of prescribers' decision-making.

### 6.    Expenses Related to Opioid Education and Training

453.    The City of Portsmouth has been forced to expend enormous amounts of time, money, and resources on re-educating and training its public safety employees in response to the opioid crisis.

454.    Every officer in the Portsmouth Police Department has received naloxone training in order to curb the growing number of overdose deaths occurring within the City.  Similarly, all members of the Portsmouth Fire, Rescue, and Emergency Services Department are required to carry and be proficient in the administration of naloxone.

455.    The City also maintains educational kiosks on drug prevention and opioid addiction in its town buildings.  Concurrently, the Portsmouth Public Schools has also borne expenses attributed to the opioid epidemic.

### 7.    Emergency Treatment Costs

456.    The opioid crisis created by Defendants has resulted in more emergency room visits, emergency responses, and emergency medical technicians' administration of naloxone, the antidote to opioid overdose.  In 2017, more than 1,400 Virginians died from an opioid overdose,

including prescription opioids, heroin, and fentanyl.[148] Virginia emergency departments reported more than 10,100 visits for opioid and heroin overdose treatment, and EMS workers reported more than 4,500 uses of naloxone, an overdose-reversal drug.[149]

457.    Portsmouth's emergency call center dispatches first responders consisting of emergency medical services, Portsmouth Fire Department and Portsmouth Police Department. Each call for a drug-related overdose puts a substantial strain and burden on the City of Portsmouth. Every time such a call is received by the City's emergency dispatch center, the following occurs: the dispatcher transfers the call to both the Portsmouth Police Department and Fire Department separately, and each department's own dispatcher contacts the individual police officers and/or firefighter to go out to the scene and investigate the reason for the call. By the time the first responders from the various departments arrive on the scene, several City employees have been assigned to just one call.

458.    Providing this emergency medical care is costly, but necessary to combat the health crisis created by Defendants.

### 8.    Law Enforcement Costs

459.    As a result of the opioid epidemic created by Defendants, and the resulting increases in drug overdoses, hospitalizations, and crime, the City of Portsmouth has been required to spend and/or allocate additional resources in order combat this epidemic.

460.    The prosecution and incarceration costs associated with the increase in drug-related crimes are substantial and continuing. Portsmouth Police Department has placed an

---

[148]    *Opioid Addiction, supra* n.141.

[149]    *Id.*

emphasis on tackling violent crimes and homelessness in doing so has incurred significant overtime, exceeding budgeted costs.

461. For example, the Portsmouth Police Department has begun implementing the Homeless Outreach Program, which allocates at least two full time police officer to help the homeless population find appropriate resources and adequate shelter.

462. In 2001, the City established a drug court for nonviolent drug offenders that stresses rehabilitation rather than incarceration, as a way to ensure that those who wanted help would receive the necessary treatment and resources. However, the increase in participation in drug court significantly impacts the Probation Office, as well. The Probation Department has begun testing for fentanyl more frequently, among a litany of other drugs, and testing comes with a significant cost. The average fentanyl test for probationers is $450 (compared to a typical drug test which costs less than $10), regardless of whether the test is court-ordered or voluntarily taken by the probationer.

463. The City Jail has also seen a dramatic increase in the cost and administration of naloxone to inmates, and has added additional mental health coverage for any and all inmates with drug related issues. The Jail also treats any inmate who is exhibiting symptoms of drug use and offers an 11-dose regiment for detox treatment. The Jail transports pregnant inmates to the local methadone clinic. Such patient visits have dramatically increased within the last five years, and each inmate requires at least two deputies to attend every appointment.

464. The City of Portsmouth participates in drug-take-back event at least twice a year. For the event, each take-back site requires the participation of three or more police officers to maintain and secure the prescription drugs that have been turned in. The confiscated prescription drugs from each event must then be transported to a facility for incineration.

### 9.    Diversion Costs

465.    Defendants have created and fueled an opioid epidemic that has forced the City of Portsmouth's employees to divert time and resources that it would otherwise devote to other issues and/or programs.   These lost productivity costs can be directly attributed the opioid epidemic.

466.    For example, City employees, including those from the Portsmouth Police Department and Public Works Department, are responding to more and more calls relating to used needles that need to be safely collected and discarded, including in the City's street network and storm water systems.

467.    The Police Department has been forced to install surveillance equipment and additional lighting in public areas throughout the City to deter drug use and drug-related theft.

468.    Furthermore, all departments within the City of Portsmouth send personnel (particularly the respective department heads) to attend various conferences and seminars concerning the education and training of their employees and subordinates on how to respond to crisis scenarios.

### 10.    Community Outreach Expenses

469.    The City of Portsmouth provides various programs to the community it serves, particularly with respect to drug addiction and treatment. Moreover, Portsmouth collaborates on several initiatives geared towards trying to contain the damage caused by Defendants' conduct.

470.    The Portsmouth Health Department provides prevention and education as well as provide support to Department of Behavioral Healthcare Services. For example, Portsmouth holds training sessions to help citizens recognize and respond to potential opioid overdoses. Elaine Breathwaite, Director of Portsmouth's Department of Behavioral Healthcare Services, describes this training as "very important because of the growing problem of opioid overdosing.

By training the friends and relatives of potential overdose victims, our community is better able to save lives and fight opioid addiction."[150]

471.   The Portsmouth Department of Behavioral Healthcare Services ("PDBHS") has held several Opioid Prevention Summits, including the Hands On Prevention & Empowerment (HOPE) Community Awareness Summit on April 17, 2018, which highlighted drug prevention and treatment.   Supportive services by the PDBHS also include a Warmline operation and awareness initiatives, such as placing billboards all over Portsmouth to increase, among other things, opioid awareness.

472.   Portsmouth was awarded the Virginia Opioid Prevention, Treatment and Recovery (VA OPT-R) Treatment Funding in both 2017 and 2018. The grant provides funding to PDBHS to provide supportive services for individuals with diagnosis of Opioid Use Disorder who require assistance with linkage and access to treatment. This grant, however, is not guaranteed to continue and expires in 2018. Portsmouth would shoulder all the costs of such outreach programs should the grant not be continued.

\*     \*     \*

473.   Virtually every department within the City of Portsmouth has been impacted, and forced to incur additional expenses year-after-year to try to mitigate the devastating impact of the opioid epidemic to Portsmouth residents.

474.   By virtue of the deceptive and fraudulent marketing campaign of the Manufacturer Defendants and Individual Defendants, and the failure of the Distributor Defendants to take reasonable care to control the flow of dangerous opioids into the City,

---

[150]   13NewsNow, *Portsmouth Trains Citizens on Signs of Opioid Overdoses* (July 7, 2016), https://www.13newsnow.com/article/news/local/mycity/portsmouth/portsmouth-trains-citizens-on-signs-of-opioid-overdoses/266592816.



Portsmouth has incurred expenditures in the tens of millions of dollars and will continue to incur those and even greater expenditures in the foreseeable future as the man-made epidemic continues to unfold.

## V.   CAUSES OF ACTION

### Count I
### Public Nuisance
### Nuisance Abatement under Va. Code Ann. §§15.2-900, 48-5
### (Against All Defendants)

475.   Plaintiff hereby incorporates by reference all preceding paragraphs as if fully set forth herein.

476.   This claim is brought by the City of Portsmouth pursuant to Va. Code Ann. §§15.2-900, 48-5 against all Defendants, individually, acting through their employees and agents, and in concert with each other, to abate the public nuisance created by the Defendants. Each Defendant has intentionally, recklessly, or negligently engaged in conduct that injuriously affected rights common to the general public, specifically the rights of the people of Portsmouth to public health, public safety, public peace, public comfort, public convenience, and public welfare, without unreasonable interference.

477.   Virginia common law and Virginia Code §15.2-900 provide that ". . . any locality may maintain an action to compel a responsible party to abate, raze, or remove a public nuisance." Further, "[i]f the public nuisance presents an imminent and immediate threat to life or property, the locality may abate, raze, or remove such public nuisance and a locality may bring an action against the responsible party to recover the necessary costs incurred for the provision of public emergency services reasonable required to abate any such public nuisance." *Id.*; *see also* Va. Code Ann. §48-5 (awarding fines and costs of abatement).

478.    Defendants' unlawful marketing, sale, and distribution of prescription opioids has created a public nuisance that constitutes a significant, unreasonable interference with these common rights, and has damaged the community and the public generally. In addition, this interference is continuing in nature and has produced a long-lasting effect.

479.    Each Manufacturer Defendant has, and continues to, intentionally, recklessly, and negligently market, their opioid products through materially false and misleading statements to physicians, pharmacists, insurers, and members of the general public that misrepresented the characteristics and safety of opioids and resulted in widespread inappropriate use of these highly addictive and dangerous pharmaceuticals. By acting in such a negligent and reckless manner, each Manufacturer Defendant injuriously affected the public health, safety and morals of the community.   Moreover, each Manufacturer Defendant had knowledge of the likely and foreseeable harm to the City and residents of Portsmouth proximately caused by its unlawful conduct.

480.    Each Distributor Defendant has, and continues to, widely disseminate, the Manufacturer Defendants' dangerous opioid products in the City of Portsmouth, in breach of state law and in a negligent and reckless manner, that injuriously affects the public health, safety, and morals of the community.   Moreover, each Distributor Defendant had knowledge of the likely and foreseeable harm to the City and residents of Portsmouth. Through their promotion, marketing, and distribution of opioids for profit, the Defendants created a public nuisance in the City proximately caused by their unlawful conduct.

481.    Individual Defendant Kapoor was the mastermind behind Insys's blatant, wanton, and willful misrepresentations and unlawful marketing schemes to sell its fentanyl product, Subsys, regardless of the dangers to unsuspecting members of the public within the City of

157

Portsmouth. Moreover, he had knowledge of the likely and foreseeable harm to the City and residents of Portsmouth proximately caused by his unlawful conduct.

482.    As members of the Purdue board of directors, the Sackler Family Defendants caused that company to blatantly, wantonly, and willfully misrepresent, and to unlawfully market and sell its opioid products regardless of the dangers to unsuspecting members of the public within the City of Portsmouth, and to the City of Portsmouth itself. Moreover, the Sackler Family Defendants had knowledge of the likely and foreseeable harm to the City and residents of Portsmouth proximately caused by their unlawful conduct.

483.    Defendants knew that opioid prescription drugs are dangerous because these drugs are highly regulated substances under federal and state law due to their addictive qualities and potential for abuse. Defendants' actions created, fueled, and expanded the overuse, misuse, and abuse of opioids, drugs that are specifically codified as constituting severely harmful substances. As such, Defendants created an intentional nuisance.

484.    Each Defendant's conduct was unlawful, intentional, and reckless and has resulted in significant and unreasonable interference with the public health, safety, peace, and welfare of Portsmouth's residents. As such, each Defendant's conduct constitutes a public nuisance and, if unabated, will continue to threaten the health, safety, and welfare of the City's residents. The public nuisance created by Defendants' actions is substantial, unreasonable, and continuing and has harmed the entire community in ways that include, but is not limited to, the following:

   a.    the high rate of opioid use leads to increased opioid addiction, overdoses, both fatal and otherwise, and an increased number of Portsmouth residents



who are unable to care for themselves or their families due to their addiction;

b. even residents who are not addicted are affected by the public nuisance Defendants created. The family members of addicted persons endure the financial and emotional burdens of striving to get help for their loved ones as they grapple with a disease that is not curable and has a formidable relapse rate, or worse have sustained the pain of having a loved one die because of the greed of Defendants;

c. even residents who are not family members of any addicted persons are affected in their use and enjoyment of public areas, such as parks and recreation areas offered by the City, due to the increased danger of crime by an increased population of addicted individuals;

d. employers have lost the quantifiable value of productive and healthy workers; and

e. the diversion of City resources to address the public nuisance of the opioid epidemic has taxed the medical, public health, law enforcement, courts, incarceration systems, and schools of the City and strained Portsmouth's financial resources.

485.    The City of Portsmouth has a clearly ascertainable right and is the appropriate party to require Defendants to abate conduct that perpetuates this public nuisance.

486.    The City of Portsmouth seeks all legal and equitable relief permitted by law.

**Count II**
**Violation of the Virginia Consumer Protection Act ("VCPA")**
**VCPA**
**Va. Code. Ann. §59.1-196,** *et. seq.*
**(Against the Manufacturer Defendants and Individual Defendants)**

487.    Plaintiff hereby incorporates by reference all preceding paragraphs as if fully set forth herein.

488.    The Virginia Consumer Protection Action ("VCPA") remedies unfair and unethical business practices that affect consumers. Va. Code Ann. §§59.1-196, *et seq.*. Manufacturer Defendants and Individual Defendants violated the VCPA, because, in the conduct of trade or commerce, Manufacturer Defendants and Individual Defendants have engaged in unfair and deceptive acts and practices.

489.    The VCPA specifically prohibits sellers from "[m]isrepresenting that goods or services have certain quantities, characteristics, ingredients, uses, or benefits." Va. Code. Ann §59.1-200(A)(5).

490.    Manufacturer Defendants and Individual Defendants made, or through their control of third parties, and by aiding and abetting third parties, made and caused to be made, untrue, false, misleading, and deceptive statements of material fact, or made or caused to be made statements that omitted or concealed material facts, rendering the statements misleading. Manufacturer Defendants and Individual Defendants made these misrepresentations to prescribers, consumers, payors, and Plaintiff, in connection with Defendants' marketing, promotion, sale, and use of prescription opioids. These untrue, false, misleading, and deceptive statements of material fact included, but were not limited to the following:

    a.  misstatements relating to the addictive nature of opioids;

    b.  misstatements relating to the risk of overdose, death, and irreversible damage to the brain;

160

c.  misstatements relating to the dangers of high titrations of opioids;

d.  misstatements relating to the risks, safety, and efficacy of the use of opioids for the treatment of chronic pain;

e.  misstatements relating to the viability, risks, benefits, and superiority of alternative treatments;

f.  Purdue's, Endo's, and Collegium's false claims that abuse-deterrent opioids reduce tampering and abuse; and

g.  Purdue's false claims that OxyContin provides a full 12 hours of pain relief.

491.  Manufacturing Defendants and Individual Defendants engaged in the above-described acts intentionally and with knowledge of the harm that would likely and foreseeably result, and thus willfully violated the VCPA under Va. Code Ann. §59.1-200. Manufacturer Defendants and Individual Defendants knew, at the time of making or disseminating the misrepresentations, that they were untrue, false, misleading and deceptive, and therefore likely to deceive the public, the prescribers, the payors, and the City of Portsmouth, about the risks, benefits, and superiority of opioids.

492.  Manufacturer Defendants and Individual Defendants made these statements with the intent that the City of Portsmouth and its residents would rely on them.  It was reasonably foreseeable to the Manufacturer Defendants and Individual Defendants that such reliance would result in the large-scale use of opioid prescriptions, in quantities and for durations that would harm the City and cause death or severe harm to users.  Manufacturer Defendants and Individual Defendants intended to deceive the physicians who prescribed opioids to the residents of Portsmouth and the payors who purchased, or covered the purchase of, opioids for chronic pain.

493.    The City and its residents reasonably relied on the Defendants' false, misleading and unconscionable statements. The City of Portsmouth has sustained ascertainable losses as a direct and proximate result.

494.    Manufacturer Defendants' and Individual Defendants' conduct, as alleged herein, offends public policy, is immoral, unethical, oppressive or unscrupulous, and caused substantial injury to consumers, including the Plaintiff.

495.    The City of Portsmouth has suffered an ascertainable loss by reason of Defendants' violation of VCPA in that, as a direct, foreseeable proximate result of the Manufacturer Defendants' and Individual Defendants' violations, Plaintiff has paid for excessive opioid prescriptions for its current and former employees and their dependents; has paid for healthcare services for the treatment of addiction resulting from their improper opioid treatment; has incurred increased expenditures for police and fire responses triggered by overdoses and suspected overdoses; has incurred increased expenditures for its law enforcement services for families and children, and the homeless, and has been forced to incur the expense of services that the City of Portsmouth never before had to provide due to the scope and nature of the opioid epidemics.

496.    Manufacturing Defendants and Individual Defendants willfully and knowingly violated the VCPA and pursuant to the VCPA, Plaintiff is entitled to injunctive relief, to attorneys' fees and to three times the damages it sustained in connection with each violation by the Defendants of Va. Code Ann. §59.1-200. Va. Code Ann §§59.1-203, 204.

**Count III**
**Violation of the Virginia Consumer Protection Act (VCPA),**
**Va. Code Ann. §59.1-196, *et seq.***
**(Against the Distributor Defendants)**

497.    Plaintiff hereby incorporates by reference all preceding paragraphs as if fully set forth herein.

498.    Distributor Defendants violated VCPA, because Distributor Defendants engaged in unfair and deceptive acts and practices in the conduct of commerce.

499.    Distributor Defendants knew or should have known that the distribution of controlled substances must be managed with extreme care in order to avoid harming the consumer and the public at large through an unwarranted proliferation of the opioids. Defendants knew or should have known that order patterns for opioids that deviated from the regular course either in quantity or frequency of purchases were suspicious and required investigation. Yet Distributor Defendants failed to investigate or to halt improper deliveries or to report, alert, or otherwise notify authorities of these irregular buying patterns.

500.    Distributor Defendants engaged in the above-described acts intentionally and with knowledge that harm might result, and thus willfully violated the VCPA under Va. Code Ann. §59.1-200. Distributor Defendants knew that their conduct concealed the highly irregular and illegal flow of opioids that would foreseeably make their way into the City of Portsmouth. Indeed, Defendants intentionally or purposefully failed to slow down, inspect, report, alert, investigate or halt, or otherwise limit the flow of these dangerous substances into the City of Portsmouth in order to generate profits that they otherwise would not generate.  Distributor Defendants knew or should have known that the City of Portsmouth and its residents relied on their non-disclosure of the suspicious sales, and it was reasonably foreseeable to the Distributor Defendants that such reliance would result in the continued and increased use of opioid



prescriptions by persons in quantities, frequencies, and durations that would cause death or severe harm to the users and harm to the City. Distributor Defendants intended to deceive the residents of Portsmouth and the payors who purchased, or covered the purchase of, opioids for chronic pain.

501. The City and its residents reasonably relied on the Distributor Defendants' omissions regarding the illegal and irregular buying patterns, and the City of Portsmouth has sustained ascertainable losses as a direct and proximate result.

502. Distributor Defendants' conduct, as alleged herein, offends public policy, is immoral, unethical, oppressive or unscrupulous, and caused substantial injury to consumers, including the Plaintiff.

503. The City of Portsmouth has suffered an ascertainable loss by reason of Defendants' violation of VCPA in that, as a direct, foreseeable proximate result of the Distributor Defendants' violations, Plaintiff has paid for excessive opioid prescriptions for its current and former employees and their dependents; has paid for healthcare services for the treatment of addiction resulting from their improper opioid treatment; has incurred increased expenditures for police and fire responses triggered by overdoses and suspected overdoses; has incurred increased expenditures for its law enforcement services for families and children, and the homeless, and has been forced to incur the expense of services that the City of Portsmouth never before had to provide, due to the scope and nature of the opioid epidemics.

504. Distributor Defendants' willfully and knowingly violated the VCPA and pursuant to the VCPA, Plaintiff is entitled to injunctive relief, to attorneys' fees and to three times the damages it sustained in connection with each violation by the Defendants of Va. Code Ann. §59.1-200. Va. Code Ann §§59.1-203, 204.

164



### Count IV
### Common Law Fraud
### (Against the All Defendants)

505.    Plaintiff hereby incorporates by reference all preceding paragraphs as if fully set forth herein.

506.    Manufacturer and Individual Defendants had knowledge of the material facts that prescription opioids are addictive and that using them for the treatment of chronic pain carries a high risk of addiction and its attendant problems, including overdose, death, or a permanently damaged brain function in affected individuals.

507.    Notwithstanding the knowledge described above, all Manufacturer and Individual Defendants falsely represented, or omitted and/or knowingly concealed information rendering the statements false, that prescription opioids are relatively safe for the management of chronic pain.

508.    All Manufacturer and Individual Defendants made those false representations to physicians, patients, hospitals, and communities across America, including Plaintiff City of Portsmouth.

509.    All Manufacturer and Individual Defendants made those false statements to induce large numbers of persons, physicians, patients, and others within the City of Portsmouth, as well as the Plaintiff itself, to purchase opioid prescriptions as a form of pain relief.

510.    In huge numbers, physicians, physician assistants, and hospital staff did indeed prescribe vast quantities of the opioids sold by Manufacturer and Individual Defendants, and large numbers of persons in the Portsmouth community did indeed take such pills as a front-line treatment for chronic pain relief in reliance on the false representations made by the Manufacturer and Individual Defendants.

511.   Distributor Defendants knew the material fact that they had a statutory duty under both Virginia law and federal law, as well as a common law duty, to protect the public health by monitoring and controlling the amount of prescription opioids that was allowed to enter the Portsmouth area. They knew they were not discharging that responsibility, failed to alert the DEA and state authorities about "suspicious sales" of drugs, and failed to halt the suspicious sales of drugs throughout the United States, including in and/or to the City of Portsmouth.

512.   The City of Portsmouth did, in fact, rely on Distributor Defendants' knowingly false statements and thereby did not become aware, until it was too late, that their community had become flooded with an exorbitant, excessive quantity of opioids.

513.   Conduct of all Defendants was willful, wanton, malicious, and directed at the public generally.

514.   As a direct and foreseeable consequence of the Defendants' fraudulent acts, Plaintiff has been damaged as alleged herein.

### Count V
### Negligent Misrepresentation
### (Against All Defendants)

515.   Plaintiff hereby incorporates by reference all preceding paragraphs as if fully set forth herein.

516.   Each Defendant had, and continues to have, an obligation to exercise reasonable care in manufacturing, marketing, selling, and distributing its products to the State of Virginia, the City of Portsmouth, and its surrounding area. Each Defendant breached that duty with foreseeably devastating consequences to the City. The injury and harm to the City was proximately and substantially caused by Defendants' negligent misrepresentation.

517.   All Defendants knew they were manufacturing, selling, and/or distributing dangerous drugs which are designated as Schedule II or III controlled substances due to their

addictive and dangerous qualities. Reasonably prudent manufacturers of pharmaceutical products would know that aggressive marketing of highly addictive opioids for long-term chronic pain was likely to cause large numbers of patients to become addicted to their opioid prescriptions, foreseeably causing such patients to need more frequent and higher levels of the opioids for pain relief, and foreseeably turning to the use of street drugs, such as heroin, and fentanyl, which are almost indistinguishable from opioids, both chemically and in the effect on the human brain.

518.    Reasonably prudent distributors of pharmaceutical products would anticipate that distribution of such dangerous prescription opioids, without monitoring for, reporting, or halting suspicious sales would wreak havoc on communities, such as the City of Portsmouth, which would be inundated with opioids, imposing excessive burdens on the City to try to contain the problem. The purpose for the closed system of opioid distribution, of which all Defendants were familiar, was precisely to control the excessive flow of dangerous substances, such as opioids, into communities, such as was experienced, and continues to be experienced, by the City.

519.    Despite this knowledge of grave foreseeable harm from marketing opioids for long-term treatment of chronic pain, without warning of the serious risks of addiction, Manufacturer and Individual Defendants made false and misleading statements and omitted material information, which made the representations false to physicians, physician assistants, payors, patients, the public, and the City, regarding the risk of addiction from long-term use of opioids.

520.    Despite this knowledge of grave foreseeable harm to the City of Portsmouth from distributing vast quantities of opioids without regard to whether or not the sales were suspicious, and without disclosing the material fact that they were acting in violation of laws and regulations

requiring that they maintain a system to prevent suspicious sales, the Distributor Defendants breached their duty to distribute the opioids in a fair and reasonable manner.

521.    But for Defendants' material factual omissions and misrepresentations, Defendants would not have been able to sell the dangerous quantity of opioids into the City of Portsmouth and its surrounding areas. As a direct and foreseeable consequence of the Manufacturer and Individual Defendants' negligent misrepresentations, Plaintiff has been damaged as alleged herein.

### Count VI
### Negligence
### (Against the Distributor Defendants)

522.    Plaintiff hereby incorporates by reference all preceding paragraphs as if fully set forth herein.

523.    Distributor Defendants knew or should have known that opioids are dangerous and addictive. Distributor Defendants knew or should have known that opioids are sought by criminals and addicted persons and, if not properly monitored and controlled, enter the black market. Distributor Defendants knew or should have known that they occupy a unique position in the closed distribution network for opioids and that, because of this position, they must take reasonable steps to stem the flow of opioids into the black market. Defendants knew or should have known that buying patterns for opioids grossly deviated from the regular course both in quantity and frequency of purchases, yet failed to identify, investigate, and, where appropriate, halt and report suspicious sales that resulted in illegal black market opioids on the streets of Portsmouth.

524.    Distributor Defendants knew, or reasonably should have known, that their omissions operated to conceal the highly irregular and illegal flow of opioids into the City of Portsmouth.

525.    Distributor Defendants knew or should have known that the City of Portsmouth and its residents relied on their distributing highly potent opioid pills in a safe and reasonable manner, and that failure to do so would damage the City and its residents.

526.    As a result of Distributor Defendants' negligent non-compliance with their common law obligations to conduct their business in a safe and reasonable manner, the City of Portsmouth incurred expenditures, including, but not limited to paying for excessive opioid prescriptions for its current and former employees and their dependents; paying for healthcare services for the treatment of addiction resulting from their improper opioid treatment; incurring increased expenditures for police and fire responses triggered by overdoses and suspected overdoses; incurring increased expenditures for its law enforcement, services for families and children, and the homeless, and being forced to incur the expense of services that the City of Portsmouth never before had to provide, due to the scope and nature of the opioid epidemics.

### Count VII
### Unjust Enrichment
### (Against All Defendants)

527.    Plaintiff hereby incorporates by reference all preceding paragraphs as if fully set forth herein.

528.    All Defendants received and accepted a material benefit from the City of Portsmouth's expenditure of funds for the purchase of opioid prescriptions for its insured employees under the City's workers' compensation and medical benefits plans. This material benefit and profit garnered by Defendants from opioid prescriptions purchased and paid for by Plaintiff and its residents was the expected and intended result of Defendants' conscious wrongdoing. Defendants accepted the payment without protest, retained and benefited from those payments, and have refused to voluntarily disgorge their unjust enrichment.

169

529.   At the time the City of Portsmouth made these expenditures, it did so in reliance and under the belief that it was provided with all the necessary and accurate information regarding the risks and benefits of opioid use. The City of Portsmouth relied on the truthfulness and accuracy of Defendants' misrepresentations and omissions to its detriment because it agreed to confer a benefit on Defendants, which the City of Portsmouth would not have done but for the wrongful conduct of Defendants.

530.   Retention of these benefits by each of the Defendants would be unjust.

531.   Additionally, it would be inequitable to allow the City of Portsmouth to continue to bear the cost of expenditures it was forced to make to try to support the health and safety of its residents, in the face of the opioid epidemic in its community created by all the Defendants, without shifting the full amount of those expenditures from the City of Portsmouth to the Defendants, who created and fueled the epidemics.

WHEREFORE, Plaintiff seeks all legal and equitable relief, as allowed by law, except as expressly disavowed herein, including, *inter alia*, injunctive relief, restitution, disgorgement of profits, compensatory and punitive damages, and all damages allowed by law to be paid by Defendants, attorneys' fees and costs, and pre- and post-judgment interest.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, City of Portsmouth, prays that the Court enter judgment against each Defendant, jointly and severally, in favor of the Plaintiff, as follows:

A.     Awarding compensatory damages in an amount not less than $150,000,000 or as determined at trial;

B.     Awarding punitive damages in the amount of $350,000 per defendant;

C.     Awarding treble damages, and all costs and expenses of maintaining this action, including reasonable attorneys' fees, pursuant to statute, where appropriate;

170

D.      Awarding pre- and post-judgment interest;

E.      Compelling each Defendant to disgorge all wrongfully retained enrichment, for the benefit of the Plaintiff;

F.      Preliminarily and permanently enjoining Defendants and requiring them to notify their employees, officers, directors, agents, successors, assignees, predecessors, parent or controlling entities, subsidiaries, and all heirs, beneficiaries, and assigns of Individual Defendants, and any other person acting in concert with any of the above from violating the VCPA pursuant to Va. Code Ann. §59.1-203, continuing to engage in unfair or deceptive practices or continuation of their fraud, or negligence, in violation of law, and ordering all temporary, preliminary, or permanent injunctive relief;

G.      Compelling the Defendants to abate and remove the public nuisance they have caused, by paying the Plaintiff for all costs that will be required, in the future, to abate the public nuisance; and

H.      Such other and further relief as this Court deems just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury.

DATED:  January 11, 2019          SCOTT+SCOTT
                                  ATTORNEYS AT LAW LLP

                                  _____
                                  David R. Scott (*pro hac vice* application pending)
                                  156 South Main Street
                                  P.O. Box 192
                                  Colchester, CT  06415
                                  Tel:  860-537-5537
                                  Fax:  860-537-4432
                                  david.scott@scott-scott.com

                                  Judith S. Scolnick (*pro hac vice* application pending)
                                  Donald A. Broggi (*pro hac vice* application pending)
                                  Sean T. Masson (*pro hac vice* application pending)

171

Joseph G. Cleemann (*pro hac vice* application pending)
SCOTT+SCOTT
ATTORNEYS AT LAW LLP
The Helmsley Building
230 Park Avenue, 17th Floor
New York, NY 10169
Tel: 212-223-6444
Fax: 212-223-6334
jscolnick@scott-scott.com
dbroggi@scott-scott.com
smasson@scott-scott.com
jcleemann@scott-scott.com

James A. Cales, III
FURNISS, DAVIS, RASHKIND
AND SAUNDERS, P.C.
6160 Kempsville Circle
Suite 341B
Norfolk, Virginia 23502
jcales@furnissdavis.com

*Counsel for Plaintiff the City of Portsmouth*